Sanjay Wadhwa
Michael Paley
Howard Fischer
Bennett Ellenbogen
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, NY 10281-1022
(212) 336-0589 (Fischer)
Email: FischerH@sec.gov

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | **Civil Case No.** |
| **Plaintiff,** | **Complaint** |
| v. | |
| **PREMIER HOLDING CORPORATION, RANDALL LETCAVAGE, and JOSEPH GREENBLATT,** | **Jury Trial Demanded** |
| **Defendants.** | |

Plaintiff Securities and Exchange Commission (the "Commission"), for its Complaint against Defendants Premier Holding Corporation ("Premier" or "the Company"), Randall Letcavage ("Letcavage"), and Joseph Greenblatt ("Greenblatt") (collectively, "Defendants"), alleges as follows:

### SUMMARY

1.    This case arises out of a fraudulent scheme by microcap issuer Premier, at the direction of the Company's Chief Executive Officer ("CEO") Letcavage, to mislead investors about

Premier's success and prospects, hide Premier's losses, inflate its assets and artificially prop up its stock price.

2.      Premier and Letcavage wove an illusory web of economic activity and purportedly important transactions designed to create the appearance of an active company with a vibrant business.  Thus, they orchestrated various deals while misrepresenting the value or significance of those transactions to the Company.  These transactions provided fodder for Premier and Letcavage to mislead investors about the financial health of the Company, and created opportunities for obfuscation and fraud in the Company's financial statements.

3.      In addition to devising a series of transactions with related parties with little to no economic substance, Defendants used an unsecured promissory note with a $5 million face value (the "Note") to which the Defendants assigned a value which they knew, recklessly disregarded, or should have known was incorrect.  At all relevant times, based on the Company's valuation, the Note was Premier's most significant tangible asset.  Premier and Letcavage misled investors about the value of this Note, among other things, in filings with the Commission, press releases and a shareholder letter.  Greenblatt, a formerly licensed certified public accountant ("CPA"), assisted Premier by preparing certain of its fraudulent financial statements which included a valuation of the Note that he knew, recklessly disregarded, or should have known was inadequately supported.

## VIOLATIONS

4.      Through the conduct alleged herein, Premier is liable for violating Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)], Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], and Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the

2

Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.13a-1, 240.13a-11, and 240.13a-13].

5.    Through the conduct alleged herein, Letcavage is liable (i) for violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5], Sections 13(a) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(5)] and Rules 13a-14 and 13b2-1 thereunder [17 C.F.R. §§ 240.13a-14, 240.13b2-1]; (ii) as a control person under Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Premier's violations of the Exchange Act described in paragraph 4 above; (iii) as an aider and abettor under Section 20(e) of the Exchange Act [15 U.S.C. 78t(e)] and Section 15(b) of the Securities Act [15 U.S.C. § 78o(b)] for Premier's violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)], and Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.13a-1, 240.13a-11, and 240.13a-13].

6.    Through the conduct alleged herein, Greenblatt is liable (i) for violating Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)] and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1], and (ii) as an aider and abettor under Section 20(e) of the Exchange Act [15 U.S.C. 78t(e)] and Section 15(b) of the Securities Act [15 U.S.C. § 78o(b)] for Premier's violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)], Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act, [15 U.S.C. § 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.13a-1, 240.13a-11, and 240.13a-13].

## JURISDICTION AND VENUE

7.     The Commission brings this action pursuant to authority conferred by Section

20(b) of the Securities Act [15 U.S.C. § 77t(b)] and 21(d)(1) of the Exchange Act [15 U.S.C.

§ 78u(d)(1)], and seeks to restrain and permanently enjoin Defendants from engaging in the acts,

practices, transactions, and courses of business alleged herein.  The Commission also seeks a

final judgment ordering Defendants to:  (i) disgorge their ill-gotten gains, together with

prejudgment interest thereon; and (2) pay civil monetary penalties, pursuant to Section 20(d) of

the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. §

78u(d)(3)].  In addition, as to Letcavage, the Commission also seeks a final judgment ordering an

officer and director bar and a penny stock bar pursuant to Section 20(g) of the Securities Act [15

U.S.C. § 77t(g)] and 21(d)(6) of the Exchange Act [15 U.S.C. § 78u(d)(6)].  Finally, the

Commission seeks any other relief the Court may deem just and appropriate.

8.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, Sections

20(b) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b) and 77v(a)] and Sections 21(d), 21(e),

and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

9.     Venue is proper in this District pursuant to Section 22(a) of the Securities Act [15

U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa] because acts and

transactions constituting violations alleged in this Compliant occurred within the Southern

District of New York.  For example, several investors in the Company's private placement of

securities resided in the District during the relevant timeframe.

10.     In connection with the conduct alleged in this Complaint, Defendants, directly or

indirectly, made use of the means or instrumentalities of transportation or communication in, and

the means or instrumentalities of, interstate commerce.

## DEFENDANTS

11.     **Premier** is a Nevada corporation with its principal place of business in Tustin, California.  At all relevant times, Premier described itself as a provider of a large array of energy services through its subsidiary companies.  Premier's common stock is registered with the Commission pursuant to Exchange Act Section 12(g) and is quoted on the OTC Link, operated by OTC Markets Group, Inc. and formerly known as the Pink Sheets.  The Company files periodic reports, including Forms 10-K and 10-Q, with the Commission pursuant to Exchange Act Section 13(a) and related rules thereunder.

12.     **Letcavage**, age 58, is a resident of Irvine, California.  Since October 5, 2012, he has been the Chairman, President, CEO, and Chief Financial Officer ("CFO") of Premier.  From at least January 2012 to January 2013, he also served as a "strategic consultant" to the Company

13.     **Greenblatt**, age 67, resides in Tustin, California.  From 1972 to 2000, he was a CPA licensed to practice in California.  From early 2013 until approximately October 2013, Greenblatt provided accounting services to Premier on a consulting basis, through his company G&R Financial Partners, preparing Premier's financial statement for fiscal year ("FY") 2012 and the first two quarters of FY 2013.  He also served as management's liaison to Premier's auditors.

## OTHER RELEVANT PARTIES

14.     **Anton & Chia, LLP** ("Audit Firm") is an accounting and auditing firm headquartered in Newport Beach, California, with offices elsewhere in California and, under the name Anton, Bryson & Schindler CPAs, LLP, in Vancouver, Canada.

15.     **Individual A**, age 61, resides in Laguna Hills, California.  As discussed below, he is affiliated with several entities related to this action.  He also served as a consultant to Premier

from at least January 2012 to at least January 2013, and as a director for approximately two weeks in October 2012.

16. **Individual B**, age 53, resides in Orange County, California. He was the President and CEO of Premier from April 2012 to October 2012

17. **The Power Company USA, LLC** ("TPC"), was, at all relevant times, a privately-held deregulated power broker based in Chicago, Illinois. On February 28, 2013, Premier purchased an 80% stake in TPC.

18. **Valuation Firm** is a consulting firm that provides valuations, restructuring, merger and acquisition services, SEC compliance services, interim management, and investor relations research for corporate clients. As discussed below, Premier engaged Valuation Firm to purportedly value the Note and other assets.

19. **WePower Ecolutions, Inc.** ("WePower Ecolutions") was a wholly-owned subsidiary of Premier formed in November 2011 for the purported purpose of "offer[ing] renewable energy production and energy efficiency products and services." On February 26, 2013, WePower Ecolutions' name was changed to Energy Efficiency Experts.

20. **WePower Eco Corp.** ("New Eco"), a Delaware corporation, was created in late 2012 purportedly to "offer[] renewable energy production and energy efficiency products and services to commercial middle market companies." The company is run by Individual B and located in Aliso Viejo, California.

21. **WePower, LLC** is a Delaware LLC incorporated in 2008. Individual A was the founder and served as its Chairman and CEO.

## FACTS

22.     At all relevant times, Letcavage controlled Premier and promoted the Company in filings and other statements with little concern for the accuracy of, or basis for, his representations.  As discussed below, Letcavage's scheme involved causing Premier to enter into transactions on terms which he knew or should have known had little economic substance and which served to mislead investors as to Premier's vitality and business prospects.

23.     Letcavage was responsible for all the public statements by Premier discussed herein, including all of Premier's filings, which he signed both as principal financial officer or CFO and as CEO.

24.     Greenblatt prepared Premier's financial statements for the 2012 fiscal year and the first two quarters of 2013.  He also served as Premier's primary contact with the Audit Firm in connection with the audit of the FY 2012 financial statements and the Audit Firm's reviews of the Company's financial statements for the first two quarters of FY 2013.

25.     According to the agreement between Premier and Greenblatt's company, dated January 16, 2013, the services to be provided by Greenberg's company included, "to advise [Premier] on all financial and accounting activities associated with a public company and to represent [Premier] in . . . prospective acquisitions, . . . and perform the duties that would normally be associated with a chief financial officer."

**The December 2011 Related-Party Transaction: Letcavage Takes**
**Control of Premier and Causes the Company to Buy Purported Assets**
**from Companies He and Individual A Controlled**

26.     In December 2011, Letcavage and a friend, Individual A, acquired a majority of Premier's outstanding shares, paying $175,000 in cash to the Company's then-CEO and majority shareholder.  Prior to that time, Premier was purportedly in the business of selling low-priced

caskets.  Letcavage and Individual A then caused Premier to acquire certain assets from two purported green energy companies controlled and owned, entirely or in large part, by either Letcavage (Green Central Holdings Inc.) or Individual A (WePower, LLC) in exchange for more than 30 million restricted shares of Premier stock (the "December 2011 Related-Party Transaction").

27.     Using these assets (the "Related-Party Assets"), and through a new wholly-owned subsidiary, WePower Ecolutions, Premier's business changed to providing clean energy products and services.  Letcavage and Individual A installed Individual B as CEO of WePower Ecolutions and as president and CEO of Premier.

28.     Although Premier issued a total of 30 million shares to WePower, LLC and Green Central Holdings Inc. in exchange for the Related-Party Assets, the Company never conducted any due diligence or obtained any independent valuation of the assets before entering into this transaction.  Ultimately, in Premier's 2011 Form 10-K, filed a few months after this transaction, the Company valued the Related-Party Assets at zero.

**The January 2013 Money-Losing-Operations-for-Note Swap**
**and Creation of the "$5 Million Note"**

29.     Premier's performance following the business change remained poor and its stock price plummeted throughout 2012.

30.     On or about October 5, 2012, Letcavage and Individual A arranged a management shake-up in which Letcavage became a director of Premier as well as CEO, president, treasurer, and principal accounting officer.  Company filings thereafter also referred to Letcavage on occasion as CFO, principal executive officer and principal accounting officer.

31.     Recognizing that Premier would have to report a substantial loss for FY 2012, and that a large portion of the loss would be attributable to the operations of subsidiary WePower

8

Ecolutions, Letcavage orchestrated a series of transactions to create the appearance that Premier had profits that essentially offset these losses.

32.     As part of this scheme, on January 7, 2013, Premier effectively sold certain money-losing operations of WePower Ecolutions to newly-formed New Eco, to be run by Individual B, who also agreed to resign from the Company.

33.     In exchange, New Eco gave Premier the Note, and purportedly assumed certain Premier liabilities (the "January 2013 Money-Losing-Operations-for-Note Swap").

34.     Neither the face amount nor the terms of the Note were based on any due diligence or a valuation, independent or otherwise, of the assets transferred to New Eco.  The terms of the Note were also extremely favorable to New Eco.

35.     Letcavage also knew or should have known that there was little, if any, possibility that New Eco would pay.  To the contrary, Letcavage knew or should have known that the Note was essentially worthless.  Indeed, in an October 3, 2012 email to Individual A, Letcavage confided, "I believe the [WePower Ecolutions] spinoff will result in nothing to our investors."

36.     Despite Letcavage's knowledge or reckless disregard that the Note would have little, if any, value, he began to tout the Note as early as December 2012 – even before the transaction was final – as a sign of the Company's imminent turn-around.  For example, on December 5, 2012, Premier announced, "[Premier] has reached an agreement in principle to sell certain assets to WePOWER Eco Corp., a newly formed entity, controlled by [Individual B]… for a $5,000,000 promissory note."

37.     Further, in a December 27, 2012 letter to shareholders, Letcavage declared, as part of the Company's plan to "fast-track [the] turnaround" he had initiated since taking over,

that he expected that Premier "could add more than $13,000,000 in assets" of which $5 million in "assets" was attributable to the Note.

**Defendants "Transform" a Loss Into a Gain**

38.     After the deal closed, Premier repeatedly and inaccurately reported, in filings with the Commission, that the Note had a value of $869,000.  Although this valuation was inconsistent with Generally Accepted Accounting Principles ("GAAP"), Defendants used the $869,000 number to enable Premier to mislead investors about the success of its operations.

39.     In its audited financial statements for the fiscal year ended December 31, 2012, filed on Form 10-K on April 22, 2013, prepared by Greenblatt and signed by Letcavage as CEO and principal financial officer, Premier reported a net loss of over $2 million, of which approximately 35% was reported as a loss from the operations of WePower Ecolutions.

40.     The 2012 Form 10-K also reported the January 2013 Money-Losing-Operations-for-Note Swap, as a subsequent event, falsely reporting that the Note, received by Premier in this transaction, had a "preliminary valuation" of $869,000.

41.     The filing also falsely stated that the We Power Ecolutions assets being sold to New Eco "have been conservatively valued at approximately $869,000."

42.     On March 28, 2013, Greenblatt emailed a friend, "[C]urrently I'm trying to get the note appraised so that our 10K for 2012 shows at least a break even on [the WePower] venture."

43.     On May 22, 2013, a week before Premier's Form 10-Q for the first quarter of 2013 was filed, Greenblatt texted Letcavage, reporting: "[Greenblatt's associate] just talked to the auditors and they apparently are buying the 869000 valuation."

44.     Through this contrivance – reporting that Premier had obtained a Note valued at $869,000 along with the purported elimination of debt in the January 2013 Money-Losing-

Operations-for-Note Swap – the Form 10-Q for the first quarter of FY 2013 falsely reported net quarterly income of $466,147, instead of reporting a loss.

45.     Not only were the same inflated balance sheet and income statement numbers repeated in Premier's second- and third-quarter financial statements and its audited FY 2013 financial statements, Premier also failed to evaluate the Note for impairment as required by GAAP. In each instance, the purported $869,000 value of the Note was Premier's largest tangible asset, constituting at least 12% of the company's total assets.

46.     The misleading valuation of the Note ultimately resulted in the overstatement of the Company's income for FY 2013 by almost $1,000,000 and by at least 12.5% in each quarter of FY 2013.

47.     Contrary to the Defendants' representations about the value of the Note in Commission filings, internally the Defendants treated the Note as worthless. For example, Premier never attempted to collect on the Note or to properly account for the Note on its books.

**Disingenuous Origin of the $869,000 Valuation**

48.     The $869,000 figure was the largest of three figures that appeared on Excel spreadsheets provided to Premier by a Valuation Firm retained by Premier for the purported purpose of valuing the Note. These spreadsheets, which Premier later characterized as a "preliminary valuation," simply illustrated the Valuation Firm's valuation models, as applied to unsupported revenue projections for New Eco.

49.     The Valuation Firm sought updated revenue projections and support for such projections from New Eco, and sought Premier's help in getting such information. The Valuation Firm needed to value New Eco (the borrower) because the collectability of the Note was dependent on the borrower's ability to pay as the Note was unsecured and not guaranteed.

11

However, New Eco never provided the requested information nor did Premier assist the Valuation Firm in obtaining the needed information.

50.     Indeed, the principal of the Valuation Firm reached out to Premier management repeatedly in Spring 2013 to emphasize the importance of verifying the assumptions used in the spreadsheets and obtain supporting documentation, and cautioned that absent such information any fair value figure shown on the spreadsheets could not be relied upon.  Premier ignored this warning.

51.     In a March 29, 2013 email, the principal of the Valuation Firm asked an officer of Premier to call him to discuss "the projections and what support exists relative to the revenues." He specifically cautioned the Premier officer in this email about relying on the spreadsheets, explicitly warning him: "This preliminary valuation is not to be quoted at this time."

52.     On April 24, 2013, having received no response from Premier, the principal of the Valuation Firm emailed the officer again, as well as Greenblatt and Greenblatt's partner, stating, "As detailed in the [March 29th] e-mail below, there were several issues related to the . . . Note valuation.  Before we issue a report, we would like some input on the assumptions. . . "

53.     Consequently, Letcavage and Greenblatt knew or should have known that the Valuation Firm was seeking information in order to value the Note.  They knew or should have known that the Valuation Firm could not complete its analysis or provide a reliable valuation of the Note without the information sought.

54.     Nevertheless, Letcavage repeated the misleading Note valuation in a May 30, 2013 earnings release, trumpeting the Company's "dramatic" turnaround, boasting that the January 2013 Money-Losing-Operations-for-Note Swap had made the Company profitable:

> [Premier] announced today that its turnaround is dramatic and the company is able to provide positive results and a status report to

shareholders that demonstrates Premier's path to building the company.
*** Premier also picked up $869,000 [ ] in revenue from the disposition of
the assets ... [which] produced net income of $466,147 [ ] in the most
recent quarter, certainly a vast improvement from Q1 2012 which showed
a net loss of $452,330 ...
***
[The quarterly results] "demonstrate results from the new management led
by Letcavage, who took control of the company in October of 2012."

55.     The Valuation Firm ultimately valued the Note at zero, in a draft valuation report

dated April 9, 2014.  The report stated that "the fair market value of the Note as of [January 7,

2013] is reasonably represented as **$0**, based on the following:" (Emphasis in original.)

- The Note is unsecured and secondary to all secured debt obtained by
  the Borrower.

- The Note is for 20 years with no principal payment for 5 years.  The
  interest rate is significantly below market at 2% with interest payments
  deferred until 11 months after issuance.

- The Note was issued by a start-up company (incorporated in late 2012)
  with no known assets other than those obtained [in the transaction with
  Premier].

- The Note was issued by a company with no known revenues.

- The Note was issued by a company with undisclosed and unknown
  quantity of secured and unsecured liabilities.

- The Assets transferred generated no revenue for [Premier] in 2012.

- The Assets transferred were operated by the Borrower in 2011 and
  generated a net loss in excess of $750,000.

- The Borrower refused to provide any information regarding its
  financial status.

**The  February 2013 TPC Transaction**

56.     On February 28, 2013, Premier acquired an 80% interest in TPC, a privately-held

deregulated power broker, along with an option to purchase the remaining 20% interest within

120 days, in exchange for 30 million shares of Premier common stock (the "TPC Transaction").

57.     While Premier apparently acquired some actual assets (contracts to provide

customers with energy) in the TPC Transaction, Premier's public statements about those assets

13

were misleading and inconsistent.  For example, Premier and Letcavage (and Greenblatt, for the first quarter 2013 Form 10-Q) showed little concern for providing a coherent or reliable description of the transaction to investors.  For example, with respect to the number of customers or clients TPC had at the time of the transaction, Premier stated:

- TPC had "over 12,000 residential and commercial customers." (Form 10-Q for the first quarter of 2013, filed May 30, 2013);
- "On the date of acquisition, TPC had over 14,000 clients . . ." ( 2013 Form 10-K, filed April 15, 2014);
- "On the date of acquisition, TPC had a *tremendous number* of clients." (Emphasis added.) (2014 Form 10-K, filed April 15, 2015);
- "By the end of the first quarter of 2013, TPC had over 11,000 clients. . . ." (2016 Form 10-K, filed on April 14, 2016).

58.     Premier was again more interested in generating positive news for the Company than in providing accurate information.  Thus, in the May 30, 2013 earnings release trumpeting Premier's "dramatic turnaround," in which the Company announced positive results for the quarter and trumpeted the Company's turnaround, Premier also falsely stated that there was a "preliminary" valuation of $4,500,000 of some of the contracts Premier had acquired in the TPC Transaction.

**Premier Improperly Accounted for Its TPC Stake**

59.     In its financial statements for the first three quarters of 2013 and its audited FY 2013 financial statements, Premier valued its interest in TPC at $4.5 million – the purported value of the 30 million shares issued to the sellers as consideration for the acquisition – and allocated the entire amount to goodwill, which then constituted a majority of Premier's assets.

60.     In its financial statements, the Company explained that it had allocated the $4.5 million amount to goodwill because an independent valuation of the identifiable assets and liabilities it had acquired was "still in process."  Premier did not disclose that it was actually

14

preventing the Valuation Firm from completing its work by failing to provide the firm with the needed information.

61.     Premier's accounting for its stake in TPC did not conform to GAAP in several respects. First, according to ASC 805, *Business Combinations*, before recognizing goodwill from an acquisition, all identifiable assets and liabilities acquired (including identifiable intangible assets) must be assigned a portion of the purchase price based on their fair value. Only after this valuation of, and allocation to, identifiable assets is performed can the remaining unallocated purchase price be recorded as goodwill.

62.     If, as the company represented in public statements around the time of the TPC Transaction, Premier had acquired certain customer contracts and receivables that purportedly had value, in order to comply with GAAP the company should have assigned a portion of the purported purchase price to such assets.

63.     Second, after recording the $4.5 million in goodwill for its stake in TPC, Premier later failed to adequately assess that goodwill for impairment, in accordance with ASC 350-20, *Goodwill, Subsequent Measurement*. For example, Premier determined, incorrectly, that as of December 31, 2013, the $4.5 million of goodwill attributable to its TPC stake – which constituted approximately 99% of its goodwill and 65% of its total assets reported as of December 31, 2013 – was not impaired. It was not until the fourth quarter of 2014 that Premier recognized any impairment to its TPC-related goodwill.

**The February 2014 Note-for-Stock Swap**

64.     The first payment on the Note – an interest payment of $50,000 – was due on December 7, 2013. The Company made no effort to collect on the Note and New Eco failed to make the payment.

15

65. The Note went into default on December 22, 2013.

66. Without assessing the Note for impairment or collectability, Premier continued to report the Note as an asset valued at $869,000 on its December 31, 2013 balance sheet.

67. When the Audit Firm requested Premier's assistance in obtaining a valuation report reflecting the Valuation Firm's completed analysis of the Note, for the purposes of auditing management's valuation of the Note, Letcavage refused to provide any further information. Instead Letcavage devised a further transaction with Individual A; and on or about February 27, 2014, Premier "sold" the Note to WePower LLC (Individual A's company) in exchange for the return of 2.5 million shares of Premier common stock held by WePower LLC (the "February 2014 Note-for-Stock Swap").

68. Like the December 2011 Related-Party Transaction, the January 2013 Money-Losing-Operations-for-Note Swap and the TPC Transaction in February 2013, the February 2014 Note-for-Stock Swap was not based on any meaningful appraisal of the relevant assets and no cash changed hands.

69. While Premier disclosed the February 2014 Note-for-Stock Swap as a subsequent event in its 2013 financial statements, it failed to disclose that the Note was in default.

70. Ultimately, the transaction amounted to little more than another contrivance to obscure Premier's true financial condition, including its poor results for 2013, and to create a misleading impression of commercial vitality.

## Premier's Failure to Make Required Disclosures About Letcavage's "Perks"

71. Public companies are legally required to make detailed disclosures about the compensation paid to certain executive officers, including CEO's like Letcavage. This includes

disclosure about perks – i.e., benefits with a direct or indirect benefit that has a personal aspect, as opposed to benefits integrally and directly related to the performance of an executive's duties.

72.     Letcavage received over $277,000 in salary and consulting fees from Premier in 2013, as well as certain other payments that were disclosed.  According to Premier's 2013 Form 10-K, Letcavage (directly or through related entities) was paid $240,000 as compensation for his role as our CEO and CFO, and $37,500 for consulting, for a total of $277,500, and $661,319 for contract labor, including payments to Nexalin Technology ("Nexalin") specifically for the direct costs related to independent contractors performing sales lead generation.  In addition, the Company also paid $28,787 to iCapital Advisory for consulting services received during the year 2013.  Mr. Letcavage is president and shareholder of iCapital Advisory. Nexalin is owned by Letcavage.

73.     In addition to these substantial fees, throughout 2013, Letcavage received, at Premier's expense, extensive "perks" that were not properly disclosed. These included funds for private airfare and hotel stays, restaurants and other forms of entertainment, clothing, beauty and spa-related activities, personal car expenses, and other similar costs which should have been disclosed as perks.

## FIRST CLAIM FOR RELIEF
### Violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5
### (Premier and Letcavage)

74.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 73, above, as though fully set forth herein.

75.     Between December 5, 2012 and at least April 15, 2014, these defendants, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or the facility of a national securities exchange, in connection with the purchase or sale of securities,

and with knowledge or recklessness:  (a) employed devices, schemes, or artifices to defraud;

(b) made untrue statements of material fact or omitted to state material facts necessary to make

the statements made, in light of the circumstances under which they were made, not misleading;

and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a

fraud or deceit upon any person.

76.     By reason of the foregoing, Premier and Letcavage, singly or in concert, directly

or indirectly, have violated, and unless enjoined will again violate, Section 10(b) of the

Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### SECOND CLAIM FOR RELIEF
#### Violations of Section 17(a) of the Securities Act
#### (Premier and Letcavage)

77.     The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 73, above, as though fully set forth herein.

78.     Between December 5, 2012 and at least April 15, 2014, defendants Premier and

Letcavage, directly or indirectly, by use of the means or instruments of interstate commerce, or

of the mails, or the facility of a national securities exchange, in connection with the offer or sale

of securities, and with knowledge or recklessness:  (a) employed devices, schemes, or artifices to

defraud; (b) obtained money or property by means of untrue statements of material fact, or has

omitted, and is omitting, to state material facts necessary in order to make statements made, in

light of the circumstances under which they were made, not misleading; and (c) engaged in

transactions, practices, or courses of business which operated or would operate as a deceit upon

any person.

79.     By reason of the foregoing, defendants Premier and Letcavage violated Section

17(a) of the Securities Act [15 U.S.C. § 77q(a)].

18

## THIRD CLAIM FOR RELIEF
### Violation of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act
### (Premier)

80.     The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 73, above, as though fully set forth herein.

81.     Between December 5, 2012 and at least April 15, 2014, Premier violated Section

13(b)(2)(A) of the Exchange Act by failing to make and keep books, records, and accounts,

which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its

assets.

82.     Moreover, Premier lacked a system of internal accounting controls sufficient to

provide reasonable assurance that, among other things, transactions were recorded as necessary

to permit the preparation of financial statements in conformity with GAAP, and thereby directly

violated Section 13(b)(2)(B) of the Exchange Act.

83.     By reason of the foregoing, Premier violated, and unless enjoined will continue to

violate, Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A)

and 78m(b)(2)(B)].

## FOURTH CLAIM FOR RELIEF
### Violations of Section 13(a) of the Exchange Act and Exchange Act Rules 13a-1,
### 13a-11, and 13a-13
### (Premier)

84.     The Commission realleges and incorporates by reference each and every

allegation contained in paragraphs 1 through 73, above, as though fully set forth herein.

85.     Between December 5, 2012 and at least April 15, 2014, defendant Premier

violated, and unless enjoined will continue to violate, Section 13(a) of the Exchange Act [15

U.S.C. § 78m(a)] and Rules 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.13a-1 and 240.13a-

13], by filing annual reports and quarterly reports that contained financial statements that

contained material misstatements, as described above.

86.     Between December 5, 2012 and at least April 15, 2014, defendant Premier also violated, and unless enjoined will continue to violate, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 13a-11 thereunder [17 C.F.R. § 240.13a-11], by failing to timely file accurate current reports on Form 8-K.

## FIFTH CLAIM FOR RELIEF
### Violation of Section 13(a) of the Exchange Act and Exchange Act Rule 13a-14
### (Letcavage)

87.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 73, above, as though fully set forth herein.

88.     Exchange Act Rule 13a-14 mandates that an issuer's principal executive officer and principal financial officer certify to the best of his or her knowledge that there are no untrue statements of material fact or omissions of material fact in the periodic reports.

89.     By reason of the foregoing, Letcavage violated, and unless enjoined will continue to violate, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 13a-14 thereunder [17 C.F.R. § 240.13a-14], by knowingly making untrue statements in Premier's periodic reports filed with the Commission.

## SIXTH CLAIM FOR RELIEF
### Violation of Section 13(b)(5) of the Exchange Act and Exchange Act Rule 13b2-1
### (Letcavage and Greenblatt)

90.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 73, above, as though fully set forth herein.

91.     In 2012 and 2013, while acting as officers and/or directors of Premier, defendants Letcavage and Greenblatt, based upon the facts set forth above, violated Section 13(b)(5) of the

Exchange Act when they knowingly circumvented or knowingly failed to implement a system of internal accounting controls and knowingly falsified the books, records or accounts of Premier.

92.     By reason of the foregoing, Letcavage and Greenblatt violated, and unless enjoined will continue to violate and cause violations of, Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)], and Rule 13b2-1 thereunder [17 C.F.R. § 240.13b2-1].

**SEVENTH CLAIM FOR RELIEF**
**Control Person Liability for Premier's Violations of Section 10(b)**
**of the Exchange Act and Exchange Act Rule 10b-5**
**(Letcavage)**

93.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 73, above, as though fully set forth herein.

94.     Between December 5, 2012 and at least April 15, 2014, Premier, directly or indirectly, by use of the means or instruments of interstate commerce, or of the mails, or the facility of a national securities exchange, in connection with the purchase or sale of securities, and with knowledge or recklessness: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of material fact or omitted to state material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

95.     By reason of the foregoing, Premier singly or in concert, directly or indirectly, have violated, and unless enjoined will again violate, Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

96.     At all times relevant hereto, Letcavage was a controlling person of Premier for the purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

97.     Letcavage knowingly or recklessly engaged in fraudulent conduct that resulted in

Premier's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

98.     By reason of the foregoing, Letcavage is liable as a controlling person pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Premier's violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**EIGHTH CLAIM FOR RELIEF**
**Control Person Liability for Premier's Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act**
**(Letcavage)**

99.     The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 73, above, as though fully set forth herein.

100.     Between December 5, 2012 and at least April 15, 2014, Premier violated Section 13(b)(2)(A) of the Exchange Act by failing to make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflected the transactions and dispositions of its assets.

101.     Moreover, Premier lacked a system of internal accounting controls sufficient to provide reasonable assurance that, among other things, transactions were recorded as necessary to permit the preparation of financial statements in conformity with GAAP, and thereby directly violated Section 13(b)(2)(B) of the Exchange Act.

102.     By reason of the foregoing, Premier violated, and unless enjoined will continue to violate, Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

103.     At all times relevant hereto, Letcavage was a controlling person of Premier for the purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

104.     Letcavage knowingly or recklessly engaged in fraudulent conduct that resulted in

Premier's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

105.    By reason of the foregoing, Letcavage is liable as a controlling person pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Premier's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

## NINTH CLAIM FOR RELIEF
**Control Person Liability for Premier's Violations of Section 13(a) of the Exchange Act and Exchange Act Rules 13a-1, 13a-11, and 13a-13**
**(Letcavage)**

106.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 73, above, as though fully set forth herein.

107.    Between December 5, 2012 and at least April 15, 2014, defendant Premier violated, and unless enjoined will continue to violate, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 13a-1 and 13a-13 thereunder [17 C.F.R. §§ 240.13a-1 and 240.13a-13], by filing annual reports and quarterly reports that contained financial statements that contained material misstatements, as described above.

108.    Between December 5, 2012 and at least April 15, 2014, defendant Premier also violated, and unless enjoined will continue to violate, Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rule 13a-11 thereunder [17 C.F.R. § 240.13a-11], by failing to timely file accurate current reports on Form 8-K.

109.    At all times relevant hereto, Letcavage was a controlling person of Premier for the purposes of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)].

110.    Letcavage knowingly or recklessly engaged in fraudulent conduct that resulted in Premier's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 13a-1,

13a-11 and 13a-13 thereunder [17 C.F.R. §§ 240.13a-1, 240.13a-11, 240.13a-13].

      111.    By reason of the foregoing, Letcavage is liable as a controlling person pursuant to Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] for Premier's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 13a-1, 13a-11 and 13a-13 thereunder [17 C.F.R. §§ 240.13a-1, 240.13a-11, 240.13a-13].

**TENTH CLAIM FOR RELIEF**
**Aiding and Abetting Liability for Premier's Violations of Sections**
**17(a)(2) and 17(a)(3) of the Securities Act**
**(Letcavage and Greenblatt)**

      112.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 73, above, as though fully set forth herein.

      113.    Between December 5, 2012 and at least April 15, 2014, defendant Premier, in the offer or sale of securities, by the use of the means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly, (a) obtained money or property by means of untrue statements of material fact or omissions to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; (b) obtained money or property by means of untrue statements of material fact, or has omitted, and is omitting, to state material facts necessary in order to make statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchasers of such securities. By reason of the conduct alleged above, Premier violated Section 17(a)(2) and (3) of the Securities Act [15 U.S.C. § 77q(a)].

      114.    Letcavage and Greenblatt aided and abetted certain of Premier's violations of Sections 17(a)(2) and (3) of the Securities Act [15 U.S.C . § 77q(a)(2) and (3)].

24

## ELEVENTH CLAIM FOR RELIEF
### Aiding and Abetting Liability for Premier's Violations of
### Sections 13(b)(2)(A) and 13(B)(2)(B) of the Exchange Act
### (Letcavage and Greenblatt)

115.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 73, above, as though fully set forth herein .

116.    Premier violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

117.    Letcavage and Greenblatt aided and abetted certain of Premier's violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. § § 78m(b)(2)(A) and 78m(b)(2)(B)], pursuant to Section 20(e) of the Exchange Act [15 U.S.C. § 78t(e)].

## TWELFTH CLAIM FOR RELIEF
### Aiding and Abetting Liability for Premier's Violations of Section 13(a) of the Exchange Act
### and Exchange Act Rules 13a-1, 13a-11, and 13a-13
### (Letcavage and Greenblatt)

118.    The Commission realleges and incorporates by reference each and every allegation contained in paragraphs 1 through 73, above, as though fully set forth herein.

119.    Premier violated Section 13(a) of the Exchange Act [1 5 U.S.C. § 78m(a)] and Rules 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R.§§ 240.13 a-1, 240.13a-11, and 240.13a-13].

120.    By virtue of the foregoing, Letcavage and Greenblatt aided and abetted certain of Premier's violations of Sections 13(a) of the Exchange Act [1 5 U.S.C. § 78m(a)] and Rules 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R.§§ 240.13 a-1, 240.13a-11, and 240.13a-13].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court:

### I.

Enter judgment in favor of the Commission finding that Premier, Letcavage, and Greenblatt each violated the federal securities laws and Commission rules as alleged in this Complaint;

### II.

Permanently enjoin Premier, Letcavage, and Greenblatt from committing the violations of the federal securities laws alleged against them in this Complaint, and permanently enjoin Letcavage and Greenblatt from aiding and abetting or otherwise engaging in conduct that would make them secondarily liable for the violations of the federal securities laws alleged as to them in this Complaint;

### III.

Order Premier, Letcavage, and Greenblatt to disgorge the ill-gotten gains received as a result of the violations alleged in this Complaint, and ordering each of them to each pay prejudgment interest thereon;

### IV.

Order Premier, Letcavage, and Greenblatt to pay civil monetary penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78 u(d)(3)];

**V.**

Order Letcavage to be barred from serving as an officer and director of a public company

pursuant to Securities Act Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section

21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

**VI.**

Order Letcavage to be barred from participating in any offering of penny stock pursuant

to Section 20(g) of the Securities Act [15 U.S.C. § 77t(g)] and Section 21(d)(6) of the Exchange

Act [15 U.S.C. § 78u(d)(6)]; and

**VII.**

Grant such other and further relief as this Court deems just and proper.

**<u>DEMAND FOR JURY TRIAL</u>**

The Commission hereby demands a trial by jury pursuant to Rule 38(b) of the Federal

Rules of Civil Procedure.

Dated:       New York, NY
             December 4, 2017

By:    _Sanjay Wadhwa_____

Sanjay Wadhwa
Howard Fischer
*Attorney for Plaintiff*
SECURITIES AND EXCHANGE COMMISSION
Brookfield Place, 200 Vesey Street, Room 400
New York, NY  10281-1022
(212) 336-0589
Email: FischerH@sec.gov

*Of Counsel*:
Michael Paley
Bennett Ellenbogen

27