ALEXANDER VASILESCU (N.Y. Bar No. 227054) (admitted *pro hac vice*)
Email:  Vasilescua@sec.gov
BENNETT ELLENBOGEN (N.Y. Bar No. 2342772) (admitted *pro hac vice*)
Email:  Ellenbogenb@sec.gov
AMY JANE LONGO (Cal. Bar No. 198304)
Email:  longoa@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Brookfield Place
200 Vesey St., Suite 400
New York, NY 10281
Telephone: (212) 336-1100
Facsimile: (212) 336-1324

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>Plaintiff,<br><br>vs.<br><br>PREMIER HOLDING CORPORATION, RANDALL LETCAVAGE, and JOSEPH GREENBLATT,<br><br>Defendants. | Case No. 18:00813-(CJC)-(KES)<br><br>**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTIONS FOR A PRECLUSION ORDER AND SUMMARY JUDGMENT AGAINST RANDALL LETCAVAGE AND PREMEIR HOLDING CORPORATION**<br><br>**Date:       November 16, 2020**<br>**Time:         1:30 p.m.**<br>**Courtroom:  9B**<br>**Before the Honorable Cormac J. Carney** |

# TABLE OF CONTENTS

**Page(s)**

I.   SUMMARY OF THE UNDISPUTED FACTS ..................................................... 2

   A.  Defendants Assigned a Value to the Note In Premier's Financial Statements Which They Knew, Recklessly Disregarded, or Should Have Known Was Incorrect .............................. 3

   B.  Defendants Made False Statements and Omitted to Disclose Material Facts Regarding Letcavage's Compensation and Perks ......................................... 9

   C.  Defendants Misleadingly Identified and Valued its Purchase of the Power Company Usa, LLC ................................................................................... 10

   D.  Steps to Obfuscate and Delay ...................................................... 12

II.  ARGUMENT ......................................................................... 13

   A.  The Court Should Preclude Defendants From Putting Forth Testimony from Letcavage Or Other Evidence Relating To His Refusal To Answer Questions At His July 15 Deposition And Should Also Draw An Adverse Inference Based On Letcavage's Invocation Of The Fifth Amendment Privilege ....................... 13

   B.  Summary Judgment Standard ....................................................... 20

   C.  Premier and Letcavage Made Material Misrepresentations in Violation of Securities Act Section 17(a) and Exchange Act Section 10(b) and Rule 10b-5(b) .......................................................................... 21

     1.  The Legal Standards .............................................................. 21

     2.  The Misrepresentations .......................................................... 23

     3.  Premier and Letcavage Acted Knowingly and Recklessly ......................... 25

   D.  Letcavage And Premier Engaged in a Fraudulent Scheme in Violation of Securities Act Sections 17(a)(1) and 17(a)(3) and Exchange Act Section 10(b) and Rules 10b-5(a) And (c) .......................................................... 27

   E.  Letcavage is Liable, as a Control Person, for Premier's Violations of the Antifraud Provisions under the Exchange Act ..................................... 28

   F.  Letcavage Aided and Abetted Premier's Violations of Securities Act Sections 17(a)(2) and 17(a)(3) ........................................................... 29

   G.  Premier Violated, and Letcavage Aided and Abetted, Premier's Violations of Reporting Provisions of the Exchange Act and Letcavage Violated Exchange Act Rule 13a-14 ...................................................................... 30

   H.  The Court Should Issue the Relief Sought by the SEC ............................. 32

III.  CONCLUSION ....................................................................... 36

# TABLE OF AUTHORITIES

**CASES**                                                                                                    **Page(s)**

*Aaron v. SEC*, 446 U.S. 680 (1980)......................................................................................22, 28

*Ames Dep't Stores Inc. Stock Litig.*, 991 F.2d 953 (2d Cir. 1993).......................................23

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .........................................................21

*Basic, Inc. v. Levinson*, 485 U.S. 224, 232 (1988)............................................................22, 24

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ................................................................ 20-21

*Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258 (9th Cir. 2000)...............................15

*Fed. Deposit Ins. Corp. v. N.H. Ins. Co.*, 953 F.2d 478 (9th Cir. 1991).....................2 n.3

*Fraser v. Goodale*, 342 F.3d 1032 (9th Cir. 2003) ..........................................................2 n.3

*FTC v. Sharp*, 782 F. Supp. 1445 (D. Nev. 1991) .............................................................14

*Hauser v. Farrell*, 14 F.3d 1338 (9th Cir. 1994) ..............................................................29

*Hollinger v. Titan Capital Corp.*, 914 F.2d 1564 (9th Cir. 1990) ....................................22

*Howard v. Everex Sys.*, 228 F.3d 1057 (9th Cir. 2000) .....................................................29

*Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011)...................21

*Laperriere v. Vesta Ins. Group, Inc.*, 526 F. 3d. 715 (11th Cir. 2008).............................29

*Lorenzo v. SEC*, 139 S. Ct. 1094 (2019)................................................................................21

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).....................21

*Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903 (9th Cir. 2008) ................................ 13-14, 15

*Sanchez v. Vild*, 891 F.2d 240 (9th Cir. 1989).....................................................................21

*Scholastic Corp. Sec. Litig.*, 252 F.3d 63 (2d Cir. 2001)....................................................22

*SEC v. Abellan*, 674 F. Supp. 2d 1213 (W.D. Wash. 2009) ..............................................35

*SEC v. Alliance Transcription Servs.*, 2010 U.S. Dist. LEXIS 10646, Fed. Sec. L. Rep. (CCH) P95,598 (D. Ariz. Feb. 8, 2010)....................................................................... 34-35

*SEC v. Apuzzo*, 689 F. 3d 204 (2d Cir. 2012) ................................................................ 29-30

*SEC v. Aqua Vie Beverage Corp.*, No. CV 04–414–S–EJL, 2008 WL 1914723 (D. Id. Apr. 29, 2008) ........................................................................................................33

*SEC v. Benson*, 657 F. Supp. 1122 (S.D.N.Y. 1987)......................................................13, 14

*SEC v. Colello*, 139 F.3d 674 (9th Cir. 1998)...................................................................15

*SEC v. Fehn*, 97 F.3d 1276 (9th Cir. 1996) ...........................................................29, 32

*SEC v. First Pacific Bancorp*, 142 F.3d 1186 (9th Cir. 1998)...........................33, 34, 35

*SEC v. Global Express Capital Real Estate Inv. Fund I, LLC*, No. 2:03-CV-01514-KJD-LRL, 2006 WL 7347289 (D. Nev. March 28, 2006), *rev'd in part, aff'd in part*, 289 Fed. Appx. 183 (9th Cir. 2008).................................................................14, 16

*SEC v. Ginder*, 752 F. 3d 569 (2nd Cir. 2014) ...............................................................28

*SEC v. IMC International, Inc.*, 384 F. Supp. 889 (N.D. Texas), *aff'd mem.*, 505 F.2d 733 (5th Cir. 1974)...............................................................................................................30

*SEC v. Interlink Data Network of Los Angeles, Inc.,* No. 93-3073 R, 1993 WL 603274 (C.D. Cal. Nov. 15, 1993)...............................................................................................14

*SEC v. Lauer*, No. 03-80612-CIV, 2008 WL 4372896 (S.D. Fla. Sept. 24, 2008) ..........................17

*SEC v. Levine*, 517 F.Supp.2d 121 (D.D.C. 2007) ................................................33 n.14

*SEC v. Luna*, No. 2:10-CV-2166-PMP-CWH, 2014 WL 794202 (D. Nev. Feb. 26, 2014) ...................................................................................15, 16, 17

*SEC v. Lund,* 570 F. Supp.1397 (C.D. Cal. 1983) ..........................................................35

*SEC v. Manor Nursing Centers*, 458 F.2d 1082 (2d Cir. 1972) ......................................22

*SEC v. McNulty*, 137 F.3d 732 (2d Cir. 1998) .........................................................22, 30

*SEC v. Murphy*, 626 F.2d 633 (9th Cir. 1980) .........................................................22, 24

*SEC v. Patel*, 61 F.3d 137 (2d Cir. 1995) ...............................................................33, 35

*SEC v. Posner*, 16 F.3d 520 (2d Cir. 1994) ...................................................................33

*SEC v. Rana Research, Inc.,* 8 F.3d 1358 (9th Cir. 1993) ..........................................22-23

*SEC v. Softpoint, Inc.*, 958 F. Supp. 846 (S.D.N.Y. 1997), *aff'd without opinion*, 159 F.3d 358 (2d Cir. June 29, 1998) ....................................................................14 n.10

*SEC v. Zandford*, 122 U.S. 1899 (2002) .........................................................................22

*Steadman v. SEC*, 603 F.2d 1126 (5th Cir.1979)...........................................................35

*Take Two Interactive Secs. Litig.*, 551 F. Supp.2d 247 (S.D.N.Y. 2008)...........................24

*Taylor v. List*, 880 F.2d 1040 (9th Cir. 1989) ...............................................................21

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438 (1976) .....................................22, 24

*United States v. Sumitomo Marine & Fire Ins. Co., Ltd.*, 617 F.2d 1365 (9th Cir. 1980)......... 16-17

**U.S. CONSTITUTION**

U.S. Const. amend. V ........................................................................................*passim*

**FEDERAL RULES OF CIVIL PROCEDURE**

Fed. R. Civ. P. 30(B)(6) ...........................................................................10, 18, 19, 20

Fed. R. Civ. P. 56(a) .................................................................................................20

**STATUTES**

15 U.S.C. § 77o(b) .....................................................................................................29

15 U.S.C. § 77q(a) ..............................................................................................*passim*

15 U.S.C. § 77q(a)(2) and (3) ...........................................................1, 21, 22, 29

15 U.S.C. § 77t(b) .....................................................................................................32

15 U.S.C. § 77t(d) .....................................................................................................35

15 U.S.C. § 77t(e) ......................................................................................................33

15 U.S.C. § 77t(g) .....................................................................................................34

15 U.S.C. § 78c(a)(51) .......................................................................................34 n.15

15 U.S.C. § 78j(b) ..............................................................................................*passim*

15 U.S.C. § 78l ...........................................................................................................30

15 U.S.C. § 78m(a) ............................................................................................1, 30, 31

15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B) ...........................................................1

15 U.S.C. § 78m(b)(5) .................................................................................................1

15 U.S.C. 78t(a) ...............................................................................................1, 28, 29

15 U.S.C. § 78t(e) .................................................................................................29, 30

15 U.S.C. § 78u(d) ....................................................................................32, 33, 34, 35

15 U.S.C. § 7241 ..........................................................................................31, 32, 33 n.14

**CODE OF FEDERAL REGULATIONS**

17 C.F.R. § 229.601(b)(31).................................................................................... 31-32

17 C.F.R. § 230.405 ............................................................................................... 28-29

17 C.F.R. § 240.3a51-1 ........................................................................................ 34 Fn.15

17 C.F.R. § 240.10b-5 ................................................................................................*passim*

17 C.F.R. §§ 240.13a-1, 240.13a-11 and 240.13a-13 .........................................1, 30, 31

17 C.F.R. § 240.13a-14 .......................................................................................1, 31, 32

17 C.F.R. § 240.13b2-1 ..................................................................................................1

17 C.F.R. § 242.600(b)(47) ...................................................................................34 n.15

## **TREATISES**

*Restatement (Second) of Torts* § 282 (1965) ..................................................................22

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

The Securities and Exchange Commission ("SEC" or "Plaintiff") respectfully moves for summary judgment against defendants Randall Letcavage ("Letcavage") and Premier Holding Corporation ("Premier," and together "the Defendants").[1]

Letcavage is liable for violating: (i) Section 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. § 77q(a)]; (ii) Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and (iii) Sections 13(a) and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78m(a) and 78m(b)(5)] and Rules 13a-14 and 13b2-1 thereunder [17 C.F.R. §§ 240.13a-14 and 240.13b2-1]. Letcavage is also liable as a control person, pursuant to Section 20(a) of the Exchange Act [15 U.S.C. 78t(a)], for Premier's violations of (i) Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; (ii) Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act; (iii) Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)]  and Rules 13a-1, 13a-11 and 13a-13 [17  C.F.R. §§ 240.13a-1, 240.13a-11 and 240.13a-13] thereunder.   Letcavage is also liable for aiding and abetting Premier's violations of: (i) Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. § 77q(a)(2) and (3)]; (ii) Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Rules 13a-1, 13a-11and 13a-13 [17  C.F.R. §§ 240.13a-1, 240.13a-11and 240.13a-13] thereunder; and (iii) Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

Premier is liable for violating: (i) Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)]; (ii) Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]; and (iii) Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A), and 78m(b)(2)(B)] and Rules 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.13a-1, 240.13a-11, and 240.13a-13].

Summary judgement should be granted against Letcavage and Premier, as Letcavage, the Chairman, President, CEO and CFO of Premier, refused to testify during his July 15, 2020 deposition based on his Fifth Amendment Privilege and, based on the documents and Letcavage's

---

[1] The Court previously granted summary judgment against the other defendant, Joseph Greenblatt ("Greenblatt"). *See* (Dkt. #146).

prior admissions, and applying the law, there are no bases for a trial on the facts.  Because Letcavage controls Premier and is its Chairman, President, CEO and CFO, his scienter and actions should be imputed against Premier and summary judgment should be entered against Premier as well.

## I.  SUMMARY OF THE UNDISPUTED FACTS

Plaintiff's accompanying Statement of Uncontroverted Facts and Conclusions of Law, dated October 13, 2020 ("*Facts*")[2] cites Letcavage's and Premier's admissions, both in Letcavage's prior sworn testimonies and in contemporaneous email communications, as well as the other corroborating documentary and testimonial evidence, which, taken together, conclusively demonstrate that Letcavage and Premier violated the federal securities laws, including the antifraud statutes and rule.[3]  In brief summary, the *Facts* establish the following:

This case arises out of a fraudulent scheme by microcap issuer Premier, a publicly traded company whose shares were registered with the SEC, and Letcavage to mislead investors about Premier's success and prospects, hide Premier's losses and inflate its assets, and also to make false statements and omissions about Letcavage's compensation and his contract with Premier and all the undisclosed compensation and perks he took out of Premier.

Defendant Letcavage, Premier's Chairman, President, CEO and CFO, wove an illusory web of economic activity and purportedly important transactions designed to create the appearance of Premier as an active company with a vibrant business.  Unbeknownst to investors who purchased more than $7 million of stock from Premier through Letcavage, these transactions provided little or

---

[2] The documents and testimony transcripts that the *Facts* cite are attached as exhibits to the Declaration of Bennett Ellenbogen, dated October 13, 2020 ("Ellenbogen Decl.").  In addition, there are additional exhibits attached to Ellenbogen Decl. supporting the motion for a preclusion order against the Defendants.

[3] At the summary judgment stage, courts "do not focus on the admissibility of the evidence's form," but rather examine the admissibility of "its contents." *Fraser v. Goodale*, 342 F.3d 1032, 1036-37 (9th Cir. 2003); *Fed. Deposit Ins. Corp. v. N.H. Ins. Co.*, 953 F.2d 478, 485 (9th Cir. 1991) ("the nonmoving party need not produce evidence in a form that would be admissible at trial in order to avoid summary judgment.")

no value to Premier and all the while Letcavage had an undisclosed contract and took out additional material compensation and perks from Premier.  Letcavage created transactions for Premier to mislead investors about the financial health of the Company, and created opportunities for obfuscation and fraud in the Company's financial statements and press releases.[4]  Letcavage, who controlled and ran Premier as its Chairman, President, CEO and CFO, and was ultimately responsible for finalizing and approving Premier's publicly filed financial statements, knew that the financial statements, public filings and press releases he finalized and approved were materially misleading in several respects.

### A.  Defendants assigned a value to the Note in Premier's financial statements which they knew, recklessly disregarded, or should have known was incorrect.

As discussed below and in further detail in the Rule 56.1 statement, at all relevant times, based on the Company's valuation, the Note was Premier's most significant tangible asset.  *Facts ¶¶* 31-36, 40-44, 49, 51-53.  Letcavage, however, was aware that the Note was actually worthless, as demonstrated by Doty Scott Enterprises, Inc. ("Doty Scott"), the valuation firm hired by Letcavage and Premier. *Facts ¶¶* 13-33. Premier and Letcavage misled investors about the value of this Note, among other things, in filings with the SEC, a press release and a shareholder letter.  *Facts ¶¶* 1, 3, 5, 9, 10, 37, 47-49, 51, 62, 101, Exs. 1, 2, 6, 7, 28, 33, 34, 35, 38, 58 at 7.  As Chairman, President, CEO and CFO, Letcavage was responsible for the financial statements. *Facts  ¶¶* 5, 9, 10, 14, 45, 50, Exs. 6, 10. And, as the Chairman, President, CEO and CFO of Premier, Letcavage finalized and approved certain of Premier's fraudulent financial statements which included a valuation of the Note that he knew, recklessly disregarded, or should have known was inadequately supported. *Facts ¶¶* 4, 11-30-36.

First, in December 2011, Letcavage and another investor, Marvin Winkler ("Winkler") created a transaction where Premier, then a purported company involved in making coffins, acquired certain green energy assets from two green energy companies, WePower, LLC

---

[4] Letcavage admitted in investigative testimony that he was responsible for Premier press releases and he was quoted in the May 2013 earnings release. *Facts ¶¶* 47-48, Ex. 33.  He also signed all the relevant Forms 10-K and 10-Q. *Facts ¶¶* 1, 3, 5, 9, 10, 37, 49, 51, 62, 76, Exs. 1, 2, 6, 7, 28, 34, 35, 38, 64.

("WePower"), controlled by Winkler, and Green Central Holdings, Inc. ("Green Central"), controlled by Letcavage, in exchange for Premier common stock. *Facts* ¶ 3.

Shortly thereafter, Letcavage, as a large shareholder of Premier, became greatly concerned that the current CEO of Premier Kevin Donovan was "running the company into the ground," and not only "failed" as the CEO, but under his leadership, the "wind turbines were not working [and] there was a lot of things said that were not true … about the performance of that product, and I didn't want to have anything to do with a product that was not going to perform the way it was supposed to," so Letcavage urgently sought to remove Donovan, as he explained during his investigative testimony.[5]  *Facts* ¶¶ 4, Exs. 4 at 28, 5 at 85:5-13.

In order to induce Donovan to depart the company, the Defendants negotiated with Donovan and his representatives to spinout the failed assets of Premier to a new entity formed by Donovan (WePower Eco Corp. ("New Eco")), and in exchange for these assets and Donovan's departure, Premier was to receive a promissory note.  (This spinoff of Premier's assets to Donovan and New Eco is referred to herein as the "Assets for Note Spinout with New Eco".)  *Facts* ¶¶ 11, 12, 78. And, on October 5, 2012, Letcavage took over as Chairman, President, CEO, and CFO of Premier, positions he still holds.  *Facts* ¶ 5.

As early as October 3, 2012, on the eve of becoming CEO and CFO of Premier, Letcavage understood that the assets that the Company was spinning off in the Assets for Note Spinout with New Eco would be worthless in backing up any Note that WePower gave Premier.  *Facts* ¶ 13, Ex. 9.  For example, Letcavage told Premier insider Winkler in an October 3, 2012 email: "I believe the (Assets for Note Spinout with New Eco,] will result in nothing to our investors."  *Facts* ¶ 13 Ex. 9.

In January 2013, the Assets for Note Spinout with New Eco was completed. Premier received an unsecured note with a $5 million face value (the "Note") which provided payments and full collectability over 20 years.  *Facts* ¶¶ 11, 70.  In connection with properly valuing the Note from New Eco, in or about mid-March 2013, Letcavage hired Doty Scott to produce a valuation of

---

[5] As discussed further in the Ellenbogen Decl. ¶¶ 8 to 13, Letcavage refused to testify substantively during the litigation; first walking out of his deposition, and then invoking his Fifth Amendment rights to questioning at the second day of depositions.

the Note.  *Facts ¶¶ 15 17.*

Prior to Premier's initial disclosure of the Note and its valuation, which took place in Premier's Form 10-K Annual filing for 2012, the only information relating to the Note's value was from Doty Scott—who cautioned Premier not to quote any of its valuation figures at that time. *Facts ¶¶ 18-23.*

Specifically, on March 29, 2013, Doty Scott provided Premier with its draft "initial valuation tables" but warned Premier that it could not rely on any of the draft initial valuation tables, noting: "**This preliminary valuation is not to be quoted at this time.**"  (emphasis added). Doty Scott further emphasized in this email that:

> the buyer refused to provide us with any information, therefore we made the following assumptions, which need to be verified by management and hopefully management can provide us some supporting documentation.\*\*\* We should have a discussion regarding the projections and what support exists relative to the revenues…."

*Facts ¶ 20, Ex. 17.*

Nevertheless, Premier and Letcavage ignored Doty Scott's requests for information and admonitions against using any preliminary valuations, and, on April 22, 2013, filed its 2012 Form 10-K with the Commission.  *Facts ¶¶ 10, 19-28, Ex. 2.*  Note 10 to the consolidated financial statements - Subsequent events – in the 2012 Form 10-K, lists a "preliminary valuation" for the Note, which came from Doty Scott's initial valuation tables:

> On January 7, 2013, Premier Holding Corporation ("PRHL"), acting through its wholly owned subsidiary, WEPOWER Ecolutions, Inc. ("Premier's Subsidiary"), completed the sale of assets under an Asset Purchase Agreement with WEPOWER Eco Corp., a newly formed entity, controlled by Kevin B. Donovan, PRHL's former CEO. PRHL sold certain assets related solar energy, wind power projects, energy efficiency projects in real estate and fuel efficiency for diesel and gasoline engines for a **note payable for $5,000,000, (preliminary valuation on the note is $869,000)** (emphasis added).

*Facts ¶¶ 11, 18-28, Exs. 2, 17, 18.*

Letcavage, who as CEO and CFO signed the financial statements, was aware at the time the 2012 10-K was filed, that there was no support for the $869,000 valuation for the Note.  *Facts ¶¶ 10-28, 30, 74, 75, 78.*

As noted, the $869,000 valuation appears to have come from one of the figures in the Doty Scott draft "initial valuation tables" which Doty Scott warned were merely draft valuations and not to be relied upon, as discussed above.  The draft initial valuation tables built by Doty Scott were created by Doty Scott merely as a template.[6]  *Facts* ¶¶ 19-27 .

Doty Scott ultimately valued the Note as of the time of the time of its issuance, i.e. January 7, 2013, at **$0** (*i.e.*, it was worthless): On April 9, 2014, Doty Scott sent Premier a report that valued the Note at $0.  *Facts* ¶ 30, 73, 74, Ex. 27.

In fact, as discussed further in the Rule 56.1 Statement, Letcavage and Premier manipulated the value of the Note to show that the Note's value outweighed the loss in value of the assets swapped out to New Eco. *Facts* ¶¶ 31-36, 39-44, 46-48, 49, 51-57, 76.  Letcavage's and Premier's reporting of the $869,000 valuation in Premier's 2012 Form 10-K allowed the company to falsely demonstrate that it was viable and profitable, instead of continuing to suffer losses such as it had at year-end 2012; *e.g.*, reporting $0 in revenues and $1,357,165 in operating losses.  *Facts* ¶¶ 31-36.

Premier continued to represent the "preliminary appraised value" of the Note as $869,000 in its Forms 10-Q for the first, second, third and fourth quarters of 2013, the Form 10-K for 2013, and in a May 30, 2013 press release, where the company falsely touted Premier's "turnaround" ("May 2013 Turnaround Press Release").[7] *Facts* ¶¶ 37, 47-49, 51, 62, 76, Exs.  6, 7, 28, 33, 34, 35, 38, 64.

---

[6] In this template, Doty Scott used financial projections for Premier's subsidiary.  That is, Doty Scott used the financial projections that it received when it allocated the purchase price relating to Premier's purchase of assets from WePower LLC and Green Central in 2011.  Thus, the financial projections used in Doty Scott's template were not relevant for valuing the Note and, further, were outdated.  Lacking any financial projections for or from New Eco, on March 29, 2013, Doty Scott sent its valuation model template to Premier in the form of an Excel workbook and referred to this Excel workbook as Doty Scott's "initial valuation tables."  *Facts* ¶¶ 16 to 26, 30, 74.

[7] By its terms, the Note was in default by December 22, 2013, as New Eco failed to timely make any payment of principal or interest.  Premier made no attempt to collect any such payment.  *Facts* ¶¶ 55, 56, 66, 74 .

The $869,000 value assigned to the Note on the balance sheet dwarfed Premier's other tangible assets for the first and second fiscal quarters of 2013 and was approximately equal to the other tangible assets for the third fiscal quarter. *Facts* ¶ 52.  At no time while Premier represented to investors that that the Note had a "preliminary" valuation of $869,000, did Premier or Letcavage take any steps to determine its actual valuation. *Facts* ¶¶ 13, 18-28, 44, 53-58, 67, 71-74, 75, 78.  In December 2013, New Eco defaulted on its scheduled payment to Premier on the Note.  *Facts*  ¶¶ 55, 56.  Defendants took no steps to collect on the Note from New Eco.  *Facts* ¶¶ 55-57.

After Letcavage was subpoenaed by Plaintiff and on the day before his investigative testimony, scheduled for March 5, 2014, Letcavage created and entered into a transaction with insider Winkler, where Premier transferred the Note to Winkler for 2.5 million shares of Premier stock held by Winkler and his family. *Facts* ¶¶ 59-69.  Winkler and his family together continued after this transaction to be a large shareholder of Premier and gave no cash to Premier for the Note. Insider Winkler did no diligence on the Note before entering into this transaction and, among other things, was not aware that the Note never was properly valued at $869,000, was in default, and that Donovan's firm WePower Eco, was insolvent or was on its way to insolvency.  *Facts* ¶¶ 63, 64. Even in this sham transaction with an insider at Premier, based on the price of Premier stock in March 2014, the 2.5 million shares that Premier obtained for the Note were worth no more than $350,000. *Facts* ¶¶ 65-75. Significantly, Letcavage and Premier did not provide Doty Scott any documents supporting the basis for the Note-stock swap with Winkler and on April 9, 2014, Doty Scott gave Premier the final report valuing the Note as being worth zero.  *Facts* ¶¶ 71-75.

On April 15, 2020, Letcavage filed Premier's Form 10-K for 2013 and continued to have Premier value the Note at $869,000. *Facts* ¶¶ 57, 76. The improper recognition of this gain resulted in Premier's reported net loss for 2013 being 25% less than what it would have been without the inclusion of the purported gain from the sale of discontinued operations. *Facts* ¶ 57. In that Form

10-K, Letcavage and Premier failed to disclose that (1) New Eco had defaulted on payment on the Note, (2) Doty Scott had valued the Note as being worth zero, and (3) Winkler purchase the Note in a transaction where no cash had been provided Premier and only Premier stock that at best was worth only $350,000. *Facts* ¶ 76.

In the course of discovery, as discussed further in the Rule 56.1 Statement, the Defendants have produced no documents supporting the $869,000 valuation assigned by Premier to the Note. *Facts* ¶ 28.  During Plaintiff's investigation, Letcavage testified that he didn't care what value the Note had or what was stated in the financial statements: "[Q]uite frankly I didn't care what the note said. So whatever we needed to file our Q is all I cared about… it doesn't matter what we put on a piece of paper." *Facts* ¶ 78.  Letcavage admitted in his March 5, 2014 investigative testimony that Premier did no analysis of Premier's ability to collect on the Note, further confirming the valueless of the Note:

> Q.   Tell me, what kind of credit analysis did your company do to make sure the collectibility of this?
>
> A.   None.
>
> Q.   None.
>
> A.   Right.  I mean what am I going to do?  I've got a guy that's destroying the company in there every day, and I've got to get him out I didn't care what I had to sign to get him out of there to be honest.  He was doing far more damage than this promissory note did.

*Facts* ¶ 57, Ex. 8 at 154:2-10.

Letcavage admitted that the Note was worthless when he first testified in 2014: "It should have never gotten to this point that we had to get rid of this guy [Kevin Donovan] and that we signed a ridiculous document like this [the Note] for 20 years and 5 years of payments.  I mean this is worthless to me." *Facts* ¶ 70, Ex 8 at 155:18-21.

**B.      Defendants made false statements and omitted to disclose material facts regarding Letcavage's compensation and perks.**

Second, Letcavage and Premier made false statements and omitted to disclose to investors related facts regarding Letcavage's compensation and perks from Premier.  While stating in its SEC filings that Premier had no employment contracts for its employees, Letcavage entered into a multiyear contract with Premier that gave him compensation not disclosed in the SEC filings. Moreover, Letcavage took out additional compensation from Premier that also was not disclosed and arguably even violated his employment agreement with Premier. *Facts* ¶¶ 80-91.

Specifically, Letcavage's employment agreement provided Letcavage with the following compensation:

- $240,000 yearly salary paid in $20,000 installments each month.
- 10% increase of salary each year.
- Bonus each year based on gross revenue.
- Stock vesting each year.
- $1,500 per month car allowance.
- $1,500 per month for undocumented expenses.

*Facts* ¶¶ 80, 81.

Throughout the relevant period, January 1, 2013 through December 31, 2013, Letcavage gave himself compensation from Premier for expenses that were much more than the $1,500 per month in his Employment Agreement ("Perks").  *Facts* ¶¶ 82, 83.  In 2013, the Perks that Letcavage paid himself from Premier totaled $92,538.18.  *Facts* ¶ 84.  The Perks included reimbursements for personal expenses such as: clothing and accessories, airlines and hotels, iTunes music, restaurants and wine clubs, florists, Netflix, numerous gift and other specific store cards.  *Facts* ¶ 85.

Despite a Court Order to do so, Premier and Letcavage have failed to produce in discovery any documents which support any claim that these Perks payments that Letcavage received were for business expenses rather than personal expenses or that he even incurred the expenses for which he was reimbursed.  *Facts* ¶ 86. When asked in his investigative testimony how he kept records of business expenses, Letcavage admitted that he didn't know.  *Facts* ¶ 90.  Later, in 2019, when

Letcavage testified as Premier's Fed. R. Civ. P. 30(B)(6)[8] witness, Letcavage said his expenses need not be accounted for, and he did not have to submit any documentation for them.  *Facts* ¶ 90.

### C.   Defendants Misleadingly Identified and Valued its Purchase of The Power Company USA, LLC

Third, Letcavage and Premier misleadingly identified and valued in its financial statements and press releases its purchase of 80% of The Power Company USA, LLC ("TPC")[9], a deregulated power broker in Illinois.  *Facts* ¶¶ 92-94.

Premier first disclosed, in a subsequent events note to its financial statements in its 2012 Form 10-K, that in the first quarter of 2013, Premier acquired an 80% interest in TPC, a deregulated power broker in Illinois, in exchange for 30,000,000 shares of Premier stock (the "TPC acquisition").  *Facts* ¶¶ 92-93.  In its First Quarter Form 10-Q for the period ended March 31, 2013, filed on May 29, 2013, Premier first valued the assets it had obtained in the TPC acquisition; attributing 100% of the TPC acquisition to goodwill; *i.e.* $4,500,000.  No valuation was provided for the actual TPC Assets purchased.  *Facts* ¶¶ 95-96.  Premier stated that these assets were all attributed to goodwill because the company is still determining the value of the assets:

> "The initial accounting for the business combination is not complete because the evaluations necessary to assess the fair values of certain net assets acquired and the amount of goodwill to be recognized are still in process."

*Facts* ¶ 96.

Premier repeated the identical goodwill valuation and the rationale for the valuation of the assets acquired in the TPC acquisition in its Second Quarter Form 10-Q for the period ended June 30, 2013, filed August 16, 2013.  *Facts* ¶ 97.

---

[8] Plaintiff's Fed. R. Civ. P. 30(B)(6) subpoena called for a witness most knowledgeable to testify about Premier's production of documents during the investigation and litigation.  Premier initially identified another employee, but then for unexplained reasons, and after sanctions for not showing up for the deposition, Letcavage was identified.  In general, he could not answer many specific questions, gave inconsistent answers, and promised additional documents and follow-up responses, which never occurred.  Ellenbogen Decl. n. 9, Ex. 72.

[9]  The entity is referred to herein as "TPC" and the assets acquired in this transaction are referred to herein as the "TPC Assets."

1   As with the "preliminary" valuation of the Note, there is no evidence that Premier took any

2   steps whatsoever to attempt to value the TPC Assets. *Facts* ¶ 98 .

3   And, contrary to these goodwill valuations, as early as December 2012, Premier and

4   Letcavage touted this acquisition and assigned significant valuation to these assets. *Facts* ¶¶ 100,

5   101-103. Then, in the May 2013 Turnaround Press Release, published one day after filing the first

6   quarter Form 10-Q, Letcavage and Premier claimed that the contracts "are worth approximately

7   $20,000,000." The disclosures of these significant valuations of the assets acquired as part of the

8   TPC acquisition are inconsistent and contrary with Premier's disclosures in its quarterly filings,

9   where the company valued the assets entirely as $4.5 million as goodwill. *Facts* ¶¶ 99, 102, 103. In

10  the May 2013 Turnaround Press Release, Letcavage and Premier did not disclose to investors that

11  Premier's financial statement valued the TPC Assets as only $4.5 million in goodwill and that TPC

12  records were such a mess that they could not value the TPC Assets. *Facts* ¶ 103. The false and

13  misleading TPC representations and omission in the May 2013 Turnaround Press Release furthered

14  Letcavage and Premier's scheme to create the false impression that Premier had significant assets

15  and a growing business. *Facts* ¶¶ 99-103.

16  Nor did Premier or Letcavage have a basis to value the TPC Assets as $4.5 million in

17  goodwill. *Facts* ¶¶ 108-113 Neither Premier nor anyone associated with Premier, including

18  Letcavage, produced any documentation that analyzes or supports the rationale for recording the

19  entire purported transaction price as goodwill. *Facts* ¶ 109.

20  Premier's financial statements did not comply with GAAP (generally accepted accounting

21  principles) and materially misstated its 2013 financial statements by improperly accounting for its

22  acquisition of TPC. Premier and Letcavage also provided false and misleading information in

23  Premier's footnotes to its financial statements by providing that an independent valuation was "in

24  process" whereas in reality Premier was preventing Doty Scott—who it again retained to conduct a

25  purchase price allocation for the TPC acquisition—from completing its valuation because Premier

26  refused to provide them with data required to complete the valuation. *Facts* ¶¶ 111, 112.

27  Finally, as outlined in greater detail in the Rule 56.1 Statement and the Expert's report,

28  Premier and Letcavage failed to test goodwill for impairment as of year-end 2013, despite

disclosing that it had, and Premier failed to devise and maintain any system of internal accounting controls, which the company admitted in subsequent filings.  *Facts* ¶¶ 114-117, Ex. 23 ¶¶ 47, 51.

### D.      Steps to obfuscate and delay.

In the course of this litigation, Letcavage and Premier have taken every step to prevent the Court, the Plaintiff and investors from understanding what happened at Premier while Letcavage has been overseeing it.  Ellenbogen Decl. ¶¶ 5-6.  Most recently, on July 15, 2020, during his Court-ordered deposition, which was a continuation of the deposition he was ordered to attend on August 28, 2019—and at which Letcavage walked out before any substantive questions could be asked—Letcavage refused to answer all substantive questions, this time asserting his Fifth Amendment privilege against self-incrimination. Ellenbogen Decl. ¶¶ 10, Ex. 51.  During this second day of Letcavage's depositions, Plaintiff asked Letcavage a series of specific questions on a topic, and catch-all questions, *i.e.,* "If I ask you any questions concerning the valuation of the $5 million promissory note, will you assert the Fifth?"  Letcavage asserted his Fifth Amendment privilege and refused to answer all specific questions and his answers to the catch-all-questions indicated he would assert his Fifth Amendment privilege and refuse to answer all other questions relating to Premier.  Ellenbogen Decl. ¶¶ 10, 11.

Plaintiff specifically apprised Letcavage during that July 15, 2020 deposition that if he refused to testify based on the Fifth Amendment, the Court and the fact finders in this case could draw an adverse inference, and also that the Court could issue a preclusion order preventing Letcavage from putting in evidence relating to the questions he refused to answer, including preventing him from testifying later in this case, such as against a summary judgment motion or trial.  Ellenbogen Decl. ¶ 12. Letcavage chose to continue to rely on the Fifth Amendment privilege and refuse to answer any and all substantive questions.  Ellenbogen Decl. ¶ 12. Letcavage was represented by attorneys during that deposition and his current attorney was a witness to that July 15, 2020 deposition. Ellenbogen Decl. ¶ 13.

In addition to stonewalling Plaintiff in depositions, Letcavage and Premier have stonewalled Plaintiff by failing to produce documents.  To this day, Letcavage and Premier have not confirmed that they have produced all documents responsive to the Plaintiff's: (1) investigatory subpoenas,

and (2) document requests.  The issue of the document productions and the failure to produce the documents has been a constant in this matter (and a subject of sanctions) from the outset, until today. Ellenbogen Decl. ¶ 26.

The only opportunity Plaintiff had to take Letcavage's testimony under oath *and where he answered substantive questions about the facts underlying this matter*, was during the investigative testimony predating this action. Ellenbogen Decl. ¶¶ 14, 15, Exs. 4, 8.  At that time, Plaintiff did not have certain key documents because Letcavage and Premier had not provided them in response to the investigative subpoena.  Ellenbogen Decl. ¶¶ 16-20.   Key among the missing documents, which we only received after Letcavage's investigative testimony, were documents from Premier employee Larry Young.  These documents, which were under the possession, custody, and control of Premier, yet never turned over by the company, included correspondence with Doty Scott and Doty Scott's valuation report, discussed above.  Ellenbogen Decl.¶¶ 16-19, Exs. 40, 41, 66-71.

## II.   **ARGUMENT**

### A.   **The Court Should Preclude Defendants From Putting Forth Testimony from Letcavage Or Other Evidence Relating To His Refusal To Answer Questions At His July 15 Deposition And Should Also Draw An Adverse Inference Based on Letcavage's Invocation of the Fifth Amendment Privilege.**

In a civil case, the Court and fact finder should draw an adverse inference against a defendant who asserted the Fifth Amendment privilege and refused to answer questions in that defendant's deposition.  In addition, the court should issue an order precluding the defendant from putting in testimony relating to the issues in the deposition.

First, with regard to preclusion orders, "it would be an abuse of the Fifth Amendment to allow a civil litigant to use it to offer proofs while denying the adversary discovery of his contentions."  *SEC v. Benson*, 657 F. Supp. 1122, 1129 (S.D.N.Y. 1987).  While he obviously has the right to assert the privilege, Letcavage "cannot have it both ways.  By hiding behind the protection of the Fifth Amendment as to his contentions, he gives up his right to prove them."  *Id.; see also Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 910-12 (9th Cir. 2008) (affirming

1  district court's preclusion of testifying at trial in order "narrowly tailored to impose upon [party

2  asserting privilege] only that detriment necessary to prevent unfair prejudice to [opposing party]")."

3  "The injustice of allowing [a party who invoked the Fifth during deposition] to put on evidence at a

4  hearing or trial on the same facts is especially manifest," and "[f]or this reason, courts have

5  frequently entered orders in such situations precluding a party from introducing any evidence in

6  support of positions for which he refuses to disclose the evidentiary basis upon grounds of

7  privilege." *SEC v. Global Express Capital Real Estate Inv. Fund I, LLC*, No. 2:03-CV-01514-KJD-

8  LRL, 2006 WL 7347289, *13 (D. Nev. March 28, 2006), *rev'd in part, aff'd in part*, 289 Fed.

9  Appx. 183 (9th Cir. 2008) (barring defendants from offering evidence after asserting Fifth

10  Amendment in depositions) *citing SEC v. Interlink Data Network of Los Angeles, Inc.,* No. 93-3073

11  R, 1993 U.S. Dist. LEXIS 20163, 1993 WL 603274, at n. 97 (C.D. Cal. Nov. 15, 1993).  Under

12  these circumstances, preclusion of his testimony is warranted.  *See Nationwide Life Ins*., 541 F.3d at

13  911-12; *Benson*, 657 F. Supp. at 1129-30 (barring testimony when defendant asserted Fifth

14  Amendment privilege and was "uncooperative and obstructive"); *Global Express Capital Real

15  Estate Inv. Fund I, LLC*, 2006 WL 7347289; *but see FTC v. Sharp*, 782 F. Supp. 1445, 1452 (D.

16  Nev. 1991) (in granting summary judgment against a defendant, court did not preclude considering

17  testimony that defendant who took the Fifth in a deposition as assertion of the Fifth was not tactical

18  and plaintiff had significant discovery from other sources).[10]

19

20

21

22  [10] Letcavage's prior investigative testimony is not a basis for not precluding Premier and Letcavage
    from entering new evidence and testimony as a result of Letcavage asserting his Fifth Amendment

23  privilege during his July 15 deposition. *SEC v. Softpoint, Inc.*, 958 F. Supp. 846 (S.D.N.Y. 1997);
    aff'd without opinion, 159 F.3d 358, 1998 LEXIS 20264 (2d Cir. June 29, 1998).  In *Softpoint*, then

24  District Court Judge Sotomayor granted summary judgment and imposed a preclusion order against
    the defendant who previously testified in the SEC's investigation, but then relied on his Fifth

25  Amendment privilege and did not answer any substantive questions in his deposition.  *Softpoint,
    Inc.*, 958 F. Supp. at 857 ("investigatory examination was not comprehensive; it did not, and could

26  not, cover the same breadth of material as his subsequent deposition").  As discussed below, there
    are many documents and facts that Plaintiff obtained to depose Letcavage that were not available at

27  the time Plaintiff took the testimony of Letcavage in the investigation before this litigation started.

28

Second, this Court should draw an adverse inference from Letcavage's repeated invocation of the Fifth Amendment in his July 15 deposition.  It is well-established that "in civil proceedings, adverse inferences can be drawn from a party's invocation of [the] Fifth Amendment right" not to testify.  *Doe ex rel. Rudy-Glanzer v. Glanzer*, 232 F.3d 1258, 1264 (9th Cir. 2000); *see also SEC v. Colello*, 139 F.3d 674, 677 (9th Cir. 1998) ("Parties are free to invoke the Fifth Amendment in civil cases, but the court is equally free to draw adverse inferences from their failure of proof.")  Such an adverse inference is not automatic, and, in *SEC v. Luna*, the court summarized what the SEC must establish for the inference to be drawn:

> The Court does not draw the inference unless (1) the SEC has a substantial need for the information, (2) no other, less burdensome means of obtaining the information exists, (3) "the value of presenting [the] evidence" is not "substantially outweighed by the danger of unfair prejudice to the party asserting the privilege," and (4) independent evidence of the fact about which the party refuses to testify exists.

No. 2:10-CV-2166-PMP-CWH, 2014 WL 794202, at *12 (D. Nev. Feb. 26, 2014) (quoting *Nationwide*, 541 F.3d at 911-12); *see also Glanzer*, 232 F.3d at 1264.

All of these criteria are present here.  Plaintiff has a substantial need for Letcavage's responses, and there is no other less burdensome means of obtaining evidence from Letcavage.  Similarly, the corporation, or others at the corporation, cannot provide such answers as Letcavage.  Letcavage, the Chairman, President, CEO and CFO of Premier, is unquestionably the sole decision-maker in his, essentially, one-person shop.  In the July 15 deposition, Plaintiff was not allowed to obtain answers from Letcavage regarding anything of substance, including anything involving Premier.  Ex. 51.  This included Plaintiff was not allowed to obtain answers from Letcavage regarding evidence that Letcavage and Premier filed in this litigation, such as Letcavage's February 21, 2020 declaration and the February 21, 2020 declaration from Greg Wahl ("Wahl"), the auditor and 50% owner of Premier's auditing firm Anton & Chia, LLP ("Anton & Chia").[11]  Defendants

---

[11] Had Letcavage not stonewalled Plaintiff at his July 15, 2020 deposition by asserting the Fifth Amendment privilege, Plaintiff would have questioned Letcavage, among other things, concerning Letcavage's communications with Wahl relating to Letcavage's appearance in the AP to testify in defense of Wahl (and where Letcavage provided testimony that contradicts his prior testimony in

relied on these declarations in moving to set aside the default sanctions and claiming that these declarations shows merit for their defenses. (Dkt. 154.1, 154.3, 162.1).  Among other things, for the July 15 deposition, Plaintiff was prepared to ask questions regarding these declarations, Letcavage's communications with Wahl, and Letcavage's testimony for Wahl's defense in his own administrative case by the SEC's Enforcement division.  Ellenbogen Decl. ¶20.  Defendants should not be allowed to rely on these declarations given that Plaintiff could not obtain answers from Letcavage.

 Only Letcavage can offer first-person information about his role in Premier, which would be admissible testimony. Moreover, Plaintiff has presented substantial, irrefutable and independent evidence against Defendants that establishes their liability; and the value of Letcavage's responses on the subject of this motion—which would have been admissible—far outweighs any chance of prejudice against them. *See Luna*, 2014 WL 794202, at *12 (finding adverse inference against defendant when the SEC presented "independent evidence" and testimony "would have constituted admissible evidence"); *Global Express Capital Real Estate*, 2006 WL 7347289, at *15 (finding adverse inference against defendants for asserting Fifth Amendment).

Thus, the consequences of Letcavage's assertions of the Fifth to every substantive question at his July 15 deposition are twofold: (1) He should be precluded from offering any testimony to rebut Plaintiff's proof of his liability at any hearing or trial in this matter; and (2) this Court should find an adverse inference that Defendants defrauded investors by means of materially false representations and omissions in offering and selling Premier securities.[12]  *See, e.g., United States v. Sumitomo Marine & Fire Ins. Co., Ltd.*, 617 F.2d 1365 (9th Cir. 1980) (upholding preclusion sanction that followed "after 18 months of delays and failures to comply with court-ordered

---

this case), as well as other materials, including sworn declarations from Letcavage that Defendants have placed into the record during this litigation. Ellenbogen Decl. ¶ 20.

[12] Even if the Court does not bar Defendants from offering Letcavage's testimony to refute his liability, it would still be more than justified to find an adverse inference against Defendants for their roles and conduct in the illegal scheme for which the SEC has provided evidence, as discussed herein.

discovery"); *Luna*, 2014 WL 794202, at *12; *SEC v. Lauer*, No. 03-80612-CIV, 2008 WL 4372896, *23 (S.D. Fla. Sept. 24, 2008) (finding adverse inference against defendant and holding him liable on SEC's summary judgment motion).

During the July 15, 2020 deposition, Plaintiff specifically advised Letcavage that the Court and fact finder could draw an inference from Letcavage's refusal to testify and reliance on the Fifth Amendment privilege and preclude him from putting in evidence.  Ellenbogen Declaration ¶ 12, Ex. 51 at 53:15-21.  Letcavage acknowledged he understood the ramifications of his refusing to answer based on his Fifth Amendment privilege. *Id*. at 53:22.  Plaintiff then asked him if he wished to waive the Fifth Amendment privilege and testify and Letcavage rejected that offer and continued to rely on the Fifth Amendment privilege and refused to testify.  *Id*. 53:23-54:8.

In his motion to set aside the default, Letcavage argued that the Plaintiff did not ask any substantive questions at the July 15, 2020 deposition, suggesting therefore that Plaintiff could have obtained substantive answers from Letcavage.  (Dkt. 188 at 17 to 18).  The deposition transcript shows that that is another false statement by Letcavage.  Ellenbogen Decl. ¶¶ 10, 11, 12 , Ex. 51.  During the deposition, Letcavage made it clear that he was refusing to answer any and all questions relating to Premier.  Plaintiff asked 30 substantive questions relating to the defenses and claims of the case, all of which Letcavage refused to answer by asserting his Fifth Amendment Privilege, such as:

> **Q.** Isn't it correct that in 2012 -- in the 2012 Annual Report Form 10-K for Premier you caused in Note 10 subsequent events to have that note valued at $869,000?
>
> **Q.** Isn't it correct that at the time that you valued the note at $869,000 you understood that there was no basis for such a valuation?
>
> **Q.** And isn't it correct that at the time that you valued the note at $869,000 you understood that the valuation from Doty Scott had refused to value that WePower Eco note, as it did not have enough information concerning WePower Eco and its ability to pay?

Ellenbogen Decl. Ex. 51 at 48-49.  In addition to the thirty substantive questions, Plaintiff asked a series of catch-all questions, to which Letcavage consistently answered that he would continue to assert the Fifth Amendment privilege and refuse to testify. Here are some examples:

Q. So, Mr. Letcavage, if I ask you any questions concerning the valuation of the promissory note, will you assert the Fifth?

Q. And if I ask you any questions concerning the valuation, accounting, and disclosures relating to The Power Company USA, LLC, will you assert the Fifth?

Q. And if I ask you any questions concerning the compensation, reimbursements, and perks you received from Premiere Holding, will you assert the Fifth?

Ellenbogen Decl. Ex. 51 at 48-49.  Letcavage now tries to argue to the Court that Plaintiff had a fair opportunity to depose Letcavage on August 28, 2019 and that it was Plaintiff's fault that Plaintiff didn't obtain answers to substantive questions posed to Letcavage.  (Dkt. 188 at 15 and n.6). The transcript shows that Letcavage insisted on talking about his medical situation at the beginning of that Court-ordered deposition and when Plaintiff tried to ask substantive questions, Letcavage walked out a second time and never returned. Ellenbogen Decl. ¶ 8, Ex. 65.  The entire deposition transcript, in which Letcavage was present, accounts for a total of 36 minutes. Ellenbogen Decl. ¶ 9, Ex. 65 at 5 to 33.  In total, Plaintiff was able to question Letcavage under oath for only 22 minutes – a timespan filled with Letcavage's obscenities and refusals to answer questions.  Prior to being sworn in on August 28, 2020, Letcavage made it clear that he would refuse to answer any substantive questions.  After being placed under oath at 10:18 am, Letcavage walked out by 10:32 am, after a total of 14 minutes had passed.  Letcavage returned for questions at 10:38 am, and spoke for 3 uninterrupted minutes about his alleged injury and medical condition, from 10:39 am to 10:42 am.  By 10:46 am, 8 minutes after returning, Letcavage again walked out but this time refused to return.  Letcavage only walked out once Plaintiff began asking substantive questions about record keeping procedures at Premier. Ellenbogen Decl. ¶ 9 and n.1, Ex. 65.

Finally, Letcavage argues to the Court that no preclusion order or inference should be entered and drawn against him and Premier because Letcavage testified in the investigation before this litigation was filed and also because he testified for Premier in the Rule 30(b)(6) deposition of Premier. (Dkt. 188 at 17).  Plaintiff's questioning of Letcavage was limited in both of those

testimonies and not a substitute for Letcavage's deposition.  When Plaintiff took Letcavage's investigation testimony prior to this litigation, Plaintiff did not have, among other things, Letcavage's and Premier's defenses in their Answers in this action and could not ask questions probing those defenses.  Moreover, there were many relevant documents from Premier and third parties that the Plaintiff obtained after it took testimony from Letcavage in the investigation.  For example, key Premier documents were subsequently produced from former Premier employee Larry Young, and not Premier or Letcavage.  Premier was under subpoena to produce all responsive documents prior to the testimonies, but notably failed to produce these and other key documents, as noted above and in greater detail in the Rule 56.1 Statement.  Plaintiff was prepared to ask questions of Letcavage in his deposition on August 28, 2019 and July 15, 2020 regarding these documents and produced them to Letcavage's attorneys prior to those depositions.  In addition, at the July 15, 2020 deposition, Plaintiff was prepared to question Letcavage regarding the summary declarations he submitted in early 2020 along with the declaration of Wahl, Premier's auditor, filed by Defendants in their first motion to set aside the default sanction.  Moreover, Plaintiff was prepared to question Letcavage regarding his January 2020 testimony in the AP proceeding against Wahl where he testified as a defense witness for Wahl.  Ellenbogen Decl. ¶¶ 15 to 21.

As for the claim that Plaintiff didn't need Letcavage's deposition on August 28, 2019 and July 15, 2020 because he testified in Premier's Rule 30(b)(6) deposition in February 2019, it was well understood by the parties at the time that the Rule 30(b)(6) deposition was limited to probing what documents had been produced to Plaintiff by Premier and what had not been produced. The notice for the Rule 30(b)(6) deposition of Premier on its face states it relates to Premier's compliance with its document discovery obligation.  Ellenbogen Decl. ¶ 22, Ex. 72.  In fact, counsel for Premier and Letcavage during the Rule 30(b)(6) deposition objected to any effort by Plaintiff to question Letcavage beyond asking for documents that had not been produced. On the record,

defense counsel stated that that Rule 30(b)(6) deposition was not Letcavage's deposition. Ellenbogen Decl. ¶23, Ex. 54 at, *e.g.* 71, 73-76, 79, and 81.

Significantly, until in their second motion to set aside default sanctions, a last-minute maneuver, Defendants never argued that Plaintiff was not entitled to depose Letcavage. Ellenbogen Decl. ¶¶ 24, 25.  In fact, when prior counsel moved to set aside the prior default sanction in February 2020, such counsel represented that Letcavage was prepared to cure his walking out of the August 28, 2019 deposition by continuing Letcavage's deposition.  (Dkt. 154 at 13 (Attorney Kaufman: "Furthermore, Letcavage will agree to be deposed to avoid Plaintiff's having to revive its September 20, 2019 motion for sanctions based on his decision to leave the August 30, 2019 deposition. (Dkt. 147 and 148).") And when the Court held a conference on June 15, 2020 and ordered Letcavage to appear and finish his deposition on July 15, 2020, at no point did Letcavage or his counsel argue there was no need for Plaintiff to take his deposition because it was duplicative of prior testimonies.  (Dkt. 174).

For these reasons, and the accompanying papers, the Court should preclude Letcavage from putting forth testimony or any other evidence relating to the questions he refused to answer at his deposition, including any testimony from Letcavage or other third parties, such as Wahl.  Also, this Court and fact finders should draw adverse inferences against Letcavage and Premier based on Letcavage's invocation of the Fifth Amendment privilege and refusal to testify.

**B.      Summary Judgment Standard.**

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  A party moving for summary judgment meets its burden by establishing, for each element of the claim or defense, that no reasonable trier of fact could find for the opposing party.  *See Celotex*, 477 U.S. at

323.  Once the moving party has met its burden, the "nonmoving party must come forward with 'specific facts showing that there is *a genuine issue for trial.*'"  *Matsushita Electric Indus. Co. Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis in original).  The nonmoving party may not rest on conclusory allegations or bald assertions, *see Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989), but must come forward with significant probative evidence tending to support its contention that material, triable issue of fact remain.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-250 (1986); *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989).  A "mere existence of a scintilla of evidence" does not suffice; rather, the nonmoving party must present "concrete evidence from which a reasonable juror could return a verdict in his favor."  *Liberty Lobby*, 477 U.S. at 252, 256.

### C.    Premier and Letcavage Made Material Misrepresentations in Violation of Securities Act Section 17(a) and Exchange Act Section 10(b) and Rule 10b-5(b)

#### 1.    The Legal Standards

Section 10(b) of the Exchange Act and Rule 10b-5(b) thereunder prohibit any person in connection with the purchase or sale of a security, directly or indirectly, from making any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. For purposes of Section 10(b), the maker of the statement "is the person or entity with ultimate authority over the statement, including its content and whether and how to communicate it.'" *Lorenzo v. SEC*, 139 S. Ct. 1094, 1098 (2019)(citing *Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 131 S.Ct. 2296, 2302 (2011)).  Section 17(a)(2) of the Securities Act prohibits any person in the offer or sale of any security from, directly or indirectly, obtaining money or property by means of any untrue statement of material fact or any omission to state a material fact necessary in order to make the statement made, in the light of circumstances under which it was made, not misleading.

Information is material if "there is a substantial likelihood that a reasonable shareholder would consider it important" in making an investment decision or if the information "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976); *Basic Inc. v. Levinson*, 485 U.S. 224 (1988). Information regarding the financial condition of an issuer is presumptively material. *SEC v. Murphy*, 626 F.2d 633, 653 (9th Cir. 1980).

Scienter is required to establish a violation of Section 10(b) and Rule 10b-5 thereunder; *Aaron v. SEC*, 446 U.S. 680, 701-02 (1980); negligence is sufficient to establish liability under Securities Act Section 17(a)(2). *Aaron*, 446 U.S. at 697. In the Ninth Circuit, "scienter may be established by demonstrating that the defendant acted recklessly." *Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568-69 (9th Cir. 1990); *see also, In re Scholastic Corp. Sec. Litig.*, 252 F.3d 63, 74 (2d Cir 2001). The scienter of a company's management can be imputed to the company. *Hollinger*, 914 F.2d at 1576-78; *see also SEC v. Manor Nursing Centers*, 458 F.2d 1082, 1096-97 n. 16-18 (2d Cir. 1972). Scienter "may be established through a showing of reckless disregard for the truth, that is, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care." *SEC v. McNulty*, 137 F.3d 732, 741 (2d Cir. 1998) (internal quotation marks and citations omitted). Negligence is a failure by an actor to conform conduct to ordinary standards of care. *See Restatement (Second) of Torts* § 282, "Negligence Defined" (1965) (negligent conduct is "conduct which falls below the standard established by law for the protection of others against unreasonable risk of harm").

The "in connection with" element of Rule 10b-5 is broadly construed. *SEC v. Zandford*, 535 U.S. 813 819 (2002) (adopting Commission's broad reading of the phrase "in connection with the purchase or sale of a security"); *SEC v. Rana Research, Inc.,* 8 F.3d 1358, 1362 (9th Circuit 1993) (the "in connection with" requirement is met "if the fraud alleged 'somehow touches upon' or has

'some nexus' with 'any securities transaction.'") (citations omitted). The element has been deemed satisfied by, among other things, misstatements in periodic filings and press releases. *See Rana Research, Inc.*, 8 F.3d at 1362 ("Where the fraud involves public dissemination in a document such as a press release, annual report, investment prospectus or other such document on which an investor would presumably rely, the 'in connection with' requirement is generally met by proof of the means of dissemination and the materiality of the misrepresentation or omission.") (citing *In re Ames Dep't Stores Inc. Stock Litigation,* 991 F.2d 953, 963, 965 (2d Cir. 1993))

By contrast, Securities Act Section 17(a) has a less expansive securities nexus: the fraud must occur "in" the offer or sale of security. That element may be satisfied in this case because, as noted above, Premier raised millions of dollars throughout the relevant period through purported private placements of stock.

### 2. The Misrepresentations

Letcavage and Premier made false and misleading statements about the value of the Note in its FY 2012 and FY 2013 financial statements, Forms 10-K and 10-Q filings (for all four quarters of 2013), and press releases. *Facts* ¶¶ 8 to 79. Premier also failed to fully disclose Letcavage's Perks and his employment agreement. *Facts* ¶¶ 80 to 91. Premier's Forms 10-K falsely stated there was no employment agreement and failed to disclose all the compensation that Letcavage was obtaining from Premier. *Id.* Finally, Letcavage and Premier made baseless misrepresentations in press releases about the value of the TPC Assets, claiming they were valued at $20 million or more, while not disclosing in those same press releases that Premier valued the TPC Assets on its financial statements as only $4.5 million in goodwill. *Facts* ¶¶ 92 to 107. And in their financial statements and Forms 10-K and 10-Q, Letcavage and Premier did not disclose that the real reason Premier valued the TPC Assets as only goodwill was because the TPC records and documents they obtained from purchasing TPC were such a mess that no one at Premier and its auditors could understand

them.  *Facts* ¶¶ 108 to 113.

The misrepresentations about the value of the Note were clearly material. The Note was the Company's largest tangible asset. *Facts* ¶ 35, Ex. 2 at 27. The baseless valuation of the Note resulted in the inflation of the Company's assets on each reporting date in 2013, as well as the overstatement of the Company's income for 2013 by almost $900,000. *Facts* ¶¶ 9, 10, 37, 49, 51, 62, 76, Exs. 6, 7, 28, 34, 35, 38. Indeed, the inflated Note valuation converted a quarterly loss to a gain. *Facts* ¶¶ 33, 36.  Thus, the truth about the values of those assets "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information available." *TSC Industries, Inc. v. Northway, Inc., supra*, 426 U.S at 449; *Basic Inc. v. Levinson*, 485 U.S. 224; s*ee also SEC v. Murphy*, supra, 626 F.2d at 653 (information regarding the financial condition of an issuer is presumptively material). *See also In re Take Two Interactive Secs. Litig.*, 551 F. Supp. 2d 247, 291 (S.D.N.Y. 2008) (stating that financial statement overstatements of 2.54%, 5-6%, 11% and 20% all may be material).

The misrepresentation and omissions regarding Letcavage's compensation was also clearly material.  Premier's Form 10-K filing for 2013 stated that there was no employment contract in the company. *Facts* ¶ 87, Ex. 38 at 20.  In fact, Letcavage had an employment contract for the period from January 1, 2013 through December 31, 2017.  *Facts* ¶¶ 80, 81, Ex. 52. That contract provided Letcavage with compensation that was not disclosed in Premier's public filings, such as 10% increases each year on his $240,000 annual salary, Premier stock shares he would get every year, $18,000 per year for his car expenses, and $18,000 per year for undocumented expenses. *Id.* ¶ 81. In addition, the Form 10-K for 2013 did not disclose that Letcavage was paid compensation for much more than $18,000 of undocumented expenses for 2013. *Id.* ¶¶ 82 to 84. In fact, he took out compensation for undocumented expenses that totaled $92,538.18 in 2013.  On the face of the bank documents, those expenses appear to be personal expenses.  *Id.* ¶ 85, Ex. 53.  Letcavage and Premier cannot refute that

those are personal expenses as Letcavage refused to answer based on his Fifth Amendment privilege, and Premier never produced any documents that show that they are not personal expenses. *Id.* ¶¶ 90, 91.

Finally, Premier and Letcavage made false statements regarding the value of the TPC Assets that Premier acquired at the beginning of 2013.  In the May 2013 Turnaround Press Release, Letcavage and Premier claimed that TPC Assets were valued at more than $20 million. *Facts* ¶ 102, Ex. 33.  Nowhere in the May 2013 Turnaround Press Release did Defendants disclose that Premier valued the TPC Assets on its financial statement as only $4,500,000 and that it was only goodwill assets. *Id.* Moreover, Letcavage and Premier in its financial statements and Forms 10-K and 10-Q filings did not disclose that the only reason it was valuing TPC Assets as $4.5 million goodwill, is because TPC's records were such a mess that no one could understand the actual value of the TPC Assets. *Facts* ¶¶ 99, 108 to 113. Both these representations were materially false.  The May 2013 Turnaround Press Release was false for claiming TPC Assets were valued at $20 million or more. And the financial statements were false and misleading for stating that TPC was valued as all goodwill and not disclosing that the records were such a mess that no one could value it.

### 3.     Premier and Letcavage Acted Knowingly and Recklessly

Letcavage acted with scienter.  Letcavage was the Chairman, President, CEO and CFO of Premier.  *Facts* ¶ 5. He orchestrated the Note transaction and the TPC Transaction and gave himself undocumented and undisclosed compensation for his personal expenses.  He knew or recklessly disregarded that the value of the Note was baseless and inflated.  *Facts* ¶¶ 12, 13, 14, 20, 23, 28, 30, 70, 74, 75, 78.  He repeatedly made representations about these transactions and the Note, with knowledge or reckless disregard of the falsity of those statements.  In an October 3, 2012 email to Winkler, he confided, "I believe the [WePower Ecolutions] spinoff will result in nothing to our investors." *Id.* ¶ 13, Ex. 9.  Letcavage admitted in testimony that he had no reason to believe that

the borrower would be able to pay off the Note and that he did not care about the Note's value; he just wanted to get rid of Donovan. *Id.* ¶ 78, Ex. 4 at 20-21, 28-29. Letcavage also actively obfuscated the facts by, among other things, failing to provide information to the auditors and Doty Scott, the valuation firm.[13]

Letcavage also knew or recklessly disregarded that the reported "preliminary valuation" was not "preliminary," because, among other things, Premier had failed to provide Doty Scott the information it needed to do a final valuation. *Facts* ¶¶ 17 to 21. On March 29, 2013, Doty Scott made it clear to Premier that it could not do a valuation and "This preliminary valuation is not to be quoted at this time." *Id.* ¶ 19, Ex. 17. Also, Letcavage's email with Winkler and his testimony in the investigation shows that Letcavage understood that the Note was worthless. *Id.* ¶¶ 13, 70, 78, Ex. 9, Ex. 4 at 20 to 21 and 28 to 29, Ex. 8 at 155. Doty Scott confirmed the Note was worthless. *Id.* ¶ 74, Ex. 27.

Letcavage knew or recklessly disregarded the false facts and omissions regarding his compensation. Letcavage signed his employment agreement and also the Form 10-K for Premier which falsely stated there was no employment agreement. *Id.* ¶¶ 80, 87, Exs. 38, 52. Letcavage was aware or recklessly disregarded that he was getting additional compensation in his employment agreement which was not disclosed in the Form 10-K. *Id.* ¶¶ 81, 85, Ex. 38. In additional, Letcavage knew or recklessly disregarded that he failed to disclose additional compensation from Premier, which was paying his personal expenses, which totaled $92,538.18 for 2013. *Id.* ¶¶ 82 to 84, Exs.

---

[13]   Greenblatt's communications with Letcavage show that Letcavage knew that that the Note was not worth $869,000 and that they were getting the auditors to also go along with their scheme or fooling the auditors. In March 2013, he texted Letcavage, asking to discuss with him "valuation strategy." *Id.* ¶ 23, Ex. 21. Then, on May 22, 2013, a week before Premier's Form 10-Q for the first quarter of 2013 was filed, Greenblatt again texted Letcavage, reporting: "Eric [Rosenberg] just talked to the auditors and they apparently are buying the 869000 valuation." *Id.* ¶ 39, Ex. 31.

38, 53.

Letcavage also knew his representation in the May 2013 Turnaround Press Release that the TPC Assets were worth $20 million was false or misleading as Premier's financial statements, which Letcavage also signed, said TPC was only valued at $4.5 million as goodwill. *Id.* ¶¶ 96, 102, Exs. 28, 33.  Letcavage also knew or recklessly disregarded that statements in the public filings that the TPC valuation was "still in process" were false and misleading because he knew that Premier had not provided Doty Scott with the information it had requested and needed in order to determine this valuation. *Id.* n. 10. He also knew or recklessly disregarded that TPC's assets were listed entirely on the financial statements as goodwill because TPC's books and records were such a mess.

Letcavage did all this while Premier actively raised nearly seven million dollars from investors and lavishly paid Letcavage and his entities.  *Id.* ¶¶ 88, 89, 118, Exs. 38, 53, 63.

Letcavage's scienter is imputed to Premier as Letcavage was that company's Chairman, President, CEO and CFO.

### D. Letcavage and Premier Engaged in a Fraudulent Scheme in Violation of Securities Act Sections 17(a)(1) and 17(a)(3) and Exchange Act Section 10(b) and Rules 10b-5(a) and (c)

Section 17(a)(1) of the Securities Act makes it unlawful, in the offer or sale of a security, for any person, directly or indirectly, to employ any device, scheme, or artifice to defraud.  Section 10(b) of the Exchange Act and Rule 10b-5(a) makes it unlawful, in connection with the purchase or sale of a security, for any person, directly or indirectly, to use any device, scheme, or artifice to defraud any person.  Securities Act Section 17(a)(3) makes it unlawful, in the offer or sale of a security for any person, directly or indirectly, to engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit upon the purchaser.  Exchange Act Rule 10b-5(c) makes it unlawful, in connection with the purchase or sale of any security, for any person, directly or indirectly, to engage in any act, practice, or course of business which operates or

would operate as a fraud or deceit upon any person.  Scienter is required to establish a violation of Securities Act Section 17(a)(1) and Section Rules 10b-5(a) and (c).  *Aaron,* 446 U.S. at 697; negligence is sufficient to establish liability under Securities Act Section 17(a)(3).  *SEC v. Ginder,* 752 F. 3d 569, 574 (2nd Cir. 2014).  The same materiality standard applies to the scheme liability provisions as the standard discussed in Section II.C.2. above.

In addition to their false and misleading statements in the Company's 2012 and 2013 financial statements, Forms 10-K and 10-Q (for all four quarters of 2013 and first quarter of 2014) and press releases, Letcavage and Premier devised and carried out deceptive acts and practices and a course of business that operated as a fraud throughout the relevant period.  The deceptive conduct included: planning and orchestrating cashless transactions, involving the swaps of stock for worthless assets (*i.e.*,  the transactions with Donovan that created the Note and then the subsequent transaction with Winkler swapping the Note for Premier stock) at the beginning of 2013 and 2014, for the ostensible purposes of obfuscating Premier's poor results in its fiscal-year financial statements; planning and orchestrating these transactions; providing Letcavage with an undisclosed employment agreement and compensation; using the TPC Transaction primarily to provide a means to inflate Premier's assets and to consolidate Letcavage's control of the Company; and by stonewalling information requests from the Doty Scott, the valuation firm.

### E.    Letcavage is Liable, as a Control Person, for Premier's Violations of the Antifraud Provisions  under the Exchange Act

Insofar as Premier itself violated the antifraud provisions of the Exchange Act, Letcavage's exercise of control over the Company and culpable participation in the Company's fraudulent acts render him liable as a control person pursuant to Exchange Act Section 20(a).  Section 20(a) provides that every person who, directly or indirectly, controls any person liable for violating the Exchange Act or any rule thereunder shall also be jointly and severally liable, to the same extent, for the same violations of the Exchange Act.  "[C]ontrol" has been defined to mean the "possession, direct or

indirect, of the power to direct or cause the direction of the management and policies of a person, whether through ownership of voting securities, by contract, or otherwise."  17 C.F.R. § 230.405. "The legislative purpose in enacting a control person liability provision was to prevent people and entities from using straw parties, subsidiaries, or other agents acting on their behalf to accomplish ends that would be forbidden directly by the securities laws."  *Laperriere v. Vesta Ins. Group, Inc.*, 526 F. 3d. 715, 721 (11th Cir. 2008).

To establish control person liability under Section 20(a), the Plaintiff must show: (1) an underlying primary violation of the securities laws by the controlled person; and (2) control over the controlled person.  *Howard v. Everex Sys.*, 228 F.3d 1057, 1065 (9th Cir. 2000) (unlike in other circuit, culpable participation not needed in 9th Circuit; noting "[p]laintiff need not show that the defendant was a culpable participant, but defendant may assert a 'good faith' defense.")  Control over a primary violator may be established by showing that the individual had the power, directly or indirectly, to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract, or otherwise.  Letcavage, as Chairman, President, CEO and CFO, had and exercised control over Premier and the relevant conduct.

## F.   Letcavage Aided and Abetted Premier's Violations of Securities Act Sections 17(a)(2) and 17(a)(3)

Section 15(b) of the Securities Act and Section 20(e) of the Exchange Act provide aiding and abetting liability for any person who at least recklessly provides substantial assistance to another person in violation of any provision.  To establish aiding and abetting liability, the Plaintiff must prove:  "(1) the existence of an independent primary violation; (2) actual knowledge by the alleged aider and abettor of the primary violation and of his or her own role in furthering it; and (3) 'substantial assistance' in the commission of the primary violation." *SEC v. Fehn*, 97 F.3d 1276, 1288 (9th Cir. 1996) citing *Hauser v. Farrell*, 14 F.3d 1338, 1343 (9th Cir. 1994) (setting forth elements of aiding and abetting liability under Section 10(b); *see also SEC v. Apuzzo*, 689 F.3d 204

at 206 (2d Cir. 2012).  A "high degree of knowledge may lessen the SEC's burden in proving substantial assistance, just as a high degree of substantial assistance may lessen the SEC's burden in proving *scienter*."  *Apuzzo*, 689 F. 3.d at 215.  The Plaintiff must show that the defendant acted knowingly or recklessly.  Exchange Act Section 20(e).

Letcavage aided and abetted Premier's violations.  Among other things, he devised and orchestrated the asset swap with Donovan that created the Note, the compensation and Perks and employment agreement that Premier provided Letcavage, and the TPC Transaction; moreover, he overstated the value of the Note in the Company's periodic filings, and signed the filings as principal executive officer and principal financial officer. Letcavage also signed and approved the May 2013 Turnaround Press Release.  Letcavage also signed his employment agreement and the Form 10-K that did not disclose that agreement and the additional compensation that he received from Premier.  Thus, he was essential to the Company's violations and knowingly aided the Company in committing these violations.

### G.  Premier Violated, and Letcavage Aided and Abetted, Premier's Violations of Reporting Provisions of the Exchange Act and Letcavage Violated Exchange Act Rule 13a-14.

Exchange Act Section 13(a) and Rules 13a-1, 13a-11 and 13a-13 thereunder require every issuer of a security registered pursuant to Exchange Act Section 12 to file with the Commission, among other things, annual, quarterly and current reports as the Commission may require.  Implicit in these provisions is the requirement that the information reported be true, correct and complete. *See SEC v. IMC International, Inc.*, 384 F. Supp. 889, 893 (N.D. Texas), *aff'd mem.*, 505 F.2d 733 (5th Cir. 1974).  No showing of scienter is required to prove a violation of these provisions.  *See, e.g., McNulty*, 137 F.3d at 740-41.

Premier violated Exchange Act Section 13(a) and Rule 13a-1 by filing the 2012 and 2013 Forms 10-K that, among other things, reported the Note as an asset with a fair value of $869,000,

when that value did not conform to GAAP and was inflated, and in, the FY 2013 Form 10-K, by reporting as part of Premier's income, the purported gain on the disposition of the discontinued operations in exchange for the Note.  Premier also violated these provisions by falsely representing that Premier had no employment agreement and not disclosing Letcavage's full compensation and benefits.  Premier also falsely valued the TPC Assets.  Premier violated Section 13(a) and Rule 13a-13 by filing the 2013 Forms 10-Q containing those same improper and inflated assets and income figures.  In addition, Premier violated Exchange Act Section 13(a) and Rules 13a-1and 13a-13 by filing the 2013 Form 10-K and three 2013 Forms 10-Q that improperly accounted for Premier's TPC stake.  The 2013 Form 10-K also failed to disclose Letcavage's extensive Perks and his employment agreement.  The Company also violated Section 13(a) and Rule 13a-11 by filing, on Form 8-K, the May 30, 2013 earnings release touting the Company's purportedly positive results for the quarter, based in part on the false valuation of the Note and the representations about the value of the "residential deregulated energy contracts" obtained with TPC and the state of the independent valuation of the assets acquired in the TPC Transaction.

Letcavage aided and abetted these violations.  As discussed above, Letcavage certified all of Premier's financial statements and oversaw the filing of Premier's forms with the SEC. Letcavage also drafted and issued Premier's press releases and his signed his employment contract with Premier during the relevant period and oversaw the compensation he paid himself from Premier. He knew, or was reckless in not knowing, that the above-described filings were false and misleading.

Letcavage as Premier's CEO and CFO is responsible for the accuracy of Premier's financial statements filed with the SEC under Section 302 of the Sarbanes-Oxley Act of 2002 that Congress passed in the wake of the Enron and Worldcom securities frauds ("SOX").  Exchange Act Rule 13a-14, promulgated by the SEC pursuant to SOX, requires that each report filed on Form 10-Q

and 10-K under Exchange Act Section 13(a) include certifications prescribed in item 601(b)(31) of Regulation S-K, signed by each principal executive and principal financial officer of the issuer, or persons performing similar functions.  Letcavage, as Premier's Chairman, President, CEO and CFO, signed the SOX 302 certifications for Premier's 2012 and 2013 Forms 10-K and Q1, Q2, and Q3 2013 Forms 10-Q, certifying, among other things, that based on his knowledge the Company's filings did not contain any untrue statement of material fact; fairly presented, in all material respects, Premier's financial condition; and has disclosed to the auditors and audit committee any fraud, in violation of sub-paragraphs 2,3, and 5 of item 601(b)(31) of Regulation S-K.

Letcavage certified Premier's financial statements despite knowing that: (1) Premier had inflated the value of the Note by material amounts; and (2) the financial statements did not fairly present the value of the Note -- which was zero.  Letcavage also mislead investors by falsely stating in the Form 10-K for 2013 that Premier had no employment agreements and not disclosing the Perks and additional compensation that Letcavage received.  Letcavage also misled investors in these filings by, among other things, indicating that a valuation of the TPC Transaction was occurring, failing to disclose that the Company was not providing essential information requested by Doty Scott, and falsely valuing TPC in Premier's May 2013 Turnaround Press Release as being valued more than $20 million.  Accordingly, Letcavage violated Rule13a-14 under the Exchange Act.

## H.    The Court Should Issue the Relief Sought by the SEC.

*Injunctive relief.*  Section 20(b) of the Securities Act, 15 U.S.C. § 77t(b), and Section 21(d) of the Exchange Act, 15 U.S.C. § 78u(d), provide that when the evidence establishes a reasonable likelihood of a future violation of the securities laws, a permanent injunction shall be granted in enforcement actions brought by the SEC.  *Fehn*, 97 F.3d at 1295-96.  Factors to be considered include the degree of scienter involved; the isolated or recurrent nature of the infractions; the defendant's recognition of the wrongful nature of his conduct; the likelihood that, based on the

defendant's occupation, future violations might occur; and the sincerity of the defendant's assurances against future violations.  *Id.*  Here, the totality of the circumstances weighs in favor of a permanent injunction.

Letcavage's and Premier's failures covered a long period of time and resulted in the filing of at least three false financial statements with the SEC.  Nonetheless, Letcavage and Premier have expressed no remorse nor responsibility for their conduct.  *Facts* ¶¶ 24, 25, 59, 60. Because Letcavage and Premier take no responsibility for their conduct, and it is likely that they would commit the same violations in the future.

**Officer and Director Bar Against Letcavage.** The Court should impose a bar against Letcavage from acting as an officer or director of any public company.  Securities Act Section 20(e) and Exchange Act Section 21(d)(2) authorize federal courts to impose an officer and director bar on an individual who violates the antifraud provisions if the person's conduct demonstrates "unfitness" to serve as an officer or director of a public company.

In deciding whether to impose an officer and director bar, courts consider six factors: (1) the egregiousness of the conduct; (2) the defendant's "repeat offender" status; (3) the defendant's role or position when he or she engaged in the conduct; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur.  *See SEC v. First Pacific Bancorp*, 142 F.3d 1186 (9th Cir.1998) (affirming imposition of permanent bar)(citing *SEC v. Patel*, 61 F.3d 137 (2d Cir. 1995)); *SEC v. Posner*, 16 F.3d 520, 522 (2d Cir. 1994) (affirming permanent bar, finding it was not a "draconian remedy of eternal boardroom banishment" but rather "should be seen as a sharp warning to those who violate the securities laws that they face precisely such banishment"); *SEC v. Aqua Vie Beverage Corp.*, No. CV 04–414–S–EJL, 2008 WL 1914723, at *2 (D. Id. Apr. 29, 2008) (imposing eight year officer and director bar for reckless conduct).[14]

---

[14] Some courts post-SOX consider two additional factors, the defendant's acknowledgment of wrongdoing and the credibility of the defendant's contrition.  *See, e.g., SEC v. Levine*, 517 F.Supp.2d 121, 144–45 (D.D.C. 2007).  As noted above, Letcavage continues to contest that his conduct and he defrauded the public markets and refuses to testify and has asserted the Fifth

Letcavage has not previously been found to have violated the federal securities laws (although he has been subject to state securities law actions), but the remaining *First Pacific Bancorp* factors for imposing an officer and director bar all argue for imposing one on Letcavage. Letcavage made significant misstatements that resulted in Premier filing fraudulent financial statements; he did so while he was serving as Premier's Chairman, President, CEO and CFO; he made those misstatements knowingly or recklessly; and he stood to make significant financial gains from the boost in Premier's stock price as well as its continued ability to obtain investments through private offerings.  In addition, he continues to serve as a high-level executive of a publicly-owned company, and his misconduct demonstrates his unfitness to serve as a public company officer and director.  Moreover, Letcavage's and Premier's conduct in this litigation, where they have violated discovery rules and various Court orders, show that Letcavage refuses to follow rules and continues to pose a risk to the investing public.

**A Penny Stock Bar against Letcavage.**  The Court should also impose a penny stock bar on Letcavage based upon the previously described acts of fraud. Securities Act Section 20(g) and Exchange Act Section 21(d)(6) authorize district courts in injunctive proceedings to impose a penny stock bar against a person "who was participating in an offering of penny stock."[15]  "When deciding to impose such a bar, the court looks at essentially the same factors that govern the imposition of an

_____

Amendment Privilege.

[15] During the relevant period, Premier's securities qualified as "penny stock" because they did not meet any of the exceptions from the definition of a "penny stock," as defined by Exchange Act Section 3(a)(51) and Rule 3a51-1 thereunder.  Among other things, the securities were equity securities: (1) that were not an "NMS stock" as defined in 17 C.F.R. § 242.600(b)(47); (2) traded below five dollars per share during the relevant period;  (3) whose issuer had net tangible assets and average revenue below the thresholds of Rule 3a51-1(g)(1); and (4) did not meet any of the other exceptions from the definition of "penny stock" contained in rule 3a51-1 under the Exchange Act. Letcavage was a "participating in an offering of penny stock" because he engaged in activities with an issuer for the purpose of issuing, trading and/or inducing or attempting to induce the purchase or sale of Premier's securities.  Securities Act Section 20(g)(2); Exchange Act Section 21(d)(6)(B).

Case No.  8:18-cv-00813-CGC-KES

officer or director bar." *SEC v. Alliance Transcription Servs.*, 2010 U.S. Dist. LEXIS 10646, Fed.

Sec. L. Rep. (CCH) P95,598 at *6 (D. Ariz. Feb. 8, 2010) (citing *Steadman v. SEC*, 603 F.2d 1126,

1140 (5th Cir.1979)).   The factors are: (1) the egregiousness of the underlying securities violation;

(2) the defendant's "repeat offender" status; (3) the defendant's role or provision when he engaged

in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the

violation; and (6) the likelihood that misconduct will recur.  *First Pacific Bancorp*, 142 F.3d at

1193, citing *SEC v. Patel,* 61 F.3d at 141; *see, e.g. SEC v. Abellan*, 674 F. Supp. 2d 1213, 1222-23

(W.D. Wash. 2009) (imposing permanent penny stock bar where defendant "organized and carried

out a prolonged scheme to defraud investors that involved a high degree of scienter"; the defendant

"was involved in this scheme at the highest level"; and the Court found it was an exceptionally

egregious violation of the underlying securities laws").

  ***Monetary relief.***  It is well settled that the SEC may seek, and courts may order,

disgorgement of ill-gotten gains.  *See First Pacific Bancorp*, 142 F.3d at 1191.  Courts have "broad

equity powers to order the disgorgement of 'ill-gotten gains' obtained through the violation of the

securities laws." *Id*.  Disgorgement usually includes prejudgment interest, which courts order to

ensure that the wrongdoer does not profit from the illegal activity.  *SEC v. Lund,* 570 F. Supp.1397,

1404 (C.D. Cal. 1983).  Section 20(d) of the Securities Act, 15 U.S.C. § 77t(d), and Section

21(d)(3) of the Exchange Act, 15 U.S.C. § 78u(d)(3), provide that the SEC may seek monetary civil

penalties for violations of those Acts.  The Securities Act and the Exchange Act provide that

penalties be assessed according to a three-tier system.  The three tiers of penalty amounts

correspond to specified degrees of culpability.  *See* 15 U.S.C. §§ 77t(d) & 78u(d)(3).  If the Court

grants Plaintiff's motion, the Plaintiff will separately offer evidence regarding the appropriate

amount of disgorgement and civil penalties for defendants' violations in an amount to be

determined upon motion by the Plaintiff.

**Conclusion.**

For the reasons stated above, the Plaintiff's motion for summary judgment on liability against Letcavage and Premier should be granted.

Dated:  New York, NY
         October 13, 2020

                                      Respectfully submitted,
                                      */s/ Alexander Vasilescu*
                                      Alexander Vasilescu
                                      Bennett Ellenbogen
                                      Amy Longo
                                      Attorneys for Plaintiff
                                      Securities and Exchange Commission

## **PROOF OF SERVICE**

I am over the age of 18 years and not a party to this action.  My business address is:

U.S. SECURITIES AND EXCHANGE COMMISSION
200 Vesey Street, Suite 400, New York, Ney York 10281
Telephone No.  (212) 336-0062; Facsimile No.  (213) 443-1904.

On August 19, 2020, I caused to be served the document entitled PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTIONS FOR A PRECLUSION ORDER AND SUMMARY JUDGMENT against Randall Letcavage and Premier Holdings on all the parties to this action addressed as stated on the attached service list:

☐    **OFFICE MAIL:**  By placing in sealed envelope(s), which I placed for collection and mailing today following ordinary business practices.  I am readily familiar with this agency's practice for collection and processing of correspondence for mailing; such correspondence would be deposited with the U.S. Postal Service on the same day in the ordinary course of business.

☐    **PERSONAL DEPOSIT IN MAIL:**  By placing in sealed envelope(s), which I personally deposited with the U.S. Postal Service.  Each such envelope was deposited with the U.S. Postal Service at Los Angeles, California, with first class postage thereon fully prepaid.

☐    **EXPRESS U.S. MAIL:**  Each such envelope was deposited in a facility regularly maintained at the U.S. Postal Service for receipt of Express Mail at Los Angeles, California, with Express Mail postage paid.

☐    **HAND DELIVERY:**  I caused to be hand delivered each such envelope to the office of the addressee as stated on the attached service list.

☐    **UNITED PARCEL SERVICE:**  By placing in sealed envelope(s) designated by United Parcel Service ("UPS") with delivery fees paid or provided for, which I deposited in a facility regularly maintained by UPS or delivered to a UPS courier, at Los Angeles, California.

☒    **ELECTRONIC MAIL:**  By transmitting the document by electronic mail to the electronic mail address as stated on the attached service list.

☒    **E-FILING:**  By causing the document to be electronically filed via the Court's CM/ECF system, which effects electronic service on counsel who are registered with the CM/ECF system.

☐    **FAX:**  By transmitting the document by facsimile transmission.  The transmission was reported as complete and without error.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  October 13, 2020

/s_____
Bennett Ellenbogen

**SEC v. Premier Holding Corp, et al.**
**United States District Court – Central District of California**
**Case No. 18:00813-(CJC)-(KES)**

**SERVICE LIST**

**Lahdan S. Rahmati**
**Law Offices of Lahdan S. Rahmati**
1901 Avenue of the Stars, Second Floor
Los Angeles, California 90067
Email: lrahmati@rahmatilawoffices.com

Counsel for Defendants Randall Letcavage and Premier Holding Corporation

*Pro Se Defendant*
Joseph Greenblatt
1701 Brookshire Ave. Tustin, CA 92780-6642
By Email: jboatjoe@gmail.com

Case No.  8:18-cv-00813-CGC-KES