```
                                                    FILED
                                          CLERK, U.S. DISTRICT COURT

                                              11/30/2020

                                          CENTRAL DISTRICT OF CALIFORNIA
                                          BY:      CW            DEPUTY
```

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA - SOUTHERN DIVISION

|  |  |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No.: SACV 18-00813-CJC(KESx) |
| Plaintiff, | |
| v. | ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT [Dkt. 192] |
| PREMIER HOLDING CORPORATION, RANDALL LETCAVAGE, and JOSEPH GREENBLATT, | |
| Defendants. | |

## I. INTRODUCTION

Plaintiff Securities and Exchange Commission ("SEC") brought this enforcement action against Defendants Premier Holding Corporation ("Premier"), Randall Letcavage ("Letcavage"), and Joseph Greenblatt.  (Dkt. 1 [Complaint, hereinafter "Compl."].)  On December 10, 2019, the Court granted the SEC's motion for summary judgment against

Greenblatt.  (Dkt. 146.)  Before the Court is the SEC's motion for summary judgment against Premier and Letcavage (collectively "Defendants").  (Dkt. 192 [hereinafter "Mot."].)  Defendants oppose this motion.  (*See* Dkt. 194-1 [Opposition, hereinafter "Opp."].)  For the following reasons, the SEC's motion for summary judgment is **GRANTED**.

## II.  BACKGROUND

This SEC enforcement action arises out of alleged securities violations which occurred in 2013.  Premier is a public company that was attempting to break into the green energy market.  (Dkt. 192-3 [Declaration of Bennett Ellenbogen, hereinafter "Ellenbogen Decl."] Ex. 2.)  As a public company, Premier is required to file periodic reports with the SEC and to ensure that its financial statements comply with generally accepted accounting principles ("GAAP").  (Dkt. 192-2 [SEC's Statement of Uncontroverted Facts, hereinafter "SEC Facts"] ¶¶ 1–2.)  The SEC's claims against Defendants arise from statements in Premier's public filings with the SEC concerning the disclosure of Letcavage's compensation and two of the company's largest assets, a promissory note and common stock in a start-up company.

### A.    The WePower Note

On October 5, 2012, Randall Letcavage became the Chairman, President, CEO, and CFO of Premier.  (SEC Facts ¶ 5.)  Soon after assuming these leadership positions, Letcavage executed an asset sale agreement between Premier and WePower Eco Corp ("WePower"), a new start-up company.  (*Id.* ¶ 11.)  Pursuant to the agreement, Premier transferred solar energy, wind power, and energy efficiency assets to WePower in exchange for a $5,000,000 promissory note.  (*Id.*)  Interest payments on the note were not scheduled to begin until December 2013.  (*Id.* ¶ 55.)

Soon after signing the agreement, Letcavage—as CEO and CFO—oversaw and approved Premier's financial statements for inclusion in its 2012 Form 10-K.  (*Id.* ¶ 10.) In connection with these statements, Premier hired Phil Scott of Doty Scott, an auditing firm, to provide a valuation of the $5,000,000 WePower note.  (*Id.* ¶ 15.)

On March 29, 2013, Doty Scott provided Premier with an initial valuation of the WePower note despite not having received the additional information from Premier or WePower that was needed to make a reliable valuation of the note.  (Ellenbogen Decl. Exs. 17–18.)  In an email to Larry Young, Premier's Vice President, Doty Scott cautioned Premier that because "the buyer [WePower] refused to provide us with any information," he was forced to make substantial "assumptions" when valuing the note.  (*Id.* at Ex. 17.) In light of the critical missing information, Doty Scott stated that "this preliminary valuation is not to be quoted at this time."  (*Id*.)  The initial valuation tables provided that—based on two preliminary calculation methods—the WePower note was worth either $869,000 or $698,377.  (Ellenbogen Decl. Ex. 18.)

At the time, Greenblatt—a consultant hired to help Letcavage with the public filings—was aware Doty Scott was unable to obtain any information that would assist it in valuing the WePower note.  (SEC Facts ¶ 22.)  Neither Greenblatt nor anyone else, responded to Doty Scott's requests for financial projections or other relevant documents. (*Id.*)  While ignoring Doty Scott's requests, Greenblatt continued to keep Letcavage informed of his attempts to value the note.  (*Id.* ¶ 23; *see* Ellenbogen Decl. Ex. 21.)

Despite Doty Scott's instruction not to quote the valuation, it was ultimately included in Premier Holding's 2012 Form 10-K, which was filed on April 22, 2013.  (*Id.* ¶ 11.)  Specifically, the 10-K contains a note which states: "[Premier Holding] sold certain assets related to solar energy, wind power projects, energy efficiency projects in

real estate and fuel efficiency for diesel and gasoline engines for a note payable for $5,000,000 (preliminary valuation on the note is $869,000)." (Ellenbogen Decl. Ex. 2 at 46.) Premier continued to quote the $869,000 figure in quarterly Form 10-Qs that were filed with the SEC for the quarters ending on March 31, June 30, and September 30, 2013. (Ellenbogen Decl. Exs. 28, 34, 35.) The WePower note was Premier's largest asset and the $869,000 valuation gave it the false and misleading appearance of a profitable company. (SEC Facts ¶¶ 31–32.) Throughout 2013, Premier Holding raised nearly $7 million from investors through sales of stock and convertible notes. (*Id.* ¶ 118.)

The WePower note fell into default on December 22, 2013 when WePower failed to make its first interest payment. (*Id.* ¶ 56.) On April 9, 2014, Doty Scott provided Premier with its final valuation report regarding the WePower note. (Ellenbogen Decl. Ex. 27.) The report concluded that, as of January 7, 2013, the note had a value of $0 given that it was unsecured and issued by a start-up company with limited assets that had refused to provide any financial projections. (*Id.*)

## B.    The TPC Assets

On February 26, 2013, Premier acquired an 80 percent interest in The Power Company USA, LLC ("TPC") in exchange for 30,000,000 shares of Premier common stock. (Ellenbogen Decl. Ex. 2.) TPC was an Illinois-based limited liability company that had allegedly developed software which enabled its clients to compare rates and services offered by different power suppliers. (*Id.*) After Premier's acquisition of TPC, Greenblatt traveled to Chicago to inspect TPC's books and records. (Ellenbogen Decl. Ex. 30 [Investigative Deposition of Joseph Greenblatt, hereinafter "Greenblatt Inv. Tr."] at 76.) Greenblatt encountered considerable difficulty in attempting to value the TPC assets and testified that TPC's books were "perfectly unauditable." (*Id.*) He was unable

to obtain any hard numbers from TPC and instead was forced to rely on estimates.  (SEC Facts ¶ 106.)

Despite these irregularities and deficiencies, Premier included information regarding the TPC acquisition in its SEC filings and other public disclosures.  (*Id.* ¶¶ 100–02, 112.)  Premier's first and second quarter 213 10-Qs valued the newly acquired TPC assets at $4,500,000, all attributable to goodwill.  (Ellenbogen Decl. Exs. 28, 34.)  The 10-Qs also provided that "valuations necessary to assess the fair values of certain net assets acquired and the amount of goodwill to be recognized are still in process."  (*Id.*)  The SEC contends that the TPC assets were only attributed to goodwill because no one at Premier was able to make sense of TPC's books and records.  (SEC Facts ¶ 66.)  Around the time of these filings, Premier issued press releases claiming that the TPC assets it acquired were worth approximately $20,000,000.  (*Id.* ¶ 102.)  Letcavage also wrote an open letter to shareholders which stated that TPC had "significant assets," including "receivables of over $1,000,000," and "power contracts with 8,600 customers that we believe represent in excess of $8,000,000 of assets that will become part of Premier Holding."  (Ellenbogen Decl. Ex. 58.)

## C.    Letcavage's Compensation

On January 1, 2013, Letcavage executed an employment agreement with Premier for a term through December 31, 2017.  (Ellenbogen Decl. Ex. 52 [Employment Agreement].)  The Employment Agreement provided that Letcavage would receive $1,500 per month for undocumented expenses ("Perks"), in addition to his $240,000 annual base salary[1] with 10% annual increases, annual bonus, $1,500 monthly car

---

[1] The Employment Agreement states that Letcavage would receive "[a]n annual base salary of $20,000 . . . for each 12 month period during the Term of Employment," (Employment Agreement at 2), and the parties agree that Letcavage's annual salary was in fact $240,000, (Dkt. 194 [Defendants' Statement of Genuine Disputes, hereinafter "SGD"] ¶ 81).

allowance, and annual stock awards.  (*Id.* at 2–4.)  Throughout 2013, Letcavage paid

himself Perks from Premier far in excess of the $1,500 per month.  (*See* Ellenbogen Decl.

Ex. 53.)  These Perks included personal expenses such as clothing and accessories,

airlines and hotels, iTunes music, restaurants and wine clubs, florists, Netflix, and gift

cards to various stores.  (*See id.*)  Letcavage paid himself a total of $92,538.18 in Perks in

2013.  (*See id.*)

Despite Letcavage's Employment Agreement, Premier's 2013 10-K states that it

had not entered into any employment agreement and discloses that Letcavage received a

$240,000 salary, $37,500 for consulting, $661,319 for contract labor, and $66,287 in "All

Other Compensation" related to payments for consulting services to iCapital Advisory,

which Letcavage is the President of.  (*See* Ellenbogen Decl. Ex. 38 at 20.)  It does not

disclose the $92,538.18 in Perks he received, his stock awards, or any other

compensation under the Employment Agreement.  (*See id.*)

## D.    The Enforcement Action

The SEC alleges that Premier and Letcavage engaged in a fraudulent scheme "to

mislead investors about Premier's success and prospects, hide Premier's losses and

inflate its assets, and also to make false statements and omissions about Letcavage's

compensation and his contract with Premier and all the undisclosed compensation and

perks he took out of Premier."  (Mot. at 2.)  Letcavage allegedly engaged in the WePower

note and TPC asset transactions "to create the appearance of Premier as an active

company with a vibrant business."  (*Id.*)  According to the SEC, "these transactions

provided little or no value to Premier" and these transactions were created by Letcavage

"to mislead investors about the financial health of the Company, and create[]

opportunities for obfuscation and fraud in the Company's financial statements and press

releases."  (*Id.* at 2–3.)  The SEC contends that Letcavage—who controlled and ran

Premier as Chairman, President, CEO, and CFO—was ultimately responsible for finalizing and approving Premier's publicly filed financial statements, and knowingly finalized and approved materially misleading financial statements, public filings, and press releases.  (*Id.* at 3.)

The SEC filed this action on December 12, 2017, alleging that Letcavage violated (1) Section 17(a) of the Securities Act, (2) Section 10(b) of the Exchange Act and Rule 10b-5 thereunder, and (3) Sections 13(a) and 13(b)(5) of the Exchange Act and Rules 13a-14 and 13b2-1 thereunder.  (*Id.* at 1.)  It also alleges that Letcavage is liable (4) as a control person, pursuant to Section 20(a) of the Exchange Act, for Premier's Section 10(b) and Rule 10b-5 violations and (5) for aiding and abetting Premier's violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act, Section 13(a) of the Exchange Act, and Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act.  (*Id.*)  Finally, the SEC alleges that Premier is liable for violating (1) Section 17(a) of the Securities Act of 1933 ("Securities Act"), (2) Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 thereunder, and (3) Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act and Rules 13a-1, 13a-11, and 13a-13 thereunder.  (*Id.*)

Over the course of this litigation, Letcavage has refused to cooperate in the litigation process and has engaged in procedural gamesmanship leading to numerous delays.  Letcavage has substituted counsel six times, often due to his counsel withdrawing because he refused to pay or cooperate with them.  (*See, e.g.*, Dkts. 94, 177.)  The Court has twice entered default judgment against Letcavage and Premier due to their failure to comply with Court orders.  (*See* Dkts. 135, 178.)  Letcavage was also highly uncooperative throughout discovery.  On one occasion he unilaterally cancelled a Rule 30(b)(6) deposition hours before it was scheduled to begin, causing Magistrate Judge Scott to impose discovery sanctions.  (*See* Dkt. 74.)

On December 20, 2019 the Court granted the SEC's motion for summary judgment against Greenblatt.  (Dkt. 146.)  The Court found that Greenblatt had recklessly aided and abetted Premier's primary violations of the securities laws.  (*See id.*)  The SEC subsequently filed the instant motion for summary judgment against Premier and Letcavage.

## III.  EVIDENCE PRECLUSION

As a preliminary matter, the SEC asserts that Letcavage should be precluded from offering testimony and other evidence in opposition to its motion for summary judgment because he asserted his Fifth Amendment privilege and refused to answer all substantive questions in his deposition.  (Mot. at 13–20.)  The Court agrees.

The SEC first attempted to depose Letcavage on August 28, 2019.  (*See* Ellenbogen Decl. Ex. 65 [Transcript of August 28, 2019 Letcavage Deposition].)  Before the SEC could ask any substantive questions, Letcavage walked out twice, the second time leaving for good.  (Ellenbogen Decl. ¶ 9 & n.1.)  The SEC was able to question Letcavage under oath for only 22 minutes, in which Letcavage refused to answer any substantive questions.  (*Id.*)  The Court subsequently ordered a continuation of Letcavage's deposition, which occurred on July 15, 2020.  (*See id.* at Ex. 51 [Transcript of July 15, 2020 Letcavage Deposition, hereinafter "July 15, 2020 Tr."].)  Letcavage again refused to answer any of the 30 substantive questions from the SEC, this time invoking the Fifth Amendment.  (*See id.*; Ellenbogen Decl. ¶ 11.)  During this deposition, the SEC specifically advised Letcavage that the Court could draw an adverse inference and preclude him from presenting evidence due to his refusal to testify.  (July 15, 2020 Tr. at 53:15–21.)  Letcavage acknowledged that he understood, continued to rely on the

Fifth Amendment privilege, and refused to testify.  (*Id.* at 53:22–54:8; Ellenbogen Decl. ¶ 12.)[2]

Asserting his Fifth Amendment privilege, Letcavage refused to answer all questions regarding the WePower note, including:

> **Q.**  Isn't it correct that in 2012 – in the 2012 Annual Report Form 10-K for Premier you caused in Note 10 subsequent events to have that note valued at $869,000?
> **Q.**  Isn't it correct that at the time that you valued the note at $869,000 you understood that there was no basis for such a valuation?
> **Q.**  And isn't it correct that at the time that you valued the note at $869,000 you understood that the valuation from Doty Scott had refused to value that WePower Eco note, as it did not have enough information concerning WePower Eco and its ability to pay?
> **Q.**  Isn't it correct that you valued the WePower Note at $869,000 so that you could give the appearance to investors and potential investors that you had financially turned around Premier[] Holding?
> **Q.**  Isn't it correct that you caused the note to be valued at $869,000 in all other public disclosures, including 10-Qs and the 10-K and press releases during 2013?
> **Q.**  Isn't it correct that you were aware that Doty Scott valued the note at $0?
> **Q.**  Isn't it correct that you are responsible as the CEO and CFO of Premier Holding for the accuracy of the company's financial statement?

(July 15, 2020 Tr. at 50:3–51:6, 51:22–25.)  Letcavage also refused to answer all questions, again asserting his Fifth Amendment Privilege, regarding the TPC assets, including:

---

[2] Defendants argue that Letcavage's August 28, 2019 and July 15, 2020 depositions were unnecessary because he testified at Premier's Rule 30(b)(6) deposition in February 2019.  The Court disagrees.  The February 2019 deposition was limited to Premier's compliance with its discovery obligations and Defendants' counsel objected to any questioning beyond asking for documents that had not been produced.  (Ellenbogen Decl. ¶¶ 22–23; *see id.* Exs. 54, 72.)

**Q.**  Isn't it correct that at the time Premier Holding acquired TPC, you understood that TPC's books and records were a mess and were unauditable?

**Q.**  And isn't it correct that in [press releases, and at least one filed with the SEC as a 10-K] you put number values for the value of TPC assets when you understood that you didn't have a basis to value those assets?

**Q.**  And isn't it correct in the form – that in the Form 10-k from 2012 and the Form 10-Q of 2013 you put the value of TPC assets for Premier Holding to be all, quote, "goodwill" because you knew the books and records were a mess?

**Q.**  And – and isn't it correct that you didn't tell investors that the reason TPC's assets were listed as goodwill in the financial statements was because TPC's books and records were a complete mess and unauditable?

(*Id.* at 52:6–9, 52:19–23, 53:3–14.)  Letcavage also asserted the Fifth Amendment privilege when refusing to answer any questions about Premier's disclosures regarding his compensation and Employment Agreement, including:

**Q.**  And isn't it correct that you entered into an employment agreement with Premier, and the Form 10-Ks you filed with Premier[] for 2012 and . . . 2013 . . . falsely stated that Premier had entered no employment agreements?

**Q.**  Isn't it correct that the Forms 10-K that you filed for Premier for 2012 and 2013 did not reveal that you received $1500 for car allowance and $1500 for undocumented discretionary expenses each month?

**Q.**  Isn't it correct that you received each month reimbursement from Premier Holding for expenses in excess of the $1500 undocumented discretionary expenses in your employment agreement for which you did not provide Premier[] documentation for those expenses as legitimate business expenses?

**Q.**  Isn't it correct that you have absolutely no support for any of the reimbursements that you received, such as receipts, bills, or invoices?

**Q.**  Isn't it correct that in the forms 10-K for 2012 and 2013 that you filed for Premier[] did not disclose the additional expense reimbursement that you received from Premier[] for which you had not – no documentation to establish that they were business expenses and not personal expenses?

**Q.**  And isn't it correct that Premier[] was not an operating company in 2012 and 2013, and the moneys that you used to pay your personal expenses came from investors['] funds?

(*Id.* at 54:19–56:3.)  Finally, Letcavage asserted the privilege when asked if he used false and misleading press releases and SEC filings to raise money for Premier.  (*Id.* at 56:9–16.)

The Court finds precluding Letcavage's testimony and other evidence is appropriate based on his complete refusal to answer the SEC's questions about the WePower note, the TPC assets, his compensation, his role in Premier's fundraising efforts, and his role in Premier's disclosure process.  These important questions implicated the facts and evidence which are central to the SEC's claims.  While Letcavage certainly has the right to assert the privilege, he "cannot have it both ways.  By hiding behind the protection of the Fifth Amendment as to his contentions, he gives up his right to prove them."  *SEC v. Benson*, 657 F. Supp. 1122, 1129 (S.D.N.Y. 1987); *see also SEC v. Colello*, 139 F.3d 674, 678 (9th Cir. 1998) (citing *Benson* with approval). "[T]he injustice of allowing [a party who invoked the Fifth during deposition] to put on evidence at a hearing or trial on the same facts is especially manifest, and [f]or this reason, courts have frequently entered orders in such situations precluding a party from introducing any evidence in support of positions for which he refuses to disclose the evidentiary basis upon grounds of privilege."  *SEC v. Glob. Express Cap. Real Estate Inv. Fund I, LLC*, 2006 WL 7347289, at *13 (D. Nev. Mar. 28, 2006) (quotation marks and citations omitted), *rev'd in part on other grounds*, 289 Fed. App'x 183 (9th Cir. 2008).[3]

//

---

[3] The Court also notes that Defendants' Statement of Genuine Disputes is neither concise nor limited to disputes about material facts as required by Local Rule 56-2, (*see* SGD), and it cites to unauthenticated documents which "cannot be considered in a motion for summary judgment."  *Orr v. Bank of America, NT & SA*, 285 F.3d 764, 773 (9th Cir. 2002) (citations omitted).  Defendants have not attached an affidavit to authenticate their exhibits through personal knowledge and the overwhelming majority of their exhibits are not authenticatable through any other manner under Federal Rules of Evidence 901(b) or 902. (*See* Dkt. 194 at Exs. 1–4, 6, 7, 9–64.)  Only Exhibits 5 and 8, certified copies of Premier's Form 10-K, are admissible through self-authentication.  (*See* Dkts. 194-6; 194-9.)

## IV.  SUMMARY JUDGMENT

### A.    LEGAL STANDARD

The Court may grant summary judgment on "each claim or defense—or the part of each claim or defense—on which summary judgment is sought."  Fed. R. Civ. P. 56(a). Summary judgment is proper where the pleadings, the discovery and disclosure materials on file, and any affidavits show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  *Id.*; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 325.  A factual issue is "genuine" when there is sufficient evidence such that a reasonable trier of fact could resolve the issue in the nonmovant's favor.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" when its resolution might affect the outcome of the suit under the governing law, and is determined by looking to the substantive law.  *Id.*  "Factual disputes that are irrelevant or unnecessary will not be counted."  *Id.* at 249.

When, as here, the movant will bear the burden of proof on an issue at trial, the movant "must affirmatively demonstrate that no reasonable trier of fact could find other than for the moving party."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007).  Once this burden is met, the party resisting the motion must set forth, by affidavit, or as otherwise provided under Rule 56, "specific facts showing that there is a genuine issue for trial."  *Anderson*, 477 U.S. at 256.  A party opposing summary judgment must support its assertion that a material fact is genuinely disputed by (i) citing to materials in the record, (ii) showing the moving party's materials are inadequate to establish an absence of genuine dispute, or (iii) showing that the moving party lacks admissible evidence to support its factual position.  Fed. R. Civ. P. 56(c)(1)(A)–(B).  The

opposing party may also object to the material cited by the movant on the basis that it "cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). But the opposing party must show more than the "mere existence of a scintilla of evidence"; rather, "there must be evidence on which the jury could reasonably find for the [opposing party]." *Anderson*, 477 U.S. at 252.

In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the nonmoving party and draw all justifiable inferences in its favor. *Id.*; *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). The court does not make credibility determinations, nor does it weigh conflicting evidence. *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 456 (1992). But conclusory and speculative testimony in affidavits and moving papers is insufficient to raise triable issues of fact and defeat summary judgment. *Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).

## B.    Violations of Sections 17(a), 10(b) and SEC Rule 10b-5

Section 17(a) of the Securities Act, and Section 10(b) of the Exchange Act and Rule 10b-5 forbid making (1) a material misstatement or misleading omission of material fact (2) in connection with the offer or sale of a security (3) by means of interstate commerce.[4] *SEC v. Phan*, 500 F.3d 895, 907–08 (9th Cir. 2007). A fact is material if there is a substantial likelihood that a reasonable investor would consider it important in making a decision because the fact would significantly alter the "total mix" of available information. *Basic Inc. v. Levinson*, 485 U.S. 224, 232 (1982). A statement is

---

[4] Here, the second and third elements are satisfied because the SEC has shown that Defendants raised millions of dollars through private placements of stock, (SEC Facts ¶ 118), and Defendants challenge only the SEC's allegations of material misstatements, omissions of material fact, and scienter. (*See generally* Opp.)

misleading if "it would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists."  *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1109 (9th Cir. 2010) (quotation marks omitted).

The SEC asserts that Letcavage and Premier made three material misrepresentations and misleading omissions of material fact:  (1) false and misleading statements and omissions about the value of the WePower note in its 2012 and 2013 financial statements, Forms 10-K and 10-Q filings, and press releases; (2) fasle and misleading statements and omissions about the value of the TPC Assets in Premier's 2013 10-Qs, and (3) failure to fully disclose in Premier's 2013 10-K the compensation Letcavage was receiving from Premier.  (Mot. at 23.)

## 1.    The WePower Note

Defendants' representations of the value of the WePower note were materially false and misleading.  Outside of the note, Premier's 2012 balance sheet listed only $520,258 in assets.  (Ellenbogen Decl. Ex. 2.)  Thus, the $869,000 "preliminary valuation of the WePower note more than doubled Premier's assets.  Given Premier's limited assets and net worth, the value of an asset of this magnitude surely was significant to a reasonable investor.  *SEC v. Talbot*, 530 F.3d 1085, 1097 (9th Cir. 2008) (finding that courts consider a variety of factors, including the magnitude of a transaction, when determining materiality).  Premier's Form 10-K provides that the "prospects" of the WePower asset sale "have been conservatively valued at approximately $869,000." (Ellenbogen Decl. Ex. 2 at 5.)  It also provides that Premier sold certain assets "for a note payable for $5,000,000 (preliminary valuation on the note is $869,000)."  (*Id.* at 46.) One of Premier's Form 10-Qs states that "the [WePower] note has been independently valued at approximately $869,000."  (Ellenbogen Decl. Ex. 28 at 20.)

When these statements are considered in light of the information that Premier had received from Doty Scott during March 2013, there is no doubt that they were false and misleading.  Not only did Doty Scott explicitly tell Premier that they were not permitted to quote the valuation, it also explained why the valuation was not quotable.  (Ellenbogen Decl. Ex. 17.)  In order for an auditor like Doty Scott to accurately value a promissory note, it needs information regarding the borrower's ability to pay.  (*Id.* at Ex. 13 [Deposition of Phil Scott] at 48:23–49:5.)  Doty Scott informed Premier in three separate emails that WePower refused to provide any information about its current finances or future projections, and as a result, Doty Scott could not properly assign a value to the note.  (*Id.* at Exs. 17, 18, 20.)  The email containing Doty Scott's preliminary valuation explained that the $869,000 figure was based on assumption and templates, rather than any real date from WePower.  (*Id.* at Ex. 17.)  Nevertheless, Premier's Form 10-K and 10-Q omit this highly relevant information and, instead, suggest that the WePower note had significant value when it was actually worthless.  As a result, the statements contained in the forms gave "the impression of a state of affairs that differs in a material way from the one that actually exists."  *Cutera Sec. Litig.*, 610 F.3d at 1109.

### 2. The TPC Assets

Defendants' representations about the TPC asset values were also materially false and misleading.  Defendants were aware that TPC's books were "unauditable."  (SEC Facts ¶ 99.)  Instead of attempting to secure a reasonable valuation of the assets, Defendants stated that TPC's assets were valued at $4,500,000 and attributed them all to goodwill in their Form 10-Qs while claiming "the evaluations necessary to assess the fair values of certain net assets acquired and the amount of goodwill to be recognized [were] still in process."  (Ellenbogen Decl. Ex. 28 at 12; *see* SEC Facts ¶¶ 95–98.)  Defendants issued press releases touting the value of their TPC acquisition.  On December 28, 2012, Letcavage wrote an open letter to shareholders which claimed TPC had "significant

assets," including receivables of over $1,000,000," and power contracts representing over "$8,000,000 of assets." (*Id.* at Ex. 58.)  Defendants also issued a May 2013 press release claiming the TPC contracts "are worth approximately $20,000,000." (*Id.* at Ex. 33.) None of these statements in the press releases or Letcavage's letter disclosed that the TPC assets were only valued as goodwill or that Premier was having issues valuing the assets because TPC's records were a mess.

These representations were material given their value relative to the rest of Premier's purported assets.  These representations were also false and misleading. Defendants took no steps whatsoever to value the TPC assets or that the assets had a value anything close to what was represented by Defendants.

### 3.    Letcavage's Compensation

Finally, Defendants' representations about Letcavage's compensation in Premier's 10-K were materially false and misleading.  Premier's 2013 10-K stated that the company "ha[d] not entered into any employment agreements," (Ellenbogen Decl. Ex. 38 at 20), despite entering into one with Letcavage, (*id.* at Ex. 52).  Under Letcavage's Employment Agreement, Letcavage was provided a $240,000 base annual salary, and much more in incentives and other compensation.  (Employment Agreement at 2.) Premier's 10-K also failed to disclose provisions of that compensation contract which provided 10% increases in his annual salary, stock shares he would receive every year, $18,000 per year for car expenses, and $18,000 per year for undocumented expenses. (SEC Facts ¶¶ 82–84.)  The 10-K failed to disclose that Letcavage was compensated much more than $18,000 for undocumented expenses in 2013, to a sum of $92,538.18 which were for personal expenses.  (*See id.* ¶ 85.)  Letcavage's significant compensation was material to investors especially given the modest value of Premier's assets.

### 4.     Scienter

Violations of Section 17(a)(1), Section 10(b), and Rule 10b-5 require the SEC to prove that Letcavage and Premier acted with scienter.  *Phan*, 500 F.3d at 908.  "The term 'scienter' refers to a mental state embracing intent to deceive, manipulate, or defraud." *See Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n.12 (1976).  Scienter can be imputed to a corporation when its director or officer acts within the scope of his authority, actual or apparent.  *In re ChinaCast Educ. Corp. Sec. Litig.*, 809 F.3d 471, 476 (9th Cir. 2015).  Letcavage's scienter can be imputed on Premier through his actions as the company's Chairman, President, CEO, and CFO.

The SEC has introduced compelling evidence that Letcavage and Premier acted with scienter.  Letcavage was the primary, if not the only, decision maker at Premier as the Chairman, President, CEO, and CFO of the company and was responsible for Premier's financial statements in those roles.  (SEC Facts ¶¶ 5, 9, 10, 14, 45, 50.) Letcavage signed Premier's misleading 10-Ks, 10-Qs, and other statements containing material misstatements and omissions of material facts.  (Ellenbogen Decl. Exs. 2, 28, 34, 35.)  Letcavage knew that the WePower note valuation was unreliable, (SEC Facts ¶¶ 20–23, 27), he knew there were significant problems with the valuation of the TPC assets, (*see id.* ¶ 99), and he knew he was receiving significant compensation and employment benefits that were not being disclosed to investors, (*see id.* ¶ 80).

The compelling evidence presented by the SEC of Letcavage's and Premier's high degree of scienter is also corroborated by adverse inferences based on Letcavage's assertion of the Fifth Amendment privilege in his deposition.  "[T]he Fifth Amendment does not forbid adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them."  *Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976).  The Ninth Circuit has delineated that, since there is "tension

between one party's Fifth Amendment rights and the other party's right to a fair proceeding," adverse inferences may only be taken when certain conditions are met. *Doe ex rel. Rudy–Glanzer v. Glanzer*, 323 F.3d 1258, 1264–65 (9th Cir. 2000).  Specifically, courts must "analyz[e] each instance where the adverse inference was drawn, or not drawn, on a case-by-case basis under the microscope of the circumstances of that particular civil litigation. . . . In each particular circumstance, the competing interests of the party asserting the privilege[] and the party against whom the privilege is invoked must be carefully balanced.  Because the privilege is constitutionally based, the detriment to the party asserting it should be no more than is necessary to prevent unfair and unnecessary prejudice to the other side.  In that light, no negative inference can be drawn against a civil litigant's assertion of his privilege against self-incrimination unless there is a substantial need for the information and there is not another less burdensome way of obtaining that information." *Id.* at 1265 (quotation omitted); *see also Nationwide Life Ins. Co. v. Richards*, 541 F.3d 903, 911–12 (9th Cir. 2008); *SEC v. Jasper*, 678 F.3d 1116, 1125–26 (9th Cir. 2012).  In addition, "an adverse inference can be drawn [only] when silence is countered by *independent evidence* of the fact being questioned." *Glanzer*, 232 F.3d at 1264 (emphasis in original).

In his deposition, Letcavage asserted his Fifth Amendment rights and refused to answer any substantive questions, including:  (1) "Isn't it correct that at the time that you valued the [WePower] note at $869,000 you understood that there was no basis for such a valuation?" (July 15, 2020 Tr. at 50:8–10); (2) "[I]sn't it correct that in [press releases and a Form 10-K] you put number values for the value of TPC assets when you understood that you didn't have a basis to value those assets?" (*id.* at 52:19–22); and (3) "[I]sn't it correct that you entered into an employment agreement with Premier[], and the Form 10-Ks you filed with Premier[] for 2012 and . . . 2013 . . . falsely stated that Premier had entered no employment agreements?" (*id.* at 54:19–23).  He also refused to answer, based on the Fifth Amendment:  (1) "Isn't it correct that you are responsible as

the CEO and CFO of Premier Holding for the accuracy of the company's financial

statement?" (*id.* at 51:22–24); (2) "Isn't it correct that in 2012, 2013, and 2014 you raised

nearly $7 million from investors by selling Premier stock?" (*id.* at 56:9–11); and (3)

"Isn't it correct that you raised those funds [for] Premier[] by using false and misleading

press releases and filings with the SEC?" (*id.* at 56:13–15).


The adverse inferences from Letcavage's assertions of the Fifth Amendment are

that Letcavage and Premier engaged in a scheme to artificially inflate the value and

profitability of Premier through material misstatements and misleading omissions of

material fact regarding the WePower note, the TPC assets, and Letcavage's

compensation, that they used those misstatements and omissions to raise money from

investors, and that they knowingly made those misstatements and omissions.  The Court

believes it is appropriate to make the adverse inferences against Letcavage and Premier.

First, the adverse inferences are supported by the independent evidence discussed above.

Second, the SEC has substantial need for the information it sought from Letcavage

regarding his scienter because he is undeniably the final decisionmaker as the Chairman,

President, CEO, and CFO of Premier and scienter is an essential element of the SEC's

claims against him and Premier.  And finally, there is no alternative, less burdensome

method to obtain information about Letcavage's and Premier's scienter.  Only Letcavage

can testify about his mental state and only Letcavage can offer first-person information

about his role in Premier and the wrongful acts underlying the SEC's claims.[5]

---

[5] The Court also believes that making the adverse inferences against Defendants is not unfairly
prejudicial to them.  Letcavage has been uncooperative throughout this litigation, even when given
ample opportunity to cooperate by the SEC and the Court.  This Court has already entered default
against Letcavage twice in this case, finding he acted culpably in "bad faith attempt[s] to delay this
litigation and avoid the SEC's claims against him."  (*See* Dkts. 163, 191.)

Accordingly, the SEC's motion for summary judgment is **GRANTED** as to its claims against Defendants for violations of Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.[6]

## C.     Remedies

The SEC requests that the Court order the following remedies: (1) a permanent injunction against Defendants, (2) an officer and director bar and a penny stock bar against Letcavage, and (3) monetary relief.  The Court will address each form of requested relief in turn.

### 1.     Permanent Injunction

The SEC first seeks a permanent injunction that would prohibit Defendants from committing future violations of the federal securities laws.  The Court agrees that such an injunction is appropriate.

Under both 15 U.S.C. §§ 77t(b) and 78u(b), the SEC may seek a permanent injunction against a person who has violated securities laws.  The Court may issue an injunction if there is a reasonable likelihood that the defendant will violate the securities laws again in the future.  *See SEC v. Fehn*, 97 F.3d 1276, 1295 (9th Cir. 1996).  In "predicting the likelihood of future violations," courts consider factors including "(1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of defendant's professional occupation, that future violations might occur; (5) and the

---

[6] Because these violations entitle the SEC to all the remedies it seeks, there is no need for the Court to analyze and enter judgment on the SEC's other claims against them.

sincerity of his assurances against future violations." *Id.* at 1295–96 (quoting *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir. 1980)).

After considering the relevant factors, the Court finds that the SEC has met its burden of showing that a permanent injunction is warranted here. Defendants made material misstatements with an intent to deceive which weighs in favor of injunctive relief. Letcavage and Premier's violations were not isolated in nature. Rather, they occurred over the course of nearly eighteen months. During that time period, the false and misleading valuations were quoted in multiple public SEC filings as well as multiple communications with potential investors. Next, Letcavage has failed to recognize the wrongfulness of his conduct and has not taken any responsibility for the violations. Instead, he flouted several of the Court's orders, stormed out of his own deposition before any substantive questioning occurred, and sought to blame others for Premier's violations. (*See* Dkts. 127, 135, 178.) Given Letcavage's refusal to meaningfully participate in this case, the Court has limited information regarding his current professional occupation or future plans. That said, his past business dealings give the Court every reason to be concerned about future violations of the federal securities laws. Finally, neither Letcavage nor Premier has made any assurances regarding future compliance with the securities laws.

### 2.     Officer and Director Bar and Penny Stock Bar

The SEC's motion next seeks an officer and director and a penny stock bar against Letcavage. The district court has broad equitable powers to fashion appropriate relief for violations of the federal securities laws, and these powers include the ability to order an officer and director bar. *See SEC v. First Pac. Bancorp*, 142 F.3d 1186, 1193 (9th Cir. 1998). In determining whether to order such a bar, a court may consider: "(1) the 'egregiousness' of the underlying securities law violation; (2) the defendant's 'repeat

offender' status; (3) the defendant's 'role' or position when he engaged in the fraud; (4) the defendant's degree of scienter; (5) the defendant's economic stake in the violation; and (6) the likelihood that misconduct will recur." *Id.* (quoting *SEC v. Patel*, 61 F.3d 137, 141 (2d Cir. 1995)). Courts are also authorized to bar an individual from trading in "penny stock," an equity security with a price of less than $5.00, when it is shown that the person was participating in an offering of penny stock at the time of his alleged misconduct. *See* 15 U.S.C. § 77t(g). The court considers "essentially the same factors that govern the imposition of an officer or director bar" when imposing a penny stock bar. *See SEC v. Abella*, 674 F. Supp. 2d 1213, 1223 (W.D. Wash. 2009).

The *Pacific Bancorp* factors weigh heavily in favor of imposing an officer and director bar as well as a penny stock bar on Letcavage. Letcavage's securities violations were egregious given his high degree of scienter. Letcavage was fully aware of the deficiencies in the WePower note valuation and TPC's asset values. Despite this knowledge, Letcavage touted this misinformation regarding the value of the assets in shareholder letters, earnings reports, and publicly filed financial statements and reports. Such conduct has warranted the imposition of an officer and director bar in other cases in this district. *See, e.g.*, *SEC v. Forum Nat'l Invs. Ltd.*, 2016 WL 6875953, at *7 (C.D. Cal. Nov. 18, 2016) (imposing officer and director and penny stock bar on defendant who, as the CEO and President of the defendant company, issued false and misleading press releases).

It is also significant that Letcavage was the most culpable person at Premier involved in the fraud. He was the Chairman, President, CEO, and CFO—he occupied all the high-level executive positions at the company. Letcavage also had a significant economic stake in the violations because he stood to make significant financial gains

from a boost in Premier's stock price.[7]  Letcavage also has been wholly uncooperative in this litigation and has not provided any evidence or assurances that shows his misconduct will not recur.

After consideration of the evidence in this case and orders issued in similar cases, the Court finds that Letcavage should be barred from acting as an officer or director of a public company and from participating in an offering of penny stock for a period of five years from the date of judgment in this case.  *Cf. Jasper*, 883 F. Supp. 2d at 931 (imposing two-year officer and director bar on former CFO who "on multiple occasions misstated the Company's financials, certified false reports to the SEC, and concealed the Company's backdating practices from auditors and the board of directors"); *SEC v. Retail Pro, Inc.*, 2011 WL 13186014, at *6 (S.D. Cal. June 23, 2011) (imposing seven-year officer and director bar on a former CFO who, among other violations, made "repeated misrepresentations to [] auditors" and disseminated financial information to the public that he knew contained material omissions); *SEC v. Hilsenrath*, 2009 WL 1855283, at *4 (N.D. Cal. June 29, 2009) (imposing five-year bar on former CEO who, like Letcavage, "used his position of the highest authority in the company to mislead the public as to the company's true financial state").  A five-year bar reflects the severity of Letcavage's multiple material misstatements made with a high degree of scienter, his lack of remorse for his mistakes, and the significant likelihood of future violations.

### 3.    Monetary Relief

The SEC next requests that the Court order disgorgement and monetary penalties against Defendants and prejudgment interest on the disgorgement amount.  The Court "has broad equity powers to order the disgorgement of ill-gotten gains obtained through

---

[7] According to Premier's 2013 Form 10-K, Letcavage owned 4.7% of the company's common stock making him one of the largest shareholders of the company.  (Dkt. 38 at 22.)

the violation of the securities laws." *See SEC v. Platforms Wireless Int'l Corp.*, 617 F.3d 1072, 1096 (9th Cir. 2010) (internal citation omitted).  "Disgorgement is designed to deprive a wrongdoer of unjust enrichment, and to deter others from violating securities laws by making violations unprofitable." *Id.*  In determining the amount of disgorgement, the SEC "bears the ultimate burden of persuasion that its disgorgement figure reasonably approximates the amount of unjust enrichment." *Id.*  "Once the SEC establishes a reasonable approximation of defendants' actual profits, however, . . . the burden shifts to the defendants to demonstrate that the disgorgement figure was not a reasonable approximation." *Id.* (internal quotations omitted).  The Securities Act and the Exchange Act also provide that civil penalties may be assessed according to a three-tier system based on degree of culpability.  *See* 15 U.S.C. §§ 77t(d) & 78u(d)(3).

The Court preliminarily finds that such monetary remedies are appropriate based on Defendants' violations of the securities laws.  Before the Court can determine the exact amount of profits to disgorge and civil penalties to assess, however, it requires additional briefing and evidence from the parties.  Accordingly, the SEC is directed to submit a separate motion regarding the appropriate amount of profits to disgorge and civil penalties to assess.

//
//
//
//
//
//
//
//
//

**VI.  CONCLUSION**

For the foregoing reasons, Defendants' motion for summary judgment is **GRANTED**.  The SEC is directed to file its motion regarding monetary relief and final judgment by **December 11, 2020**.  Defendants' opposition shall be filed by **December 18, 2020** and the SEC's reply shall be filed by **December 24, 2020**.

DATED: November 30, 2020

HON. CORMAC J. CARNEY

UNITED STATES DISTRICT JUDGE