ALEXANDER M. VASILESCU (N.Y. Bar No. 2270254) (*Admitted Pro Hac Vice*)
Email: VasilescuA@sec.gov
BENNETT ELLENBOGEN (N.Y. Bar No. 2429488) (*Admitted Pro Hac Vice*)
Email: EllenbogenB@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
100 Pearl Street, Room 20-100
New York, New York 10004
Telephone:  (212) 336-0062

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | *Case No.* 8:18-CV-00813-CJC-KES |
| Plaintiff, | Hon. Karen E. Scott Courtroom 6D |
| vs. | **STATUS REPORT** |
| PREMIER HOLDING CORPORATION, et al. | |
| Defendants. | |

1

STATUS REPORT REGARDING SETTLEMENT PROCEEDINGS

1. Pursuant to the Court's August 2, 2022 minute order (Dkt. 291) ("Minute Order"), Plaintiff Securities and Exchange Commission ("SEC") writes to provide a status report on developments in its post-judgment discovery and collection efforts and its position regarding the Motion for Contempt ("Contempt Motion") (Dkt. 261) since the Court held the contempt hearing on January 18, 2022 ("Contempt Hearing"). Specifically, the Court's Minute Order stated:

> Given that some time has elapsed since the filing of the Motion, the Court requests SEC to file a Status Report by August 12, 2022, on the status of post-judgment discovery and debt collection. At a minimum, SEC should address whether there have been any material changes that affect (1) its position regarding the issuance of a contempt order, or (2) any of the proposed factual findings identified in Dkt. 270-1 in support of the Motion. [Dkt. 291].

2. The SEC still seeks a contempt finding as Defendants Randall Letcavage ("Letcavage") and Premier Holding Corp. ("Premier") (collectively "Defendants") continue to violate the Court's orders by failing to: (1) pay the ordered $8,691,500.41 disgorgement and prejudgment interest ("Judgment") (Dkts. 220, 221); and (2) comply fully with the Court's Discovery Order (Dkt. 256.) ("Discovery Order".) (Contempt Motion at 11.)

3. There have been some developments, described below, in post-judgment discovery and debt collection. These developments have not, however, resulted in *any* payment from either Defendant.

4. Further, the additional discovery undertaken has not provided significant information that would assist the SEC in finding the Defendants' assets.

5.      Thus, as summarized below, Defendants continue to show clear contempt for the Court's Orders.

**Relevant Prior Proceedings**

6.      The Court held the Contempt Hearing concerning the Defendants' failures to pay pursuant to the Judgments (Dkts. 220-221) – entered a year before – and failures to comply with the Court's Discovery Order on January 18, 2022 (Dkt. 256).

7.      Before the Contempt Hearing, Premier, and its current Chief Executive Officer, Scott Dinsmoor, failed to participate at all in post-judgment discovery, or to respond to the SEC's motion to compel discovery ("Discovery Motion"), filed on July 15, 2021, or Contempt Motion, filed on November 20, 2021.  (Dkts. 247, 261.)

8.      Letcavage participated to some extent in post-judgment discovery and opposed the SEC's Discovery Motion and Contempt Motion.  But, as per his *modus operandi* in this litigation, his participation was more illusory than substantive: he failed to make any payment toward the Judgment *and* he failed to comply with the Discovery Order.

9.      In connection with opposing the SEC Discovery Motion, Letcavage represented to the Court that he was willing to appear in a deposition regarding his assets (Dkt. 267, transcript of January 18, 2022 hearing on Contempt Motion at 15-16).[1]

---

[1] In response to the SEC's claim that there are numerous other companies with which Letcavage is affiliated but that he has failed to disclose, his attorney told the Court that "Mr. Letcavage has said, 'These are all the records that I have. I've diligently searched everything.'  He's provided a declaration for that basis also... If [the SEC has] the information [on Letcavage's affiliation with other companies], then question Mr.

While the Court stated that the SEC should take the deposition of CEO Dinsmoor, the

Court did not state that a deposition of Letcavage was necessary and instead asked the

parties to submit the fact findings for the SEC's Contempt Motion (Dkt. 267, at 33-34),

which the parties subsequently filed.  (Dkts. 266 to 270.)[2]

### Subsequent Post-Judgment Discovery

#### 1.  Premier (Dinsmoor)[3]

10.     Pursuant to the Court's Order, on March 31, 2022, the SEC conducted a

judgment debtor exam of Premier through its nominal Chief Executive Officer, Scott

Dinsmoor.  In sum, Dinsmoor's testimony shows that that he knows nothing of

relevance concerning Premier's financial condition. Which is not surprising as

Letcavage had Dinsmoor replace him as Premier's CEO after the SEC judgments were

entered in 2021 and Dinsmoor had never previously been an officer of Premier or any

other company.[4]

---

Letcavage… **I've even offered to make Mr. Letcavage available.  You want his
deposition?  Take his deposition."**  (emphasis added) (Id.)

[2] On April 18, 2022, the Ninth Circuit issued a mandate after it denied Defendants'
appeal of the judgments and summary judgment in this case. (Dkt 285).

[3] Attached hereto as **Exhibit A** is the transcript of the March 31, 2022 judgment debtor
exam of Scott Dinsmoor ("Dinsmoor Tr.").  Upon the Court's request, the SEC will
provide copies of the materials discussed herein.

[4] Dinsmoor testified that previously he was a handyman, with no college degree or
experience running (or even working in) a company when CEO Letcavage, with whom
he was familiar, "needed someone who could read a script" and requested that he read
a script to Premier noteholders regarding "convert[ing] their equity to debt" and after
he read the script, "with what I had done for that, Randy [Letcavage] had faith in

11.     Dinsmoor did not answer almost any of the substantive questions about Premier posed by SEC counsel.  On the other hand, Dinsmoor acknowledged that: he has no relevant educational, business, executive, or green energy experience; he became CEO after reading of a script to investors; he receives no compensation from Premier; he has no knowledge of other current or recent litigation involving Premier; he does not know or remember where many of Premier's corporate records are located; he does not know all of Premier's current liabilities; and he does not know the name of any Premier shareholders. (Dinsmoor Tr. at 28-30, 33, 40, 41, 43, 54, 65, 66, 69, 70, 77, 90, 91, 123.)

12.     Dinsmoor claims not to know what documents responsive to the SEC's discovery requests Premier has—save for some tax documents.[5]  (Id. at 143-149.)

---

me…" and Letcavage asked Dinsmoor to become CEO of Premier.  (Id. at 40, 41, 43, 54, 66.)

The recent litigations related to Premier include the following: *e.g. Guevara v. Nexalin* et al., Case No. 30-2018-01028595-CU-WT-CJC, Orange Cty., CA, *Veltz v. Nexalin, et al.,* case no. 30-2021-01180164-CU-WT-CJC, Orange County, CA., Zhang v. Premier, case no., BC714907, Los Angeles Cty. Superior Court, *SEC v. Premier*, No. 21-55249 (9th Cir.).

[5] Dinsmoor's testimony concerning the tax returns was often nonsensical and raised more questions about his role in the returns and their accuracy.  For instance, although he signed off on each return approximately six months prior to his judgment debtor exam, Dinsmoor did not know what documents were allegedly used to assist in the preparations of the tax forms.  And none were produced.  He then admitted he didn't know if the taxes that were filed were even accurate.  He also stated that a "friend of a friend" assisted in the tax preparations, but he did not know this friend of a friend's full name or even his friend's name:

Q     How did you obtain the information from 2017 to file this document?
A     I don't remember.

13.     In fact, except for certain tax documents, Premier produced <u>no</u> documents responsive to the document request, including producing no documents responsive to requests for the following categories of documents:

- Documents concerning Premier corporate structure;

- Documents concerning the exchange of Premier assets for shares of stock in the private company;

- Bank account information;

- Income received;

---

Q     When did you do it?
A     I honestly don't remember.
Q     Was it within the last six months?
A     I don't know.
Q     It's dated September 10th, 2021.  Was that the time that you did it?
A     I don't remember.
***
Q     Did Frank help you?
A     He must have.  I don't remember.
***
Q     And when did this take place?
A     I don't remember.
Q     Was it within the last two months?
A     I don't know.
Q     Was it in the last two days?
A     I don't remember.
Q     You don't remember whether or not in the last 48 hours, you obtained a flash drive containing tax returns?
A     In 48 hours?
Q     Is that correct?  Yes or no?  You don't recall?
A     I don't recall.  There's a lot – I don't recall.  I don't remember.
Q     Was it within the last year?
A     I don't remember.

(Id. at 15-18, 95-103, 109-110, 117-118, 120-121.)

- Persons and entities who received income on Premier's behalf;

- Interest in any property;

- Equity stakes held; and

- Cryptocurrency held.[6]  (Id.)

14.     Dinsmoor's purported or actual lack of knowledge about Premier and its records continues to frustrate the SEC's ability to discover its assets.  Indeed, Dinsmoor could not explain the status of the alleged transaction Premier used to convey its assets to another entity, in exchange for shares of stock in that entity – information critical to the SEC's collection efforts.[7]  (Id. at 83, 84.)

15.     Thus, it appears that Premier is using Dinsmoor as a CEO in name only to conceal information relevant to collection efforts.  Indeed, Dinsmoor testified that: "Basically, I'm the CEO on paper." (Id. at 64.)

16.     While Premier has failed to produce documents or provide testimony identifying what happened to the nearly $7 million it fraudulently raised from victim investors in this case, Dinsmoor now claims without providing evidence that Premier is now a shell with no assets.  (Id. at 32-33.)

---

[6] Premier never stated that no such documents exist.

[7] Dinsmoor testified that: he does not believe Premier has possession of the shares it was supposed to have received in exchange for its assets; Premier has not distributed any shares in the private company to its investors; he does not believe there has been any value received by Premier from that company in the alleged exchange of assets for stock transaction, and that he is unaware whether Premier has any obligations to its investors to distribute any shares. (Id. at 83, 84, 86-87, 123-124, 152, 153.)

17.     Not able to obtain any critical information from CEO Dinsmoor regarding Premier's prior financial condition and its assets, the SEC decided to take up Letcavage's suggestion to depose him.

## 2. Letcavage

18.     In May 2022, before his June 2022 deposition, Letcavage produced to the SEC documents that purported to contain his current and past financial condition. The documentation[8] provides information inconsistent with his previously produced "accounting" such as including the identity of additional company shares of stock owned; and assets he received from other companies.[9]  Neither the prior nor this recent production includes supporting documents such as financial account statements, or other information that could lead to discovering the true nature of Letcavage's assets and income.

19.     The newly produced financial statement does shed some light on Letcavage's financial condition however.  For instance, for the first time in these financials, Letcavage disclosed assets of furniture and household goods, plus consulting fees and fringe benefits, including:

> life insurance policies, household assets totaling more than $33,000 "all located at my current residence at 5081 East Copa De Oro Drive, Anaheim, CA 926807

---

[8] Namely, first an unsworn financial statement and footnotes to the statement, and then, two days later, a sworn, and modified, financial statement and modified footnotes.

[9] As noted in footnote 1, Letcavage's counsel informed the Court that Letcavage's prior responses to document requests and Court orders was accurate and complete.

[sic]," a cash flow of $10,000 a month for an "agreement with iCapitol" [sic], 10,200 shares of GATC Health Corp., which he valued at between $3-4 per share, and "fringe benefits" from his relationship with a previously undisclosed entity, including health insurance payments, car insurance, use of an automobile, and payments on a cell phone bill.

20.     Letcavage for the first times alleges he pays monthly $10,500 in mortgage/rent alone and other expenses totaling $13,569 per month.

21.     Further, Letcavage initially produced an unsigned set of financials that stated he transferred funds abroad to family in Indonesia.  But his signed financials omit references to the overseas transfers.  (Moreover, as discussed below, when Letcavage was asked about transfers abroad, he asserted his Fifth Amendment right against self-incrimination.)

22.     On June 22, 2022, the SEC followed up on Letcavage's offer of a deposition, and deposed Letcavage in his personal capacity.  Letcavage however invoked his Fifth Amendment right against self-incrimination to all pertinent questions including all questions designed to discover his financial condition and for which no reasonable basis likely exists for such an assertion, such as questions such as how many beds and baths his home has.  Significantly, although public records show that Letcavage resided in a luxury home when this litigation started, and the Court ordered him to disclose current and past ownership of his house—and he agreed to provide this information,[10] Letcavage has refused to produce records or testify about that property.

---

[10] "The Commission is entitled to discover who does own Letcavage's residence to ascertain whether asserts have been fraudulently concealed or transferred." (Dkt. 256.) In response, Letcavage stated that: "After discussion with the court clarifying the

23.     The address of that home is 51 Poppy Hills Rd., Laguna Niguel, CA 92677.  Zillow lists that house as valued at $3,366,200, with 5 beds and 8,250 square feet.  Zillow describes the house as follows:

> OCEAN and SUNSET VIEWS are captured from this luxury, extensively remodeled, custom estate home located behind the 24 hour guarded gates of Ocean Ranch in Laguna Niguel. This stately home has five bedrooms, four of which are en-suite including one downstairs. The home is designed to maximize ocean and sunset views from the backyard, living room, dining room, office/library, upstairs secondary bedroom, and master suite. Highlighted features include three fireplaces, a gourmet kitchen with Thermador appliances, a stunning cascade quartz center island, and a cozy wood paneled office/library with a temperature Z baths.  (https://www.zillow.com/homedetails/51-Poppy-Hills-Rd-Laguna-Niguel-CA-92677/25586715_zpid/)

24.     With regard to another home identified on his recently produced financial statement -- 5081 East Copa De Oro Drive, Anaheim, CA 92807 -- Zillow lists that house as valued at $5,378,000, with 6 beds and 6.5 bathrooms. (https://www.zillow.com/homedetails/5081-E-Copa-De-Oro-Dr-Anaheim-CA-92807/25413360_zpid/)

25.     Letcavage continues to flout his obligation to respond fully to the SEC's documents requests. (*See* the SEC's Memorandum in Support of Contempt, at 7-10 for the description of Letcavage's list of discovery shortcomings and failures, Dkt. 261-1.) Letcavage even invoked the Fifth Amendment when asked what documents he had produced.

---

misunderstanding, Letcavage will respond to this request 17 further." (Dkt. 270-4 at ¶ 118.)

26.     Letcavage has hamstrung the SEC's efforts to assess the extent of his opulent lifestyle and assets in his possession and control as he invoked the Fifth Amendment in response to questions about his income, assets, liabilities and expenses, among other things.  The SEC, and Court, still do not know the extent of Letcavage's ability to satisfy the Judgment.

27.     At a minimum, it is clear that Letcavage has some ability to satisfy the Judgment as he has admitted, in submissions to the Court before the January 18, 2022 contempt hearing, that he has at least approximately $400,000 in assets (Dkt. 261-1 at 7), though in his recent submission, his total asset figure has dropped to $129,015 and income/cash flow of at least $9,240.  Yet even without supporting documents and a proper sworn accounting, his financial statement shows that he is living lavishly and squandering funds that could be used to pay the Judgment and be returned to his victims.

28.     The Court should draw an adverse inference from Letcavage's assertions of the Fifth Amendment.  *Rolex Watch U.S.A., Inc. v. Dauley*, No. C-84-6150-WWS, 1986 US Dist LEXIS 29660, at *5 (ND Cal Feb. 4, 1986), *Baxter v. Palmigiano*, 425 U.S. 308, 96 S. Ct. 1551, 47 L.Ed.2d 810 (1976).  And the Court should hold Letcavage in contempt and require that he pay the Judgment.  *SEC v. Goldfarb*, No. C 11-00938 WHA 2012 US Dist LEXIS 85628 (ND Cal June 12, 2012) (court holds defendants in civil contempt for failure to comply with a final judgment, and orders remedial sanctions).

29.     SEC has and will continue to seek information – and assets – from third parties as part of its effort to find Letcavage's and Premier's income and assets.  Thus, the SEC respectfully requests that the Court (a) Hold Letcavage and Premier in contempt; and (b) Order Letcavage to (1) make a good-faith payment of at least $100,000 toward the disgorgement and prejudgment interest he owes by no later than 3 days after the Court enters an order; (2) commence $5,000 monthly payments by the 10th of each month after the date the Court enters an order enters until he pays what the disgorgement and prejudgment interest he owes in full or the SEC reaches a payment plan with Letcavage after it completes its discovery efforts; and (3) order Letcavage to appear *in camera* and address the reasonable basis for each of his Fifth Amendment assertions or answer the questions posed in the deposition before the SEC.

Respectfully Submitted

Dated: August 12, 2022

SECURITIES AND EXCHANGE COMMISSION

By: _____

Bennett Ellenbogen
Alexander Vasilescu
Attorneys for Plaintiff
Securities and Exchange Commission

## **CERTIFICATE OF SERVICE**

I am over the age of 18 years and not a party to this action. My business address is: 100
Pearl Street, Room 20-100, New York, NY 10004.

On August 12, 2022, I caused to be served the document entitled Status Report on all
the parties to this action addressed as stated on the attached service list:

☒      **E-FILING:** By causing the document to be electronically filed via the Court's
CM/ECF system, which effects electronic service on counsel who are registered with
the CM/ECF system.

☒      **ELECTRONIC MAIL:** By transmitting the document by electronic mail to
the electronic mail address as stated below.

*Attorneys for Defendant Premier Holding Corp. and Randall Letcavage*

Randall Letcavage
c/o Phillip G. Trad
Law Offices of Phillip G. Trad
Post Office Box 19093
Irvine, CA  92623-9093
PH: 949-632-4676
Email: ptrad@roadrunner.com

Premier Holding Corp.
c/o Scott Dinsmoor CEO
1382 Valencia Avenue
Suite F
Tustin CA 92780
PH: (949) 260-8070
scott_dinsmoor@yahoo.com
-and
Uri Litvak
Litvak Law Group
2424 SE Bristol St., Suite 300
Newport Beach, CA  92660

*Case No.* 8:18-CV-00813-CJC-KES

1    I declare under penalty of perjury that the foregoing is true and correct.

2                                        Date: August 12, 2022

3

4                                        /s _____
                                         Bennett Ellenbogen
5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28