```
 1

 2

 3

 4                 UNITED STATES DISTRICT COURT

 5                CENTRAL DISTRICT OF CALIFORNIA

 6                      SOUTHERN DIVISION

 7                          - - -

 8      THE HONORABLE CORMAC J. CARNEY, JUDGE PRESIDING

 9
        SECURITIES AND EXCHANGE,      )CERTIFIED TRANSCRIPT
10      COMMISSION,                   )
                          Plaintiff,  )
11          vs.                       )
                                      ) SACV-18-00813-CJC
12      PREMIER HOLDING CORPORATION,  )
        et al.,                       )
13                        Defendants. )
        -----------------------------)
14

15

16          REPORTER'S TRANSCRIPT OF PROCEEDINGS

17                 Santa Ana, California

18                  December 2, 2022

19

20                      SHARON A. SEFFENS, RPR
                        United States Courthouse
21                      411 West 4th Street, Suite 1-1053
                        Santa Ana, CA  92701
22                      (612) 804-8655

23

24

25
```

1   APPEARANCES OF COUNSEL:

2   For the Plaintiff:

3   BENNETT ELLENBOGEN
    SECURITES AND EXCHANGE COMMISSION
4   100 Pearl Street, Suite 20-100
    New York, New York  10004-2616
5   (212) 336-0062

6   ALEXANDER M. VASILESCU
    U.S. SECURITIES AND EXCHANGE COMMISSION
7   New York Regional Office
    200 Vesey Street
8   New York, NY  10281
    (212) 336-0178

9

10  For Defendants RANDALL LETCAVAGE:

11  PHILLIP G. TRAD
    PHILLIP G. TRAD LAW OFFICES
12  P.O. Box 19093
    Irvine, CA  92693-9093
13  (714) 990-3541

14

15

16

17

18

19

20

21

22

23

24

25

```
 1

 2                              I-N-D-E-X

 3

 4    PLAINTIFF'S
      WITNESSES:                 DIRECT   CROSS   REDIRECT   RECROSS
 5
      DENNIS LOCKE               17
 6    RANDALL LETCAVAGE          25

 7
      PLAINTIFF'S
 8    EXHIBITS:                                   MARKED     RECEIVED

 9    Exhibit 25                                              70
      Exhibits 1, 2, 4-9, 11A, 11B
10          14, 32, 37, 39, 40, 41                           70
      Exhibits 12, 12A, 49, 199, 151,
11          49, 150, 134, 132, 138,
            128, 140, 137, 136, 130,
12          143, 142, 141, 131, 135,
            133, 139, 129, 201, 202,
13          102-118                                          127

14
      DEFENSE
15    WITNESSES:        DIRECT    CROSS    REDIRECT   RECROSS

16     (None)

17    DEFENSE
      EXHIBITS:                                  MARKED     RECEIVED
18
       (None)
19

20

21

22

23

24

25
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| | 1 | SANTA ANA, CALIFORNIA; FRIDAY, DECEMBER 2, 2022; 10:00 A.M. |
| 10:01 | 2 | THE COURT:  Good morning. |
| 10:01 | 3 | THE CLERK:  Calling item number one, |
| 10:01 | 4 | SACV-18-00813-CJC, Securities and Exchange Commission versus |
| 10:01 | 5 | Premier Holding Corporation, et al. |
| 10:01 | 6 | Counsel, please state your appearances. |
| 10:01 | 7 | MR. ELLENBOGEN:  Good morning.  Ben Ellenbogen for |
| 10:01 | 8 | the Securities & Exchange Commission. |
| 10:01 | 9 | THE COURT:  Good morning, Mr. Ellenbogen. |
| 10:01 | 10 | MR. ELLENBOGEN:  Good morning. |
| 10:01 | 11 | MR. VASILESCU:  Alexander Vasilescu for the United |
| 10:03 | 12 | States Securities & Exchange Commission, Your Honor. |
| 10:03 | 13 | THE COURT:  Hello, Mr. Vasilescu. |
| 10:03 | 14 | MR. TRAD:  Good morning, Your Honor.  Phillip Trad |
| 10:03 | 15 | on behalf of defendant Letcavage. |
| 10:03 | 16 | THE COURT:  Hello, Mr. Trad. |
| 10:03 | 17 | MR. HAMPTON:  George Hampton on behalf of |
| 10:03 | 18 | subpoenaed third-party witness Dennis Locke. |
| 10:10 | 19 | THE COURT:  Hello, Mr. Hampton. |
| 10:10 | 20 | Okay.  Well, we are here for the evidentiary |
| 10:10 | 21 | hearing on whether Mr. Letcavage and Premier should be held |
| 10:10 | 22 | in contempt.  I propose that we just get right to it and |
| 10:10 | 23 | call the first witness. |
| 10:10 | 24 | MR. TRAD:  Your Honor, I have some objections and |
| 10:10 | 25 | some disturbing issues that I need to bring up here before |

| | | |
|---|---|---|
| 10:10 | 1 | we start. |
| 10:10 | 2 | THE COURT:  All right. |
| 10:10 | 3 | MR. TRAD:  I feel it's important that I bring them |
| 10:10 | 4 | to the Court's attention. |
| 10:10 | 5 | THE COURT:  Would you be kind enough, if we're |
| 10:10 | 6 | going to do that, to approach the lectern, please. |
| 10:10 | 7 | MR. TRAD:  Thank you. |
| 10:10 | 8 | As the Court may recall, on November 9th when we |
| 10:10 | 9 | were before you, I suggested that the parties enter into a |
| 10:10 | 10 | meet and confer to identify which documents, which records, |
| 10:10 | 11 | or whatever we could do to expedite today's hearing.  Of |
| 10:10 | 12 | course, this date hadn't been set yet. |
| 10:11 | 13 | Within several days after being here, I had a meet |
| 10:11 | 14 | and confer with Mr. Ellenbogen concerning what documents |
| 10:11 | 15 | they were intending to use.  The biggest question was |
| 10:11 | 16 | whether or not the documents would be authenticated or we'd |
| 10:11 | 17 | have to bring somebody out from New York to testify in order |
| 10:11 | 18 | to resolve hearsay objections, foundation objections, or |
| 10:11 | 19 | authentication of the documents.  That was around |
| 10:11 | 20 | November 11th, Your Honor. |
| 10:11 | 21 | I did not get any of those documents, and he had |
| 10:11 | 22 | numbered them Exhibits 51 through 149, approximately 99 or |
| 10:11 | 23 | 100 documents, okay, until November 25th.  They were served |
| 10:11 | 24 | on me through their Accellion document conveyor that they |
| 10:11 | 25 | use. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:11   1           I contacted Mr. Ellenbogen and I advised him

10:11   2   that -- then, you know, it's Thanksgiving weekend.  I have

10:11   3   no idea where these people are.  I will try to do the best I

10:12   4   can, but it may be Monday or Tuesday -- that would be this

10:12   5   week -- before I can get back to you and advise whether or

10:12   6   not we can stipulate to authenticity or resolve some of the

10:12   7   other issues.

10:12   8           I wanted to do that also, Your Honor, because we

10:12   9   don't need to drag Your Honor through a whole bunch of

10:12  10   silliness if we can avoid it.  I did speak to

10:12  11   Mr. Ellenbogen, I believe it was, Tuesday of this week, and

10:12  12   he advised me that he had several other documents that had

10:12  13   inadvertently not been provided or such as that.  And he

10:12  14   wanted to know if I would sign a stip as to the documents

10:12  15   that were identified as Exhibits 51 through 149.

10:12  16           And he also suggested that he wanted to use a

10:12  17   declaration to establish foundation and authenticate

10:12  18   exhibits that he wanted to use.  My simple answer was I

10:12  19   haven't seen the declaration.

10:12  20           In principle I understand what you're asking, but

10:13  21   until I see the documents, until I see the declaration or

10:13  22   anything, we can at least proceed with a stipulation or an

10:13  23   agreement as to the documents I have reviewed and I'm

10:13  24   willing to stipulate that their authenticity is established.

10:13  25           We're not making any admissions.  We're not saying

10:13  1   everything in the document is accurate, but to try to get
10:13  2   past that initial burden.
10:13  3         On November 29th I got another group of documents,
10:13  4   another 19 exhibits, 48, 59, 50, and 186, and a series of
10:13  5   additional bank records 170 through 185.  We're two days
10:13  6   before today's hearing, and so I said I will make the best
10:13  7   effort I can to try to see if we can get these validated.  I
10:13  8   don't know who I can get a hold of this week or what's going
10:13  9   on, but I will make the effort.
10:13  10        We went through -- I contacted Mr. Ellenbogen, I
10:13  11  believe, just before he flew out, or it may have been when
10:14  12  he landed here.  And I apologize, Your Honor.  I was up late
10:14  13  last night printing out thousands of exhibits that have not
10:14  14  previously been served on me.
10:14  15        I said:  First off, Exhibits 170 through 185 that
10:14  16  I just spent all this time going through are duplicates of
10:14  17  what you've already sent me in Exhibits 51 through 149.  So
10:14  18  I think that solves that problem.  And the other four
10:14  19  exhibits were summaries, and I said I can't agree until I
10:14  20  see the declaration and what the circumstances are that you
10:14  21  want to use -- I can't stipulate to, you know, foundation or
10:14  22  authenticity in the blind.
10:14  23        We left it where he was going to send me the
10:14  24  stipulations to the first set of documents that I looked at
10:14  25  and agreed that I would be happy to agree to those, and

| | | |
|---|---|---|
| 10:14 | 1 | those covered bank records from approximately January of |
| 10:14 | 2 | 2021 to mid to late summer 2022.  There are several -- six |
| 10:15 | 3 | different accounts, so there might be a month difference |
| 10:15 | 4 | here or there, but in principle that's the time period. |
| 10:15 | 5 | He said he had a form stipulation he was going to |
| 10:15 | 6 | send out to me.  I have never received that.  He had -- he |
| 10:15 | 7 | asked me about -- I've never received a declaration that he |
| 10:15 | 8 | was trying to use to authenticate and establish foundation |
| 10:15 | 9 | with regard to the new records. |
| 10:15 | 10 | So I filed my objections, which, I will go through |
| 10:15 | 11 | them quickly with the Court. |
| 10:15 | 12 | THE COURT:  That's not going to be productive or |
| 10:15 | 13 | efficient to do that. |
| 10:15 | 14 | MR. TRAD:  All right.  Last night in the evening, |
| 10:15 | 15 | not even from Mr. Ellenbogen, I get served with several |
| 10:15 | 16 | thousand pages of exhibits, many of which go back to 2010, |
| 10:15 | 17 | 2011.  In my meet-and-confer discussions with |
| 10:15 | 18 | Mr. Ellenbogen, none of this was referenced.  None of these |
| 10:15 | 19 | documents were identified as what he wanted to introduce. |
| 10:15 | 20 | He sent me, based on our conversation, the records that he |
| 10:16 | 21 | intended to use. |
| 10:16 | 22 | Now I've literally printed a half a box of paper |
| 10:16 | 23 | to go through these things.  And I have had discussion this |
| 10:16 | 24 | morning with regard to some of these records and, you know, |
| 10:16 | 25 | they want to know if I'll stipulate as to authenticity.  I |

10:16  1    cannot, and I'm asking the Court to exclude any of these

10:16  2    records that were late served at 8:00 last night.  I have no

10:16  3    ability to go through them and represent my client on these

10:16  4    records.  I haven't seen them until last night.

10:16  5         And then as to the prior objections that I filed

10:16  6    with the Court, you know, for Your Honor's consideration, my

10:16  7    biggest concern is we brought the issue of a meet and

10:16  8    confer.  We complied with the meet and confer.  We

10:16  9    identified between us the documents that were going to be

10:16  10   used.

10:16  11        I don't mean to be rude here, but I don't care

10:16  12   what fairytale comes from the U.S. Securities & Exchange

10:16  13   Commission about what they think they said or what they

10:17  14   didn't say.  There is not a chance on this earth that any

10:17  15   reasonable trial lawyer would not want to see thousands of

10:17  16   pages of exhibits.

10:17  17        And one of the exhibits is 787 pages long, and

10:17  18   they're Bank of America bank records, I believe the same

10:17  19   account that I had already agreed I would stipulate to but

10:17  20   from January 2021 through 2022, which we have had an

10:17  21   opportunity to investigate and to review.

10:17  22        These records go back -- some of them go back to

10:17  23   2010, 2011.  I have no conceivable way of being ready, you

10:17  24   know.  So if the Court appreciates the dilemma, I would ask

10:17  25   the Court to exclude -- plus there's a lot of hearsay

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:17    1    documents.

10:17    2              And whether we go through them and the Court makes

10:17    3    a quick ruling as to each one, fine.  But if we can't get

10:17    4    there, I don't know that I can be ready to be able to

10:17    5    properly defend my client because he has not been provided

10:18    6    the opportunity to review and examine the information.

10:18    7    That's my first concern.

10:18    8              Secondly, I'm trying to cut to the chase and maybe

10:18    9    try to help all of us out.  I have seen the requested

10:18   10    prayer.  I want the Court to know that Mr. Letcavage is

10:18   11    willing to drop his negotiations about trying to reduce the

10:18   12    8.6 million.  He'll pay the $5,000 a month they're asking

10:18   13    for.  He just needs 90 days so he can get gainfully employed

10:18   14    so he has the $5,000 a month to pay with.

10:18   15              The only problem we had there which I discussed

10:18   16    with counsel here -- and by the way, we have no agreement as

10:18   17    to that -- he doesn't have $450,000 or $400,000 as a down

10:18   18    payment.  In the same 90 days, maybe 120 days, he'll

10:18   19    liquidate whatever limited holdings he still has and he'll

10:18   20    give them that money, which he thinks will be about

10:19   21    $100,000, so we could at least get this burden off of all of

10:19   22    our desks and enter into a settlement.

10:19   23              If we can't do it, maybe the Court could order us

10:19   24    out to a mediator who could take it from there and try to

10:19   25    get this thing done.  So I wanted to advise the Court that

| | | |
|---|---|---|
| 10:19 | 1 | Mr. Letcavage is more than willing to enter into an |
| 10:19 | 2 | arrangement.  He has withdrawn his attempts at negotiation, |
| 10:19 | 3 | but we are stalled. |
| 10:19 | 4 | THE COURT:  I understand. |
| 10:19 | 5 | Mr. Ellenbogen, do you want to respond to all of |
| 10:19 | 6 | this, please? |
| 10:19 | 7 | MR. ELLENBOGEN:  I think Mr. Vasilescu is going to |
| 10:19 | 8 | address it. |
| 10:19 | 9 | THE COURT:  Okay. |
| 10:19 | 10 | MR. VASILESCU:  Thank you, Your Honor.  This |
| 10:19 | 11 | objection that Mr. Trad made was -- the first time we heard |
| 10:19 | 12 | this objection was five minutes before this hearing started |
| 10:19 | 13 | today.  We have been working with him, my co-counsel |
| 10:19 | 14 | Mr. Ellenbogen, since the Court first said we were going to |
| 10:19 | 15 | have this conference many weeks ago. |
| 10:20 | 16 | The documents that he's complaining about are bank |
| 10:20 | 17 | records where Mr. Letcavage is the actual signatory for, |
| 10:20 | 18 | which have not been previously -- some of them have not been |
| 10:20 | 19 | previously produced by Mr. Letcavage, and we had to go get |
| 10:20 | 20 | it from Bank of America because he wouldn't identify them. |
| 10:20 | 21 | And we produced those documents. |
| 10:20 | 22 | The most significant documents is about four |
| 10:20 | 23 | accounts where he's the signatory, the bank statements from |
| 10:20 | 24 | January 2021.  That's relevant because that's when Your |
| 10:20 | 25 | Honor's judgments were entered against Mr. Letcavage and |

10:20  1   Premier.  The point is that these records will show from

10:20  2   January 2021 until the last record we could get, which is in

10:20  3   May of 2022, he was spending a lot of money after the

10:20  4   judgments were entered and making zero payments to Your

10:20  5   Honor's judgments.  That's why they're relevant.

10:21  6         And in terms of are they real documents, these are

10:21  7   bank statements that go to Mr. Letcavage and to his

10:21  8   colleague who worked with him.  So we produced them and we

10:21  9   gave them all the bank records for one account going back to

10:21  10  2010 because that's when Mr. Letcavage, I guess, opened this

10:21  11  account.  So that's why he has it.

10:21  12        What we subsequently did is we realized it would

10:21  13  be easier with Mr. Letcavage on the stand to just put one

10:21  14  month at a time from January of 2021.  So in terms of

10:21  15  understanding the documents, Mr. Letcavage should understand

10:21  16  these documents because they are his own bank records.

10:21  17        He has got many, many bank accounts because he has

10:21  18  many, many different companies that have bank accounts that

10:21  19  he controls.  So in terms of --

10:21  20        THE COURT:  Let me interrupt you.  I get it with

10:21  21  Mr. Letcavage, but Mr. Trad, he needs to be able to defend

10:21  22  Mr. Letcavage because the stakes have dramatically

10:22  23  increased.  Now we're talking about contempt and contempt --

10:22  24  failure to pay money, failure to produce documents.

10:22  25        Mr. Letcavage is going to subject himself to

10:22  1   paying a fine until he pays that.  And if he doesn't and I

10:22  2   feel he has money and he doesn't pay the fine, he's going to

10:22  3   go into custody until he pays it.  So the stakes are pretty

10:22  4   serious now.

10:22  5           And did you do a document dump?  That's my

10:22  6   characterization of what Mr. Trad said.  He said the SEC is

10:22  7   hitting him with all these documents that he has never seen

10:22  8   before.  And with the stakes as high as they are now, has he

10:22  9   had inadequate time to review them and defend Mr. Letcavage?

10:22  10  That's my concern.

10:22  11          MR. VASILESCU:  Well, Your Honor, we tried to work

10:22  12  as quickly as we can with Mr. Trad.  Earlier, before this

10:22  13  week, I believe we did produce documents that were the bank

10:22  14  records, including the one account that goes back to 2010.

10:23  15          Now, in these documents, there are lots of monthly

10:23  16  statements.  We had someone in our office who is not an

10:23  17  attorney but is good at, like, looking through each bank

10:23  18  record and finding, you know, where the money went to, like,

10:23  19  you know, did it go to wine?  Did it go to dining?  Did it

10:23  20  go to, you know, personal expenses?

10:23  21          So that person submitted a declaration saying,

10:23  22  okay, this bank record, I went through all these from

10:23  23  January 2021 to May, and the money that went to, like, wine

10:23  24  is this much, money that went to food is this much, money

10:23  25  that went to this and that is that much.  So that's

10:23  1    something that he got earlier this week.

10:23  2            And basically -- so the two documents that we want

10:23  3    him to confirm are the physical bank records from the banks

10:23  4    that Mr. Letcavage controlled.  I don't see why

10:24  5    Mr. Letcavage can't just confirm that those are real

10:24  6    documents because they look like real documents.  He is the

10:24  7    signator.  They're not fake documents.

10:24  8            The other document is this declaration that

10:24  9    basically says if you look from January 2021 to May, in

10:24  10   these bank records you will find, if you calculate the money

10:24  11   for the wine, he could go through each statement and say,

10:24  12   yeah, that was a wine payment on May.  That was a wine --

10:24  13   but basically this declaration basically says if you look at

10:24  14   these documents, X is wine, X is food, X is whatever.  So

10:24  15   that's the other thing that we wanted him to basically

10:24  16   confirm can come in.

10:24  17           THE COURT:  And I appreciate that and I agree, but

10:24  18   if you just hit him with it a couple days ago, is that

10:24  19   realistic that he can go through those and evaluate and

10:24  20   analyze and then discuss with Mr. Letcavage?  That's my

10:25  21   concern.

10:25  22           As you know, contempt is a very serious issue, and

10:25  23   it's critical for it to be able to be held up that I give

10:25  24   him due process and a reasonable opportunity to defend

10:25  25   himself.  So Mr. Letcavage might have knowledge of all these

10:25   1    documents but does counsel that's representing him?

10:25   2               MR. ELLENBOGEN:  Can I add two cents to this?

10:25   3               THE COURT:  You can, but please stand.

10:25   4               MR. ELLENBOGEN:  Thank you, Your Honor.  I

10:25   5    apologize that I didn't stand.

10:25   6               Just the point is that just for the Court to be

10:25   7    aware is these were documents, these bank records, where

10:25   8    Mr. Letcavage had been obligated to disclose the bank

10:25   9    records to us since the litigation.

10:25   10              THE COURT:  I get that.  I understand that.  But

10:26   11   he's entitled to due process, and counsel is saying you did

10:26   12   a document dump on him.  And whether Mr. Letcavage knows

10:26   13   that and understands them, has his counsel?  So I feel I

10:26   14   have two options.  One is we just go forward and I've got to

10:26   15   give Mr. Trad an opportunity to evaluate these documents.

10:26   16              It's like a criminal case.  As you know, in a

10:26   17   criminal case you don't have to turn over documents

10:26   18   technically, conceptually, until after the witness has

10:26   19   testified.  But then defense counsel has an opportunity,

10:26   20   hey, I need time to review this.  I need time to go through

10:26   21   it, so we're going to have to delay the proceedings.  So

10:26   22   it's always the tension I put a lot of pressure on.

10:27   23              MR. ELLENBOGEN:  I understand, Your Honor.  After

10:27   24   the date was set, we sent an e-mail to Mr. Trad saying here

10:27   25   are all of the bank accounts we have identified, and here

10:27  1    are all the entities we have identified that seem to be

10:27  2    affiliated with Mr. Letcavage.  Can you respond?

10:27  3         He wrote back -- and it's a document that's in the

10:27  4    record -- and he said, oh, that's an old irrelevant bank

10:27  5    account, and just to a few of them.  Maybe he didn't have

10:27  6    the opportunity to finish evaluating that with his client,

10:27  7    but I don't know what else we could have done.

10:27  8         THE COURT:  We are going to just have to proceed,

10:27  9    and we're just going to have to see where it goes.

10:27  10        Mr. Trad, you have my assurance I'm not going to

10:27  11   jam you.  It's going to be inefficient, but we will just go

10:27  12   through it as we need to go through it.  It's the

10:27  13   government's burden to prove by clear and convincing

10:27  14   evidence that there was an order that I issued and it was

10:28  15   not complied with, and we will just take it.  We'll see how

10:28  16   it goes.

10:28  17        MR. TRAD:  If I may respond, Your Honor.

10:28  18        THE COURT:  No, because we're already a half hour

10:28  19   late.  This is unacceptable to me.  I'm very disappointed

10:28  20   that this wasn't worked out, but I'm not going to continue

10:28  21   this for another day.  We've just got to start.  And it

10:28  22   might not be the most efficient way to do it, but we are

10:28  23   going to start.

10:28  24        So call your first witness.

10:28  25        MR. ELLENBOGEN:  Okay.  We're going to call

| | | |
|---|---|---|
| 10:28 | 1 | Mr. Locke to the stand, please. |
| 10:28 | 2 | THE COURT:  If you will stand right by the court |
| 10:28 | 3 | reporter.  We'll administer an oath to you, sir, and then |
| 10:28 | 4 | have you take the witness stand. |
| 10:28 | 5 | DENNIS LOCKE, PLAINTIFF'S WITNESS, SWORN |
| 10:29 | 6 | THE CLERK:  Please be seated.  Please state your |
| 10:29 | 7 | name and spell your last name for the record. |
| 10:29 | 8 | THE WITNESS:  My name is Dennis Locke, L-o-c-k-e. |
| 10:29 | 9 | THE COURT:  Please proceed. |
| 10:29 | 10 | MR. ELLENBOGEN:  Thank you. |
| 10:29 | 11 | DIRECT EXAMINATION |
| 10:29 | 12 | BY MR. ELLENBOGEN: |
| 10:29 | 13 | Q    Good morning, Mr. Locke. |
| 10:29 | 14 | A    Good morning. |
| 10:29 | 15 | Q    Thank you for coming today.  Can you please describe |
| 10:29 | 16 | where you work. |
| 10:29 | 17 | A    I work basically from home.  I work for ONIT Sciences. |
| 10:29 | 18 | Q    What is ONIT Sciences? |
| 10:29 | 19 | A    It is a manufacturer of a fertilizer for agricultural |
| 10:29 | 20 | products. |
| 10:29 | 21 | Q    Okay.  And has Mr. Letcavage played any role with |
| 10:29 | 22 | working at ONIT Sciences? |
| 10:29 | 23 | A    As a consultant. |
| 10:29 | 24 | Q    Can you describe in more detail what Mr. Letcavage has |
| 10:29 | 25 | done for ONIT. |

| | | |
|---|---|---|
| 10:29 | 1 | A    He assisted us in business decisions and introduced us |
| 10:30 | 2 | to potential partners. |
| 10:30 | 3 | Q    Can you be more specific?  Let's take it with the |
| 10:30 | 4 | potential partners.  What potential partners has he |
| 10:30 | 5 | introduced you to? |
| 10:30 | 6 | A    I don't know.  I wasn't involved in that. |
| 10:30 | 7 | Q    How are you aware that he introduced you to potential |
| 10:30 | 8 | partners? |
| 10:30 | 9 | A    That was his role. |
| 10:30 | 10 | Q    Are you aware if he actually has identified any |
| 10:30 | 11 | potential partners? |
| 10:30 | 12 | A    I'm not. |
| 10:30 | 13 | Q    And when you say assisted with business decisions, what |
| 10:30 | 14 | are you referring to? |
| 10:30 | 15 | A    I have not been involved with that.  That's what I |
| 10:30 | 16 | understand was his role. |
| 10:30 | 17 | Q    How do you understand that? |
| 10:30 | 18 | A    It's what I understood.  You know, that's what I was |
| 10:30 | 19 | told.  I did not interact with Mr. Letcavage on any |
| 10:30 | 20 | regularity. |
| 10:30 | 21 | Q    Now, you were deposed in this post-judgment litigation, |
| 10:30 | 22 | correct? |
| 10:30 | 23 | A    Yes, sir. |
| 10:30 | 24 | Q    And you came as a representative of ONIT Sciences, |
| 10:30 | 25 | right? |

| | | |
|---|---|---|
| 10:30 | 1 | A    That is correct. |
| 10:30 | 2 | Q    And you were the one who was identified as having the |
| 10:30 | 3 | most knowledge about Mr. Letcavage and Premier Holding's |
| 10:31 | 4 | relationship with ONIT Sciences, right? |
| 10:31 | 5 | A    Not Premier Holdings. |
| 10:31 | 6 | Q    Just Mr. Letcavage? |
| 10:31 | 7 | A    Just Mr. Letcavage. |
| 10:31 | 8 | Q    Okay.  And there was also a request for documents, |
| 10:31 | 9 | correct? |
| 10:31 | 10 | A    What do you mean? |
| 10:31 | 11 | Q    From ONIT Sciences to produce in anticipation of the |
| 10:31 | 12 | deposition. |
| 10:31 | 13 | A    I don't know what they are. |
| 10:31 | 14 | Q    Do you know if any documents were produced? |
| 10:31 | 15 | A    I don't. |
| 10:31 | 16 | Q    I can represent to you that only a spreadsheet was |
| 10:31 | 17 | produced.  Does that sound familiar, the spreadsheet of |
| 10:31 | 18 | payments? |
| 10:31 | 19 | A    I saw that. |
| 10:31 | 20 | Q    Okay.  And that identified payments going to |
| 10:31 | 21 | Mr. Letcavage, right? |
| 10:31 | 22 | A    Correct. |
| 10:31 | 23 | Q    And are you aware of whether there are any documents |
| 10:31 | 24 | that support the payments that were made to Mr. Letcavage? |
| 10:31 | 25 | A    I am not. |

20

| | | |
|---|---|---|
| 10:31 | 1 | Q    And did you produce any documents that support the |
| 10:31 | 2 | claim that Mr. Letcavage did consulting for ONIT Sciences? |
| 10:32 | 3 | A    No. |
| 10:32 | 4 | MR. ELLENBOGEN:  May I approach, Your Honor? |
| 10:32 | 5 | THE COURT:  You may. |
| 10:32 | 6 | BY MR. ELLENBOGEN: |
| 10:32 | 7 | Q    I'm handing to you what has been premarked by us as |
| 10:32 | 8 | Exhibit Number 25.  I'm going to put this on the elmo so you |
| 10:32 | 9 | all can see it.  I know it's not super clear on the screen. |
| 10:32 | 10 | Are you familiar with Exhibit 25? |
| 10:32 | 11 | A    I am. |
| 10:32 | 12 | Q    What is this? |
| 10:32 | 13 | A    It is a ledger of payments. |
| 10:32 | 14 | Q    And those include payments to Mr. Letcavage through his |
| 10:32 | 15 | company, iCapital Advisory; is that correct? |
| 10:33 | 16 | A    Yes.  Yes. |
| 10:33 | 17 | Q    Who put this document together? |
| 10:33 | 18 | A    I don't know. |
| 10:33 | 19 | Q    Do you know if Megan Bradshaw put this document |
| 10:33 | 20 | together? |
| 10:33 | 21 | A    I don't know. |
| 10:33 | 22 | Q    Do you know who Megan Bradshaw is? |
| 10:33 | 23 | A    Yes, I do. |
| 10:33 | 24 | Q    Who is she? |
| 10:33 | 25 | A    She is our bookkeeper. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:33 | 1 | Q    By the way, do you know if Megan Bradshaw works for any |
| 10:33 | 2 | other companies other than ONIT Sciences? |
| 10:33 | 3 | A    She does. |
| 10:33 | 4 | Q    What companies are those? |
| 10:33 | 5 | A    GATC Health. |
| 10:33 | 6 | Q    If you flip over to the third page, you will see |
| 10:33 | 7 | there's payments made to the law offices of John W. |
| 10:33 | 8 | Fagerholm.  Do you see that? |
| 10:33 | 9 | A    Page 3 meaning? |
| 10:33 | 10 | Q    Page 3 if you ignore the double-sided.  It's the third |
| 10:34 | 11 | page. |
| 10:34 | 12 | A    Okay. |
| 10:34 | 13 | Q    Do you know who that is? |
| 10:34 | 14 | A    No, I don't. |
| 10:34 | 15 | Q    Do you know why that is included on the spreadsheet? |
| 10:34 | 16 | A    I have no idea. |
| 10:34 | 17 | Q    Are you aware that Mr. Fagerholm is an attorney who |
| 10:34 | 18 | represented Mr. Letcavage or his entities in other matters? |
| 10:34 | 19 | Are you aware of that? |
| 10:34 | 20 | A    No. |
| 10:34 | 21 |          MR. TRAD:  Objection, Your Honor.  Speculation. |
| 10:34 | 22 | Hearsay. |
| 10:34 | 23 |          THE COURT:  He said he didn't know. |
| 10:34 | 24 |          Mr. Locke, if you could, before you answer any |
| 10:34 | 25 | question, let me rule on the objection. |

22

| | | |
|---|---|---|
| 10:34 | 1 | THE WITNESS:  Sure. |
| 10:34 | 2 | MR. TRAD:  Thank you, Your Honor. |
| 10:34 | 3 | BY MR. ELLENBOGEN: |
| 10:34 | 4 | Q    Are you aware as to whether or not ONIT Sciences paid |
| 10:34 | 5 | Mr. Fagerholm for work he performed for Mr. Letcavage or any |
| 10:34 | 6 | other entity of Mr. Letcavage's? |
| 10:34 | 7 | A    (No response) |
| 10:34 | 8 | Q    You can answer if there's no objection. |
| 10:34 | 9 | A    No. |
| 10:34 | 10 | Q    Okay.  Is that something that ONIT Sciences should be |
| 10:34 | 11 | paying Mr. Letcavage pursuant to whatever consulting |
| 10:34 | 12 | agreement ONIT Sciences has with Mr. Letcavage? |
| 10:35 | 13 | A    I don't know. |
| 10:35 | 14 | Q    Why don't you know? |
| 10:35 | 15 | A    I'm not the bookkeeper. |
| 10:35 | 16 | Q    Do you know what the terms of the agreement that ONIT |
| 10:35 | 17 | Sciences had with Mr. Letcavage? |
| 10:35 | 18 | A    No. |
| 10:35 | 19 | Q    What time period did Mr. Letcavage work for ONIT |
| 10:35 | 20 | Sciences? |
| 10:35 | 21 | A    I'm not entirely sure.  I was hired in '19, like, mid |
| 10:35 | 22 | '19, and he I think was offering services prior to that, but |
| 10:35 | 23 | I don't know the dates. |
| 10:35 | 24 | Q    And does he continue to provide services to ONIT |
| 10:35 | 25 | Sciences? |

| | | |
|---|---|---|
| 10:35 | 1 | A    No. |
| 10:35 | 2 | Q    When did that stop? |
| 10:35 | 3 | A    I gotta think.  Six plus months ago. |
| 10:35 | 4 | Q    And as you sit here today, you can't describe one |
| 10:35 | 5 | specific piece of activity that Mr. Letcavage did for ONIT |
| 10:36 | 6 | Sciences? |
| 10:36 | 7 | A    I was not involved in that. |
| 10:36 | 8 | Q    Who was involved in that? |
| 10:36 | 9 | A    I don't know.  I had a role and I served my role.  I |
| 10:36 | 10 | don't know the answer to that question, sir. |
| 10:36 | 11 | Q    What is your title at ONIT Sciences? |
| 10:36 | 12 | A    I'm in operations, operations manager. |
| 10:36 | 13 | Q    How many employees does ONIT Sciences have? |
| 10:36 | 14 | A    No employees. |
| 10:36 | 15 | Q    How many officers? |
| 10:36 | 16 | A    Two officers. |
| 10:36 | 17 | Q    Who are they? |
| 10:36 | 18 | A    Myself and Gary Martin. |
| 10:36 | 19 | Q    Okay.  And would Gary Martin know what Mr. Letcavage |
| 10:36 | 20 | did specifically for ONIT Sciences? |
| 10:36 | 21 | A    I don't know. |
| 10:36 | 22 |         MR. TRAD:  Objection.  Calls for speculation. |
| 10:36 | 23 | Hearsay. |
| 10:36 | 24 |         THE COURT:  He said he didn't know. |
| | 25 | |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:36 | 1 | BY MR. ELLENBOGEN: |
| 10:36 | 2 | Q    Are you familiar with Scott Dinsmore? |
| 10:36 | 3 | A    Yes. |
| 10:36 | 4 | Q    Who is he? |
| 10:36 | 5 | A    Scott was kind of a handyman.  Ran errands. |
| 10:36 | 6 | Q    As he was paid by ONIT Sciences as well for his work at |
| 10:36 | 7 | ONIT Sciences? |
| 10:36 | 8 | A    According to the ledger. |
| 10:36 | 9 | Q    Do you have any personal knowledge? |
| 10:36 | 10 | A    I don't have any personal knowledge.  No, I don't. |
| 10:36 | 11 | Q    Do you know if he was paid directly or through another |
| 10:37 | 12 | entity? |
| 10:37 | 13 | A    I have no idea. |
| 10:37 | 14 | Q    Do you know of Mr. Dinsmore's role at Premier Holding? |
| 10:37 | 15 | A    I do not. |
| 10:37 | 16 | Q    And finally, when was the last time you spoke with |
| 10:37 | 17 | Mr. Letcavage -- strike that.  Have you spoken with |
| 10:37 | 18 | Mr. Letcavage about this litigation? |
| 10:37 | 19 | A    No. |
| 10:37 | 20 | Q    At any time? |
| 10:37 | 21 | A    Never. |
| 10:37 | 22 | Q    Okay. |
| 10:37 | 23 |         MR. ELLENBOGEN:  Thank you, Mr. Locke.  I don't |
| 10:37 | 24 | have any questions. |
| 10:37 | 25 |         THE COURT:  Do you have any questions, sir? |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:37 | 1 | MR. TRAD:  No questions, Your Honor. |
| 10:37 | 2 | THE COURT:  You can step down.  You are excused. |
| 10:37 | 3 | Thank you, sir. |
| 10:37 | 4 | THE WITNESS:  Thank you. |
| 10:37 | 5 | MR. VASILESCU:  At this time we call Mr. Randall |
| 10:37 | 6 | Letcavage to the stand. |
| 10:37 | 7 | THE COURT:  All right. |
| 10:37 | 8 | Mr. Letcavage, please come forward, sir.  If you |
| 10:37 | 9 | could stand by our court reporter, we'll administer an oath |
| 10:37 | 10 | to you and then have you take the witness stand. |
| 10:37 | 11 | RANDALL LETCAVAGE, PLAINTIFF'S WITNESS, SWORN |
| 10:38 | 12 | THE CLERK:  Please be seated, sir. |
| 10:38 | 13 | Please state your name for the record. |
| 10:38 | 14 | THE WITNESS:  Randall Letcavage. |
| 10:38 | 15 | THE COURT:  Please proceed. |
| 10:38 | 16 | DIRECT EXAMINATION |
| 10:38 | 17 | BY MR. VASILESCU: |
| 10:38 | 18 | Q    Mr. Letcavage, did there come a time in January 2021 |
| 10:38 | 19 | when you understood there were judgments entered in this |
| 10:38 | 20 | case against you and Premier Holding? |
| 10:38 | 21 | A    Yes. |
| 10:38 | 22 | Q    Did you understand that one of the parts of the relief |
| 10:38 | 23 | in those judgments were that you had to pay the disgorgement |
| 10:39 | 24 | of the money that was raised from the investors that you |
| 10:39 | 25 | obtained money from in 2013 and 2012 and on? |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

10:39   1   A     Can you repeat that question.

10:39   2   Q     Did you understand that you had to pay disgorgement in

10:39   3   approximately seven million plus prejudgment interest?

10:39   4   A     I understood that that was the fine and that I had to

10:39   5   pay it, and that's as much as I knew because I had no

10:39   6   mechanism of paying that to anybody.

10:39   7             MR. VASILESCU:  Your Honor, may I approach the

10:39   8   witness?

10:39   9             THE COURT:  You may.

10:39   10  BY MR. VASILESCU:

10:39   11  Q     Mr. Letcavage, I'm going to hand you what has been

10:39   12  premarked as Exhibit 39 and also what's been premarked as

10:39   13  Exhibit 40 and Exhibit 41.  Wait.  I'm sorry.  Which one is

10:40   14  that?

10:40   15  A     Thirty-nine.

10:40   16            MR. TRAD:  I apologize, Your Honor.  In all of

10:40   17  this stuff, I don't have a 39.

10:40   18            THE COURT:  Okay.  We'll make sure before the

10:40   19  question starts that you have a copy of whatever exhibit is

10:40   20  presented.  We have Exhibit 39, which is --

10:40   21            MR. ELLENBOGEN:  Here is a copy.

10:40   22            THE COURT:  Okay.

10:40   23            THE WITNESS:  Well, I have two 41s and a 40.  Am I

10:41   24  looking at three or four exhibits here?  I have a 39, a 40,

10:41   25  and a 41.

| | | |
|---|---|---|
| 10:41 | 1 | BY MR. VASILESCU: |
| 10:41 | 2 | Q    Do you have more than one of one? |
| 10:41 | 3 | A    I have two 41s. |
| 10:41 | 4 | Q    Okay.  Mr. Letcavage, you should have three exhibits, |
| 10:41 | 5 | Exhibits 39, 40, and 41. |
| 10:41 | 6 | If you take a look at 39, Mr. Letcavage, this is |
| 10:41 | 7 | the order granting relief in terms of the -- relief against |
| 10:41 | 8 | you in this case by the Court in terms of disgorgement and |
| 10:41 | 9 | civil penalties.  Do you see that? |
| 10:41 | 10 | A    I'm sorry.  Can you point me to the area I'm supposed |
| 10:41 | 11 | to look at. |
| 10:41 | 12 | Q    Sure.  If you look at page 5 of Exhibit 39. |
| 10:41 | 13 | A    Yes. |
| 10:41 | 14 | Q    There is a section entitled disgorgement? |
| 10:41 | 15 | A    Yes, 5-B or whatever. |
| 10:42 | 16 | Q    If you look in the bottom paragraph, it says:  The SEC |
| 10:42 | 17 | seeks disgorgement of $6,880,111 representing the total |
| 10:42 | 18 | investments Premier and Letcavage raised from December 5th, |
| 10:42 | 19 | 2012, through May 20th, 2015, the period during which the |
| 10:42 | 20 | company made material misstatements to the public, so that |
| 10:42 | 21 | it may return those funds to the defrauded investors.  Do |
| 10:42 | 22 | you understand that? |
| 10:42 | 23 | A    I do. |
| 10:42 | 24 | MR. TRAD:  Object, Your Honor, as misstates the |
| 10:42 | 25 | evidence, misstates the document.  The document speaks for |

| | | |
|---|---|---|
| 10:42 | 1 | itself.  This document is an order as to Premier Holding and |
| 10:42 | 2 | Letcavage, but I just want to make sure that we're looking |
| 10:42 | 3 | at the same provision here. |
| 10:42 | 4 | THE COURT:  We don't have to have speaking |
| 10:42 | 5 | objections.  I can figure it out. |
| 10:42 | 6 | MR. TRAD:  I apologize. |
| 10:42 | 7 | THE COURT:  Mr. Letcavage, if you don't understand |
| 10:42 | 8 | a question -- |
| 10:42 | 9 | BY MR. VASILESCU: |
| 10:42 | 10 | Q    And if you look on the next -- |
| 10:42 | 11 | THE COURT:  Counsel, wait a minute.  I was trying |
| 10:42 | 12 | to give Mr. Letcavage some direction. |
| 10:42 | 13 | MR. VASILESCU:  Sorry. |
| 10:42 | 14 | THE COURT:  Sir, you don't have to adopt any |
| 10:42 | 15 | characterization in the question.  If you don't understand |
| 10:43 | 16 | the question, just let counsel know and he'll rephrase it. |
| 10:43 | 17 | Okay? |
| 10:43 | 18 | THE WITNESS:  Uh-huh. |
| 10:43 | 19 | THE COURT:  All right. |
| 10:43 | 20 | THE WITNESS:  I believe I understand the question. |
| 10:43 | 21 | I think I answered "I do."  I don't know if that's on |
| 10:43 | 22 | record. |
| 10:43 | 23 | BY MR. VASILESCU: |
| 10:43 | 24 | Q    Mr. Letcavage, if we go on to the next page of |
| 10:43 | 25 | Exhibit 39, page 7, on the paragraph above where it says |

10:43  1  civil penalties, do you see that the Court calculated

10:43  2  interest and added it to the disgorgement amount of

10:43  3  $6,880,111 to come to the total of $8,691,500.41?  Do you

10:43  4  see that?

10:44  5  A    Okay.  I know what you're saying.  Okay.  My document

10:44  6  says the million-dollar penalty each for Premier and

10:44  7  Letcavage is not excessive considering the nearly

10:44  8  seven million of ill-gotten gains, but I do not see anything

10:44  9  that says $6.8 million on here.

10:44  10  Q    If I could direct your attention to the top of page 7

10:44  11  above civil penalties and read that paragraph.

10:44  12  A    Okay.  I see it.

10:44  13  Q    Now, as you sit here today, do you understand that the

10:44  14  disgorgement here is based on the monies obtained from

10:44  15  investors who were defrauded in the Premier case?  Do you

10:44  16  understand that?

10:44  17  A    I understand that that was the ruling, yes.

10:44  18  Q    Okay.  Now, if we take a look at Exhibit 41, that

10:45  19  document is entitled Judgment as to Defendant Randall

10:45  20  Letcavage.  Do you see that?

10:45  21  A    Yes, sir.

10:45  22  Q    Okay.  And if you go to page 7 which I have on the

10:45  23  elmo -- it's on your screen -- do you see that there is an

10:45  24  order there from the Court that the defendant is liable for

10:45  25  disgorgement of $6,880,111 jointly and severally with

| | | |
|---|---|---|
| 10:45 | 1 | defendant Premier representing profits gained as a result of |
| 10:45 | 2 | the conduct alleged in the Complaint, together with |
| 10:45 | 3 | prejudgment interest thereon in the amount of $1,811,389.41, |
| 10:45 | 4 | totaling $8,691,500.41, to the Securities & Exchange |
| 10:45 | 5 | Commission within 14 days after the entry of this final |
| 10:46 | 6 | judgment?  Do you see that? |
| 10:46 | 7 | A    I do. |
| 10:46 | 8 | Q    Now, were you represented by counsel at the time that |
| 10:46 | 9 | this judgment was entered? |
| 10:46 | 10 | A    I believe so.  And the reason I say that is because my |
| 10:46 | 11 | counsel at that time was for the appellate hearing.  I'm not |
| 10:46 | 12 | sure where that counsel ended or where it began. |
| 10:46 | 13 | Q    Well, did you have a counsel in a district court action |
| 10:46 | 14 | who was a woman attorney? |
| 10:46 | 15 | A    Yeah, but she was no longer representing me. |
| 10:46 | 16 | Q    At the time the judgments were entered, she was not |
| 10:46 | 17 | representing you? |
| 10:46 | 18 | A    No. |
| 10:46 | 19 | Q    Okay.  Take a look at Exhibit 40.  That is a judgment |
| 10:46 | 20 | against Premier Holding; is that right? |
| 10:46 | 21 | A    Yes, sir. |
| 10:46 | 22 | Q    And were you aware when this was entered that there was |
| 10:46 | 23 | a judgment against Premier Holding jointly and severally |
| 10:46 | 24 | putting Premier responsible together with you for that |
| 10:47 | 25 | eight-million-plus disgorgement and prejudgment interest? |

10:47  1    A    I am, yes.

10:47  2    Q    And at the time the judgment was entered, were you the

10:47  3    CEO of Premier?

10:47  4    A    For the period of about seven days between the judgment

10:47  5    being entered and my resignation.

10:47  6    Q    But at the time the judgment was entered, you were the

10:47  7    CEO, right?

10:47  8    A    I believe so.

10:47  9    Q    And you had been the CEO of Premier going back to late

10:47  10   2012; isn't that right?

10:47  11   A    I don't have the dates, but that sounds right.

10:47  12   Q    And both judgments required payment within 14 days;

10:47  13   isn't that right?

10:47  14   A    I see that, but this is the first time I'm seeing that.

10:47  15   Q    Is it your position that you were unaware that the

10:47  16   Court's judgments entered in January 2021 required you to

10:48  17   pay within 14 days?  Were you unaware of this?

10:48  18   A    Yes, I was unaware of that.

10:48  19   Q    When did you first review these judgments?

10:48  20   A    I don't know that I ever did.

10:48  21   Q    As the CEO of Premier, did you feel it was your

10:48  22   responsibility to review the judgment against Premier?

10:48  23   A    Well, you essentially killed Premier with your action,

10:48  24   so there was nothing left in Premier.  What was I going to

10:48  25   do, whether I reviewed it or not?  I'm not trying to be

10:48  1    callous here.  I'm just saying what was there left for me to

10:48  2    do?

10:48  3    Q    How did you know what was in the judgments to the

10:48  4    extent it killed Premier if you didn't read it?

10:48  5    A    I'm not going to answer that that way because you

10:48  6    killed Premier a long time ago when you started the action

10:48  7    against the company, but I don't want to get into that

10:48  8    obviously.  That has been adjudicated already.  I knew from

10:48  9    talking to my attorney that we lost the appeal.

10:48  10   Q    Did the attorney send to you the judgments?

10:48  11   A    Probably, but I don't know that for sure.

10:49  12   Q    Did you make any effort to pay the judgment after it

10:49  13   was entered in January of 2021?

10:49  14   A    Yes.

10:49  15   Q    What efforts did you make to make a payment on those

10:49  16   judgments?

10:49  17   A    I contacted new counsel, which is Phillip Trad, and I

10:49  18   had him try to work with you so that we could work out

10:49  19   payment.

10:49  20   Q    Did you make any attempt to make a partial payment on

10:49  21   the monies that you were ordered to pay in January 2021?

10:49  22   A    How do you do that?  Answer me that question, please,

10:49  23   and then I'll answer.  So how would I make that attempt?

10:49  24        MR. VASILESCU:  Your Honor, I request that the

10:49  25   witness be instructed to answer that question.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:49 | 1 | THE COURT:  Rightfully or wrongfully, |
| 10:49 | 2 | Mr. Letcavage, he gets to ask the questions.  We don't need |
| 10:49 | 3 | to argue.  I know Mr. Trad will ask you questions to get |
| 10:50 | 4 | information that you want me to know, and I appreciate that. |
| 10:50 | 5 | We'll get through this quicker if we try to answer the |
| 10:50 | 6 | question if you can.  Then if you can't -- |
| 10:50 | 7 | THE WITNESS:  I don't know want to be |
| 10:50 | 8 | argumentative obviously.  But if I didn't know that I had |
| 10:50 | 9 | 14 days to pay it and I'm waiting for them to give me |
| 10:50 | 10 | instructions on how to make these payments, what am I |
| 10:50 | 11 | supposed to do? |
| 10:50 | 12 | THE COURT:  Why don't we get a question. |
| 10:50 | 13 | THE WITNESS:  Okay -- please.  Sorry, Your Honor. |
| 10:50 | 14 | BY MR. VASILESCU: |
| 10:50 | 15 | Q    Mr. Letcavage, did you have a counsel named Lahdan |
| 10:50 | 16 | Rahmati? |
| 10:50 | 17 | A    Yes. |
| 10:50 | 18 | Q    Okay.  Does this refresh your recollection if I mention |
| 10:50 | 19 | to you that her withdrawal from this case on the docket is |
| 10:50 | 20 | number 223, and it came after the judgments were entered? |
| 10:50 | 21 | MR. TRAD:  Objection, Your Honor.  Speculation. |
| 10:50 | 22 | Assumes facts not in evidence and beyond this witness's |
| 10:50 | 23 | understanding. |
| 10:50 | 24 | THE COURT:  I think he asked did it refresh his |
| 10:51 | 25 | recollection.  Did it refresh your recollection, sir? |

| 10:51 | 1 | THE WITNESS:  No, because I don't know those |
| 10:51 | 2 | dates, number one.  And number two, whenever she filed |
| 10:51 | 3 | something, I don't know, but I wasn't paying her probably |
| 10:51 | 4 | from the time of the appeal, to be honest.  And I don't |
| 10:51 | 5 | remember that, so I probably shouldn't comment on it.  I |
| 10:51 | 6 | don't remember when her last payment was. |
| 10:51 | 7 | BY MR. VASILESCU: |
| 10:51 | 8 | Q    Now, you understood that there were specific terms with |
| 10:51 | 9 | the judgment that you had to comply with right away; isn't |
| 10:51 | 10 | that right? |
| 10:51 | 11 | A    No -- well, other than I was prohibited from acting as |
| 10:51 | 12 | a director or an officer in a public company.  My attorney |
| 10:51 | 13 | did make me aware of that, and that's why I resigned from |
| 10:51 | 14 | Premier. |
| 10:51 | 15 | Q    And is it your position that your attorney did not make |
| 10:51 | 16 | you aware that there was language in the judgment that |
| 10:51 | 17 | required you to make payment within 14 days? |
| 10:51 | 18 | A    Absolutely not.  This is the first time I'm seeing |
| 10:51 | 19 | that. |
| 10:52 | 20 | Q    Now, you did not seek a stay of the judgment from this |
| 10:52 | 21 | Court or the Court of Appeals when you appealed to the Ninth |
| 10:52 | 22 | Circuit; isn't that right? |
| 10:52 | 23 | A    That is correct. |
| 10:52 | 24 | Q    And did you have an understanding of the concept of |
| 10:52 | 25 | seeking a stay of the judgment from the Court or from the |

10:52  1  Ninth Circuit at that time?

10:52  2  A    I'm not a lawyer, but I understood that that was an

10:52  3  option.  I also understood that I would have to post a bond

10:52  4  to be able to do that, and I just decided that it wasn't in

10:52  5  anybody's interest for me to do that.

10:52  6  Q    Did there come a time in 2021 when the SEC reached out

10:52  7  to you through your lawyers requesting that you comply and

10:52  8  pay the judgment?

10:52  9  A    Not that I am aware of.  The first time I got a

10:53  10  document was the financial statement which I filled out.

10:53  11  Q    Now, in 2021 in the first half, did you understand that

10:53  12  the SEC was seeking post-judgment financial discovery from

10:53  13  you and Premier?

10:53  14  A    No.  In fact, I wondered why I wasn't hearing from you.

10:53  15  Q    Did you authorize an attorney to submit documents in

10:53  16  production to the SEC in the summer of 2021?

10:53  17  A    I don't know.  I'm assuming yes because I'm assuming

10:53  18  Phil was my -- Mr. Trad was my attorney at that time.  But

10:54  19  again that's just an assumption.  By the way, I think that's

10:54  20  the time that I filled out the financial statement, the

10:54  21  first copy.

10:54  22          MR. TRAD:  Your Honor, if it will save time, I'm

10:54  23  happy to stipulate that Mr. Letcavage filed oral responses

10:54  24  in 2021 in response to a request for production of

10:54  25  documents.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 10:54 | 1 | THE COURT:  All right. |
| 10:54 | 2 | MR. VASILESCU:  Your Honor, if I may approach the |
| 10:54 | 3 | witness. |
| 10:54 | 4 | THE COURT:  You may. |
| 10:54 | 5 | MR. VASILESCU:  This is what has been marked as |
| 10:55 | 6 | Exhibit 1 and Exhibit 9. |
| 10:55 | 7 | MR. TRAD:  Did I hear Exhibit 1 and Exhibit 9? |
| 10:55 | 8 | MR. VASILESCU:  Yes.  These are discovery |
| 10:55 | 9 | requests. |
| 10:55 | 10 | BY MR. VASILESCU: |
| 10:55 | 11 | Q    Now, if you take a look at Exhibit 1, Mr. Letcavage, do |
| 10:55 | 12 | you see the date of that document on the last page?  It's |
| 10:55 | 13 | February 24th, 2021? |
| 10:56 | 14 | A    Yes, I see it. |
| 10:56 | 15 | Q    And would you agree with me that that request is less |
| 10:56 | 16 | than one month after the judgments were entered against you? |
| 10:56 | 17 | A    I would agree to that. |
| 10:56 | 18 | Q    And exhibit -- that's a document request to you, |
| 10:56 | 19 | Mr. Letcavage, right? |
| 10:56 | 20 | A    Yes.  That doesn't mean it came to me. |
| 10:56 | 21 | Q    Okay.  And Exhibit 9 is a document request to Premier |
| 10:56 | 22 | of the same date; is that right? |
| 10:56 | 23 | A    Yes. |
| 10:56 | 24 | Q    And did you understand that the SEC in these document |
| 10:56 | 25 | requests -- well, did there come a time when you understood |

10:56   1   that these document requests were made to you?

10:56   2   A    No.

10:56   3   Q    So prior to today you have no understanding that these

10:56   4   document requests were made to you in February 2021?

10:56   5   A    No.  I have never seen these documents, and I can't

10:57   6   tell who Exhibit 1 was sent to.

10:57   7   Q    Is it your representation here today that your

10:57   8   attorneys, including Mr. Trad, never told you that there

10:57   9   were document requests in February of 2021?

10:57   10          MR. TRAD:  Object, Your Honor.  Misstates the

10:57   11  testimony.  Assumes facts not in evidence as to when I

10:57   12  became of record.  So if we can clarify, I will be happy to

10:57   13  withdraw the objection.

10:57   14          THE COURT:  Do you want to rephrase the question?

10:57   15  BY MR. VASILESCU:

10:57   16  Q    Well, after Ms. Rahmati.  Who was your next attorney in

10:57   17  this case after Ms. Rahmati?

10:57   18  A    Mr. Trad.

10:57   19  Q    Okay.  Did you give Mr. Trad access to your litigation

10:57   20  file in this case?

10:57   21  A    I don't remember that, and I don't know what that means

10:57   22  actually.  I don't remember signing anything in that regard.

10:57   23  Q    Do you know if you authorized Ms. Rahmati to work with

10:58   24  Mr. Trad to get the record in this case?

10:58   25  A    I don't think so.  I don't remember, but I don't think

| | | |
|---|---|---|
| 10:58 | 1 | so. |
| 10:58 | 2 | MR. VASILESCU:  Your Honor, if I could approach |
| 10:58 | 3 | the witness again? |
| 10:58 | 4 | THE COURT:  You may. |
| 10:58 | 5 | MR. VASILESCU:  Mr. Letcavage, I'm going to give |
| 10:58 | 6 | you what has been marked as Exhibit 37 and also Exhibit 32. |
| 10:59 | 7 | Mr. Trad, they are two court documents, |
| 10:59 | 8 | Exhibits 37 and 32. |
| 10:59 | 9 | (Counsel conferring) |
| 10:59 | 10 | BY MR. VASILESCU: |
| 10:59 | 11 | Q    Mr. Letcavage, if you could take a look at Exhibit 37. |
| 11:00 | 12 | A    (Witness complies.)  Yes. |
| 11:00 | 13 | Q    This is an order on the elmo there.  It's an order |
| 11:00 | 14 | issued on September 7th, 2021.  Do you see that? |
| 11:00 | 15 | A    Yes. |
| 11:00 | 16 | Q    And this was issued by the magistrate judge in this |
| 11:00 | 17 | case, Magistrate Scott.  Do you understand that? |
| 11:00 | 18 | A    I don't see that, but I will take your word for it. |
| 11:00 | 19 | Q    Well, did there come a time in September of 2021 when |
| 11:00 | 20 | you understood that the SEC went to the Court to compel you |
| 11:01 | 21 | to produce financial documents and financial records that we |
| 11:01 | 22 | had asked for in discovery that we basically stated that you |
| 11:01 | 23 | had not produced? |
| 11:01 | 24 | A    Yes and no, okay?  Yes, I was aware that you were |
| 11:01 | 25 | looking for these financial records.  Also, this was the |

11:01  1   first time I realized that they had not been produced or the

11:01  2   first time that I realized that you asked for those records,

11:01  3   those particular records.

11:01  4   Q    Is it fair to say that after this was issued, you

11:01  5   became aware of this order by Magistrate Scott?

11:01  6   A    Yes.

11:01  7   Q    And did you understand that this order required you to

11:01  8   produce various records?

11:01  9   A    Yes.

11:02  10  Q    Now, if you look on page 8 of Exhibit 37, at the bottom

11:02  11  is a Section IV order.  Do you see that?

11:02  12  A    Sorry.  Could I have the page number again, please.

11:02  13  Q    It's on page 8 of Exhibit 37.  There's a Section IV

11:02  14  order.  Do you see that?

11:02  15  A    Well, I don't have the pages marked here.

11:02  16  Q    There are pages at the --

11:02  17  A    Oh, I see.  I'm sorry.  I apologize.  Okay.  What am I

11:02  18  looking at?

11:02  19  Q    The section under Roman numeral IV order.  Do you see

11:03  20  that?

11:03  21  A    Yes.

11:03  22  Q    And do you see there is a category A, post-judgment

11:03  23  document production.  Do you see that?

11:03  24  A    Yes.

11:03  25  Q    Okay.  And do you see that it states:  As discussed

| 11:03 | 1 | above, all of the defendants' objections to the commission's |
| 11:03 | 2 | post-judgment document requests are overruled by no later |
| 11:03 | 3 | than September 24, 2021.  Each defendant shall serve |
| 11:03 | 4 | supplemental responses to the post-judgment document |
| 11:03 | 5 | requests, omitting all objections overruled and truthfully |
| 11:03 | 6 | stating that all responsive statements in its possession, |
| 11:03 | 7 | custody, or control will be produced by October 15, 2021, or |
| 11:03 | 8 | that none exist.  Do you see that part? |
| 11:03 | 9 | A    I see it, yes. |
| 11:03 | 10 | Q    And did you have an understanding of what your |
| 11:03 | 11 | obligation was to comply with that part of the order by |
| 11:03 | 12 | October 15, 2021? |
| 11:04 | 13 | A    Not really.  I mean, I can read, but at this point I |
| 11:04 | 14 | had an attorney, so I was just relying on what I was doing |
| 11:04 | 15 | working with the lawyer. |
| 11:04 | 16 | Q    And your attorney at the time was Mr. Trad? |
| 11:04 | 17 | A    It was. |
| 11:04 | 18 | Q    Okay.  And then the second part says:  Number two, |
| 11:04 | 19 | begin a rolling unredacted production of all responsive |
| 11:04 | 20 | non-privileged documents to be completed by October 15, |
| 11:04 | 21 | 2021.  Do you see that? |
| 11:04 | 22 | A    I do see that. |
| 11:04 | 23 | Q    And it goes on to state:  If defendants are withholding |
| 11:04 | 24 | or redacting any responsive information based on an |
| 11:04 | 25 | applicable attorney/client or work-product privilege, they |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:04   1   shall promptly produce a privilege log identifying every

11:04   2   responsive document withheld or redacted based on privilege

11:04   3   and providing sufficient facts in the law to assess the

11:04   4   validity of those privilege claims.

11:04   5           Do you know if you asserted any privilege claim?

11:04   6           MR. TRAD:  Object to the form of the question,

11:04   7   Your Honor.  It calls for an expert opinion, a legal

11:05   8   condition.

11:05   9           THE COURT:  Sustained.

11:05   10  BY MR. VASILESCU:

11:05   11  Q   Let's go to the next section, Mr. Letcavage, accounting

11:05   12  of assets.  It says:  By no later than September 24, 2021,

11:05   13  each defendant shall produce a detailed accounting of their

11:05   14  assets identified during the period of January 1, 2012, to

11:05   15  the present; the identity of every bank and brokerage

11:05   16  account in which Premier or Letcavage had an interest either

11:05   17  directly or indirectly.  Do you see that?

11:05   18  A   Yes.

11:05   19  Q   At the time did you have an understanding that was your

11:05   20  responsibility to produce the identity of every bank and

11:05   21  brokerage account in which Premier or Letcavage had an

11:05   22  interest either directly or indirectly?

11:05   23  A   Yeah, I understand it.  I'm not sure about the dates.

11:05   24  And I believe you got all of those records.

11:05   25  Q   Now, for that same period, January 1, 2012, to the time

11:06  1    of that order, the Court also required you to identify the

11:06  2    transfer out of funds raised by Premier; isn't that right?

11:06  3    A    I'm sorry.  I don't understand that question.

11:06  4    Q    Did you have an understanding after Magistrate Scott

11:06  5    issued this order that one of your responsibilities was to

11:06  6    identify all transfers of funds out of Premier from the

11:06  7    period January 1, 2012, to that date in September of 2022?

11:06  8    A    You have every bank record going back for eight years

11:06  9    when you first started subpoenaing all these records.  So

11:06  10   you have all of those records, and you have audited

11:06  11   financials from the auditor.  So you have every single

11:06  12   record there.  So whatever we had we gave to you, either

11:06  13   Premier gave to you because I helped them prepare the

11:07  14   documents, or we gave to you at some point.

11:07  15            MR. VASILESCU:  Your Honor, I move to strike the

11:07  16   answer as nonresponsive.

11:07  17            THE COURT:  Overruled.

11:07  18   BY MR. VASILESCU:

11:07  19   Q    Did you have an understanding as to what your

11:07  20   obligation was to produce?

11:07  21   A    Yes.  I thought we met that obligation.

11:07  22   Q    Did you have an understanding whether Magistrate Judge

11:07  23   Scott felt you met your obligation when she issued this

11:07  24   order?

11:07  25   A    I don't have an issue with Magistrate Scott.  I don't

11:07  1   know what she understood.  Are you asking me what I

11:07  2   understood?

11:07  3   Q    Yes.

11:07  4   A    That we met the obligation?

11:07  5   Q    Well, did you feel that Magistrate Scott did not agree

11:07  6   with you that you met your obligation regarding --

11:07  7   A    I don't know that.  I wouldn't see how based on what I

11:07  8   just said.

11:07  9        MR. TRAD:  Objection to the form of the question.

11:07  10  Again calls for a legal conclusion.  Speculation.

11:07  11       THE COURT:  He indicated he didn't know.  So

11:08  12  technically as framed it was speculative, but he said he

11:08  13  didn't know.

11:08  14  BY MR. VASILESCU:

11:08  15  Q    Did you have an understanding after this magistrate

11:08  16  judge's order was issued in September of 2021 that you were

11:08  17  responsible to identify all assets held directly or

11:08  18  indirectly by Premier and you?

11:08  19  A    Yes, and we started doing it.  By the way, I need to

11:08  20  take back that answer.  I literally had nothing to do with

11:08  21  Premier after January.  So with Premier there was nothing in

11:08  22  there anyway, so I paid no attention to Premier.  I will be

11:08  23  completely honest there.  But for me, yes.

11:08  24  Q    Is it fair to say that in terms of what was going on at

11:08  25  Premier between December 2012 through January of 2021, you

11:09  1   were the person most knowledgeable about the activities of

11:09  2   Premier during that time period?

11:09  3   A    Yes.

11:09  4   Q    By the way, you installed someone to replace you in

11:09  5   January 2021 after you resigned as CEO; isn't that right?

11:09  6   A    Yes.

11:09  7        MR. TRAD:  Objection.  Argumentative.

11:09  8   Mischaracterizes the facts.  Assumes facts.

11:09  9        THE COURT:  Overruled.  I think he said yes.

11:09  10  BY MR. VASILESCU:

11:09  11  Q    Who did you install?

11:09  12  A    Well, install?  I don't know if it was install.  Nobody

11:09  13  wanted that position, number one.  Number two, there was

11:09  14  only one thing left to protect in Premier, and that was the

11:09  15  transfers of shares that were filed in the 14(c).  So Scott

11:09  16  agreed that he would take that position.  He actually came

11:09  17  to us.

11:09  18  Q    Scott?

11:09  19  A    Scott Dinsmore.  I'm sorry.

11:10  20  Q    At the time you resigned as the CEO of Premier, who

11:10  21  were the other board members other than you on the board of

11:10  22  Premier?

11:10  23  A    I think they all resigned before that.

11:10  24  Q    So at the time you resigned, you were the only board

11:10  25  member, right?

11:10   1   A    I believe so, yeah.

11:10   2   Q    And as the only board member, you were the board that

11:10   3   make the decision to make Mr. Dinsmore the CEO?

11:10   4   A    I think so.  I don't know the legal mechanics that went

11:10   5   on at that time or what liability or who approved what.  I'm

11:10   6   still unclear on Premier just because of the situation.

11:10   7   Q    And Mr. Dinsmore worked as a handyman for Premier prior

11:10   8   to that time?

11:10   9   A    No.

11:10   10   Q    Has he ever provided handyman services to Premier?

11:10   11   A    Yes -- no.

11:10   12   Q    Well, is it yes or no?

11:10   13   A    No, not to Premier.

11:10   14   Q    To who?

11:10   15   A    To other people that I introduced him to.

11:11   16   Q    So was that one of his main lines of work, to be a

11:11   17   handyman?

11:11   18   A    Yeah.

11:11   19   Q    Did he have a college degree?

11:11   20   A    I don't know.

11:11   21   Q    Did he have any experience running a public company

11:11   22   before you appointed him?

11:11   23   A    I didn't appoint him.  You know, we found somebody.  I

11:11   24   don't know where you're going with this.  What are you

11:11   25   trying to accomplish?  I'm sorry, but what's the point here?

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:11   1   Q    Well, you just referred to we, we found someone.  Who

11:11   2   is we?

11:11   3   A    I don't remember.  I really don't.  I don't remember.

11:11   4   There was a lot going on during that time, including looking

11:11   5   at a judgment of $8 million against me.  I don't remember

11:11   6   what happened.

11:11   7   Q    But you understood that only the board could appoint a

11:11   8   new CEO of Premier; isn't that right?

11:11   9   A    I don't know if there was anybody left on the board,

11:11   10  and I don't even know the dates that that took place.  So

11:11   11  how do I know if I was still a board member at that time?

11:12   12  There's a lot of things I don't recall going on at that

11:12   13  time.

11:12   14  Q    But were you involved in the decision to make

11:12   15  Mr. Dinsmore the CEO of Premier?

11:12   16  A    Yes.

11:12   17  Q    Who else was involved in making --

11:12   18  A    I don't remember.

11:12   19  Q    Please let me finish my question before you answer

11:12   20  because it also gives your attorney a chance to object.

11:12   21       Who other than you was involved in making the

11:12   22  decision to hire Mr. Dinsmore as the CEO of Premier?

11:12   23  A    I didn't hire him for anything.  I can't answer these

11:12   24  questions because I don't know if I was still on the board

11:12   25  at that time.  I don't know what process was used to bring

11:12  1  Scott in.  So what do you want me to say?

11:12  2          Did I sit down and talk to other people about it?

11:12  3  Yes, I am sure we did.  I don't remember who at the time.

11:12  4  And quite frankly I'm not sure why it's important, but I

11:13  5  will leave that up to you.

11:13  6  Q    Now, since January of 2021 have you had any

11:13  7  communications with Mr. Dinsmore?

11:13  8  A    Yes.

11:13  9  Q    How often have you had conversations with him?

11:13  10  A    Very rarely.

11:13  11  Q    Were you involved in any businesses with Mr. Dinsmore

11:13  12  subsequent to January of 2021 that didn't include Premier?

11:13  13  A    I don't think so.

11:13  14  Q    Did you have an understanding prior to today that

11:13  15  Mr. Dinsmore was deposed by the SEC in this case as the CEO

11:13  16  of Premier in the spring of 2022?

11:13  17  A    Yes.

11:13  18  Q    Did you attend that deposition?

11:13  19  A    I did not.

11:13  20  Q    Did you get a copy of the transcript?

11:13  21  A    I don't think so.  In fact, I'm certain I did not.

11:14  22  Q    Who remained on the board of Premier after you resigned

11:14  23  as CEO?

11:14  24  A    I don't know.

11:14  25  Q    A few days ago we received notice from Mr. Dinsmore's

```
11:14    1    counsel that he was resigning from Premier as of a day or
11:14    2    two ago.  Did you have any knowledge of that?
11:14    3    A    Yes.
11:14    4    Q    How did you have knowledge of that?
11:14    5    A    Scott called me and told me he was resigning.  I said:
11:14    6    Do what your attorney tells you to do.
11:14    7    Q    Why was he calling you to tell you that he's resigning
11:14    8    if you --
11:14    9    A    We were friends.
11:14   10    Q    Can I finish the question, please.
11:14   11    A    Sure.
11:14   12    Q    Why was he calling you to tell you he's resigning if
11:14   13    you were no longer affiliated with Premier?
11:14   14              MR. TRAD:  Object to the question, Your Honor.
11:14   15    Assumes facts not in evidence.  It's argumentative and it's
11:14   16    twisting facts.
11:14   17              THE COURT:  Sustained.
11:14   18    BY MR. VASILESCU:
11:14   19    Q    Why was Mr. Dinsmore -- what was your understanding of
11:15   20    why Mr. Dinsmore was calling you to tell you he resigned as
11:15   21    CEO of Premier?
11:15   22    A    Because he tried to call me about every decision he
11:15   23    made in his life.  I just didn't answer the phone most of
11:15   24    the time.
11:15   25              THE COURT:  Would this be a good time for our
```

| | | |
|---|---|---|
| 11:15 | 1 | morning break? |
| 11:15 | 2 | MR. VASILESCU:  Yes, Your Honor, it would be. |
| 11:15 | 3 | THE COURT:  Why don't we take a 15-minute break. |
| 11:15 | 4 | MR. VASILESCU:  Thank you, Your Honor. |
| 11:15 | 5 | (Recess taken at 11:15 a.m.; |
| 11:15 | 6 | proceedings resumed at 11:43 a.m.) |
| 11:16 | 7 | THE COURT:  All right.  Please continue. |
| 11:43 | 8 | MR. VASILESCU:  Your Honor, if I may approach the |
| 11:43 | 9 | witness. |
| 11:43 | 10 | THE COURT:  You may. |
| 11:43 | 11 | BY MR. VASILESCU: |
| 11:43 | 12 | Q    Mr. Letcavage, this is Exhibit Number 2. |
| 11:43 | 13 | (Counsel conferring) |
| 11:43 | 14 | BY MR. VASILESCU: |
| 11:44 | 15 | Q    Mr. Letcavage, if you would take a look at number 2, |
| 11:44 | 16 | this document is dated March 12, 2021.  Do you recognize |
| 11:44 | 17 | this document as your response to the first document request |
| 11:44 | 18 | from the SEC in 2021? |
| 11:44 | 19 | A    I don't, but go ahead.  I'm sorry. |
| 11:44 | 20 | Q    Well, if you look at the front page, this document says |
| 11:44 | 21 | defendant Randall Letcavage's responses to plaintiff's |
| 11:44 | 22 | post-judgment document requests.  Do you see that? |
| 11:44 | 23 | A    I do. |
| 11:44 | 24 | Q    Does that refresh your recollection as to what this |
| 11:44 | 25 | document is? |

50

| | | |
|---|---|---|
| 11:44 | 1 | A    No. |
| 11:44 | 2 | Q    Now, if you look on the page 26, it's signed by Lahdan |
| 11:44 | 3 | Rahmati.  Do you see that? |
| 11:44 | 4 | A    I do. |
| 11:45 | 5 | Q    Do you know -- did she confer with you in producing |
| 11:45 | 6 | this response? |
| 11:45 | 7 | A    I don't remember. |
| 11:45 | 8 | Q    Is it your general practice when you are in litigation |
| 11:45 | 9 | to confer with the attorney who is representing you? |
| 11:45 | 10 | MR. TRAD:  Objection.  Attorney/client privilege |
| 11:45 | 11 | and also calls for speculation. |
| 11:45 | 12 | THE COURT:  Overruled. |
| 11:45 | 13 | THE WITNESS:  I'm sorry.  Can you ask the question |
| 11:45 | 14 | again. |
| 11:45 | 15 | BY MR. VASILESCU: |
| 11:45 | 16 | Q    Is it your general practice when you have an attorney |
| 11:45 | 17 | representing you in court proceedings to confer with them on |
| 11:45 | 18 | a regular basis? |
| 11:45 | 19 | A    Yes, but I don't remember this.  I'm sorry. |
| 11:45 | 20 | Q    Now, this is in response to what I gave you before, |
| 11:45 | 21 | Exhibit 1, which was the document request.  If you look on |
| 11:45 | 22 | page number 1 under definitions number two, the relevant |
| 11:45 | 23 | period is defined as January 1, 2012, to the present.  Do |
| 11:46 | 24 | you see that? |
| 11:46 | 25 | A    I'm don't -- I'm sorry.  Where is this?  I believe you. |

51

| | | |
|---|---|---|
| 11:46 | 1 | Q    Exhibit 1.  I'll put it up on the elmo here.  If you |
| 11:46 | 2 | look at Exhibit 1 under definitions, number two, it says: |
| 11:46 | 3 | Unless otherwise specified, the relevant period shall be |
| 11:46 | 4 | January 1, 2012, through the present.  Do you see that? |
| 11:46 | 5 | A    Yes. |
| 11:46 | 6 | Q    Okay.  And if you look in Exhibit 2, the specific |
| 11:46 | 7 | requests are enumerated and then your response is listed. |
| 11:46 | 8 | Do you see that? |
| 11:46 | 9 | A    Yes. |
| 11:46 | 10 | Q    Now, in Exhibit 2, if we flip forward to number 12 on |
| 11:46 | 11 | page 15 -- the numbers are on the bottom. |
| 11:47 | 12 | A    Yes. |
| 11:47 | 13 | Q    The request is documents sufficient to show every |
| 11:47 | 14 | interest you hold in real property or shares of a property, |
| 11:47 | 15 | for example, a cooperative, during the relevant period.  Do |
| 11:47 | 16 | you understand that? |
| 11:47 | 17 | A    Yes. |
| 11:47 | 18 | Q    Now, after January 1, 2012, did you own any real |
| 11:47 | 19 | property? |
| 11:47 | 20 | A    After 2012? |
| 11:47 | 21 | Q    Yes. |
| 11:47 | 22 | A    I don't believe so. |
| 11:47 | 23 | Q    Well, did you ever own a house, live in a house that |
| 11:47 | 24 | you owned? |
| 11:47 | 25 | A    No. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

52

| | | |
|---|---|---|
| 11:47 | 1 | Q    Well, did you and your wife together own a house? |
| 11:47 | 2 | A    No. |
| 11:47 | 3 | Q    Where did you live in the period 2012 to 2015? |
| 11:48 | 4 | A    2012 to 2015, I can give you the places I lived.  I'm |
| 11:48 | 5 | not sure I can recall right now the years, but I lived in |
| 11:48 | 6 | Laguna Hills.  I lived in Laguna Niguel, and I lived in |
| 11:48 | 7 | Anaheim Hills. |
| 11:48 | 8 | Q    Did you represent to the SEC at some point that you |
| 11:48 | 9 | transferred a property that you owned to your wife so it was |
| 11:48 | 10 | solely in her name? |
| 11:48 | 11 | A    No. |
| 11:48 | 12 | Q    Now, if you look at request number 7 on page 9, it says |
| 11:49 | 13 | documents sufficient to show all persons and entities that |
| 11:49 | 14 | receive income on your behalf. |
| 11:49 | 15 | A    Okay. |
| 11:49 | 16 | Q    Did there come a time after the SEC sent the document |
| 11:49 | 17 | request to you where you understood that you had to identify |
| 11:49 | 18 | to the SEC all entities that you are affiliated with that |
| 11:49 | 19 | are holding some money that you have access to? |
| 11:50 | 20 | A    I don't remember this document, so I can't say that I |
| 11:50 | 21 | do, but I understand that. |
| 11:50 | 22 | Q    If you look at request number 4 on page 5, there's a |
| 11:50 | 23 | request that says documents sufficient to show all financial |
| 11:50 | 24 | accounts over which you have signatory authority. |
| 11:50 | 25 | A    Okay. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

11:50    1    Q    Do you know as you sit here today what signatory

11:50    2    authority over a bank account is?

11:50    3    A    Yes.

11:50    4    Q    And is it fair to say during the relevant period, you

11:50    5    had signatory authority over more than one bank account?

11:50    6    A    Yes.

11:50    7    Q    Well, during the relevant period how many bank accounts

11:50    8    did you have signatory authority over?

11:50    9    A    I have no idea.

11:50    10    Q    Was it more than ten or less than ten?

11:50    11    A    I don't know.

11:50    12    Q    Did you understand when you were seeking to comply with

11:50    13    the magistrate judge's order that one of the things that you

11:51    14    had to comply with was identifying all accounts that you had

11:51    15    signatory authority over?

11:51    16    A    Yeah, I guess I did.

11:51    17    Q    If you look at page 6 of Exhibit 2, the second full

11:51    18    paragraph -- and I will put this on the elmo for you --

11:51    19    there is a representation in that document to the SEC by

11:51    20    your counsel that says:  Mr. Letcavage objects to the

11:51    21    overbroad scope of this request.  Plaintiff seeks documents

11:51    22    spanning a period of nine years.  Mr. Letcavage's position

11:51    23    is that the relevant period should be limited to January 1,

11:51    24    2017, to the present.  Do you see that?

11:51    25    A    I do.

54

```
11:51   1   Q    As you sit here today, is it your position that you
11:52   2   have produced to the SEC and identified all accounts that
11:52   3   you had signatory authority over after 2017?
11:52   4   A    It's my position that somebody did, yes.
11:52   5   Q    Well, you understand that financial documents,
11:52   6   financial statements and accountings of some sort were
11:52   7   produced by you to the SEC; is that right?
11:52   8   A    Yes.
11:52   9        MR. TRAD:  Objection.  Vague as to time, Your
11:52  10   Honor.
11:52  11        THE COURT:  Let's see if he remembers ever doing
11:52  12   that, and then we can nail down the time.
11:52  13        THE WITNESS:  Well, yeah, I mean, I know I have
11:52  14   responded at least four times to requests for information
11:52  15   from you in detail.  And as far as the dates for these or
11:52  16   the signatory accounts, you know, I don't even know how many
11:53  17   of these the accounts are even active, but I don't think
11:53  18   that there was any money in those accounts that were there.
11:53  19        All of these accounts you have gotten before from
11:53  20   the banks, like I said, during the whole eight-year-plus
11:53  21   period of time.  So, yes, somebody has produced them, either
11:53  22   the bank, my office, our administrative staff or myself in
11:53  23   the four responses that I sent to you.
11:54  24        MR. VASILESCU:  Your Honor, if I may approach the
11:54  25   witness.
```

| | | |
|---|---|---|
| 11:54 | 1 | THE COURT:  You may. |
| 11:54 | 2 | MR. VASILESCU:  Exhibit 7, Exhibit 8, Exhibit 5. |
| 11:55 | 3 | (Counsel conferring) |
| 11:55 | 4 | BY MR. VASILESCU: |
| 11:55 | 5 | Q    Mr. Letcavage -- |
| 11:55 | 6 | A    Yes. |
| 11:55 | 7 | Q    -- if you take a look at Exhibit 7. |
| 11:55 | 8 | A    Yes. |
| 11:55 | 9 | Q    If you look at this first page, it has a date of |
| 11:55 | 10 | October 1, 2021.  Do you see that? |
| 11:56 | 11 | A    Yes. |
| 11:56 | 12 | Q    And it's entitled attachments to defendant Randall |
| 11:56 | 13 | Letcavage's third supplemental response to plaintiff's |
| 11:56 | 14 | post-judgment document requests.  Do you see that? |
| 11:56 | 15 | A    Yes. |
| 11:56 | 16 | Q    Okay.  And you would agree with me that the date of |
| 11:56 | 17 | October 1st, 2021, is after Magistrate Scott's order which |
| 11:56 | 18 | is Exhibit 37? |
| 11:56 | 19 | A    Okay. |
| 11:56 | 20 | Q    And is it your understanding when you -- well, did you |
| 11:56 | 21 | approve this document being produced? |
| 11:56 | 22 | A    Let me look at the document. |
| 11:56 | 23 | MR. TRAD:  Your Honor, while the witness is |
| 11:56 | 24 | looking at the document, the document is assembled out of |
| 11:56 | 25 | order.  But I do think that the information is correct as it |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

56

| | | |
|---|---|---|
| 11:56 | 1 | stands, but I want the record to reflect that I haven't had |
| 11:57 | 2 | a chance to make a comparison between the two.  But I do |
| 11:57 | 3 | think that it's just a matter of being assembled out of |
| 11:57 | 4 | order. |
| 11:57 | 5 | THE COURT:  All right. |
| 11:57 | 6 | THE WITNESS:  I don't see the actual document.  I |
| 11:57 | 7 | see the attachments.  Is there a document that goes with |
| 11:57 | 8 | this, or am I just not looking in the right place? |
| 11:57 | 9 | MR. VASILESCU:  I will note for the record that |
| 11:57 | 10 | it's Bates numbers on the bottom of this document, and the |
| 11:57 | 11 | Bates numbers appear to be in numerical order.  And it is |
| 11:57 | 12 | the SEC practice to Bates stamp documents as they come in, |
| 11:57 | 13 | in the way they come in. |
| 11:57 | 14 | BY MR. VASILESCU: |
| 11:57 | 15 | Q    Anyway, Mr. Letcavage, when this was filed, did you |
| 11:57 | 16 | have an understanding that Mr. Trad was relying on you to |
| 11:57 | 17 | know the facts regarding what accounts you had signatory |
| 11:58 | 18 | authority to? |
| 11:58 | 19 | A    Yeah.  Yes. |
| 11:58 | 20 | Q    Like, is it fair to say no one other than you has the |
| 11:58 | 21 | best knowledge of what bank accounts you have signatory |
| 11:58 | 22 | authorities as to?  Is that right? |
| 11:58 | 23 | A    No. |
| 11:58 | 24 | Q    Who else has better knowledge as to your signatory |
| 11:58 | 25 | authority? |

11:58   1   A    Anybody that worked in accounting in my office or

11:58   2   anybody that worked in administrative.  I never went to the

11:58   3   bank.  We had a lot of accounts, as you're aware of.  I'm

11:58   4   not even familiar with some of them that I was on.

11:58   5   Q    Right.  But is it fair to say that during the period

11:58   6   from January 21 to when this document was created,

11:58   7   Exhibit 7, there were some bank accounts that you had access

11:58   8   to as a signatory authority that you decided what payments

11:58   9   to make from that account?

11:58   10  A    Yes.

11:58   11  Q    And is it fair to say that you had better knowledge as

11:59   12  to those accounts where you had signatory authority during

11:59   13  that relevant period than accounts that you weren't using?

11:59   14  A    Better knowledge of those accounts, yes.

11:59   15  Q    And do you know if in this -- if you take a look at

11:59   16  Bates stamp number SEC Letcavage RP0000032 where request

11:59   17  number 4 is, we see the same request that was in the one

11:59   18  back in February 2021.  Do you see that, documents

11:59   19  sufficient to show all financial accounts over which you

11:59   20  have signatory authority?  Do you see that?

12:00   21  A    Okay.  Yes.

12:00   22  Q    And the title of this document is attachment to

12:00   23  defendant Letcavage's third supplemental response to

12:00   24  plaintiff's post-judgment document requests.  As you sit

12:00   25  here today, do you have an understanding this was the third

58

| 12:00 | 1 | time you supplemented the response to the February 2021 |
| 12:00 | 2 | document requests? |
| 12:00 | 3 | A    That's what it says here, yes. |
| 12:00 | 4 | Q    And in the answer to document request 4, did you |
| 12:00 | 5 | represent that you would identify all signatory accounts |
| 12:00 | 6 | that you had access to? |
| 12:01 | 7 | A    Yes. |
| 12:01 | 8 | Q    Now, if you would take a look at Exhibit 8.  That is a |
| 12:01 | 9 | document dated October 15, 2021.  And do you see that the |
| 12:02 | 10 | title is attachment to defendant Randall Letcavage's fourth |
| 12:02 | 11 | supplemental response to plaintiff's post-judgment document |
| 12:02 | 12 | requests? |
| 12:02 | 13 | A    Yes. |
| 12:02 | 14 | Q    Is it your position by this date, October 15, 2021, you |
| 12:02 | 15 | had produced to the SEC all -- had identified all accounts |
| 12:02 | 16 | that you had signatory authority over? |
| 12:02 | 17 | A    I believe so. |
| 12:02 | 18 |        MR. VASILESCU:  Your Honor, if I may approach the |
| 12:03 | 19 | witness. |
| 12:03 | 20 |        THE COURT:  You may. |
| 12:03 | 21 | BY MR. VASILESCU: |
| 12:03 | 22 | Q    Mr. Letcavage, here is Exhibit 6 and Exhibit 9.  Now, |
| 12:04 | 23 | Mr. Letcavage, if you take a look at Exhibit 6, if you look |
| 12:04 | 24 | at the fifth page, this is a document filed with the Court |
| 12:04 | 25 | on November 12, 2021.  Do you see that? |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 12:04 | 1 | A    Yes. |
| 12:05 | 2 | Q    And do you have an understanding that this was a |
| 12:05 | 3 | representation to you as to what your post-judgment |
| 12:05 | 4 | discovery production had been to that point? |
| 12:05 | 5 | A    I understand it is a representation, yes. |
| 12:05 | 6 | MR. TRAD:  Your Honor, I'm going to move to strike |
| 12:05 | 7 | or ask the Court to strike rather Exhibit 14, Exhibit 6. |
| 12:05 | 8 | This is exactly the problem I was concerned about by getting |
| 12:05 | 9 | the document dump of thousands of pages.  I haven't had a |
| 12:05 | 10 | chance to review this or review it with Mr. Letcavage prior |
| 12:05 | 11 | to today. |
| 12:05 | 12 | Many of these documents, as I've indicated, are |
| 12:06 | 13 | filed out of order.  I understand that the SEC may Bates |
| 12:06 | 14 | stamp them.  These aren't Bates stamped.  This has been |
| 12:06 | 15 | isolated out from another document, and it's unfair to |
| 12:06 | 16 | require Mr. Letcavage to understand the context of whatever |
| 12:06 | 17 | it is that's being placed in front of him. |
| 12:06 | 18 | THE COURT:  Well, let's just see where it goes. |
| 12:06 | 19 | MR. VASILESCU:  Just a little clarification from |
| 12:06 | 20 | counsel.  What document are you referring to?  Six is a |
| 12:06 | 21 | filing by Mr. Letcavage and your office with the Court.  So |
| 12:06 | 22 | what is wrong with number 6?  This is a document you |
| 12:06 | 23 | submitted on behalf of your client. |
| 12:06 | 24 | MR. TRAD:  That's correct.  It was submitted to |
| 12:06 | 25 | you folks because of a discussion of settlement.  Let's make |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|---|---|---|
| 12:06 | 1 | sure we're clear about this.  But I don't know that |
| 12:06 | 2 | Mr. Letcavage -- and frankly I have to go back and look at |
| 12:06 | 3 | these because, again, I just got these and I'm not sure |
| 12:06 | 4 | about number 6.  I have my own copy of it. |
| 12:06 | 5 | THE COURT:  We are just going to go to it.  I |
| 12:07 | 6 | assure you you will be given as much time as you need to go |
| 12:07 | 7 | through it.  Let's just see if we have a dispute.  I think |
| 12:07 | 8 | given the lack of meeting and conferring on what exhibits |
| 12:07 | 9 | were going to be used at this evidentiary hearing, it's not |
| 12:07 | 10 | going to be productive to try to sort each dispute out. |
| 12:07 | 11 | MR. VASILESCU:  Thank you, Your Honor. |
| 12:07 | 12 | THE COURT:  Let's go through the document. |
| 12:07 | 13 | MR. VASILESCU:  Thank you, Your Honor. |
| 12:07 | 14 | THE COURT:  The questions -- with all that said, |
| 12:07 | 15 | Mr. Letcavage, if there is any question that's asked that |
| 12:07 | 16 | you don't understand or you need context, just let us know. |
| 12:07 | 17 | THE WITNESS:  I understand.  Thank you. |
| 12:07 | 18 | BY MR. VASILESCU: |
| 12:07 | 19 | Q    If you look on page 3 of this document filed in |
| 12:07 | 20 | November 2021, a representation is made on number nine:  I |
| 12:07 | 21 | do not have nor have I had any financial arrangements |
| 12:07 | 22 | whereby income is received by any third party, be they |
| 12:08 | 23 | individuals or entities, for my benefit.  Do you see that? |
| 12:08 | 24 | A    Yes. |
| 12:08 | 25 | Q    Do you recall making that representation at that time? |

| | | |
|---|---|---|
| 12:08 | 1 | A    I don't, but I see it on this document. |
| 12:08 | 2 | Q    As you sit here today, is that representation accurate |
| 12:08 | 3 | as of that time? |
| 12:08 | 4 | A    What is a third party?  Another bank account? |
| 12:08 | 5 | Q    Do you have an understanding what the term third party |
| 12:08 | 6 | means? |
| 12:08 | 7 | A    Not in this case.  I'm not sure if you're talking about |
| 12:08 | 8 | bank accounts that I have or bank accounts from somebody |
| 12:08 | 9 | else.  Is that a third party, or is it the bank account?  Is |
| 12:08 | 10 | it the corporate account that's a third party? |
| 12:08 | 11 | Q    Have you performed consulting work since |
| 12:09 | 12 | January 2021 -- subsequent to January 2021 where you |
| 12:09 | 13 | received compensation? |
| 12:09 | 14 | A    Subsequent to January 2021? |
| 12:09 | 15 | Q    Yes. |
| 12:09 | 16 | A    I'm sure I have. |
| 12:09 | 17 | Q    And earlier today there was a witness on the stand; |
| 12:09 | 18 | isn't that right? |
| 12:09 | 19 | A    Yes. |
| 12:09 | 20 | Q    And do you know what company he was with? |
| 12:09 | 21 | A    ONIT. |
| 12:09 | 22 | Q    And did you provide consulting services to ONIT? |
| 12:09 | 23 | A    Yes. |
| 12:09 | 24 | Q    Did you get monies paid from ONIT subsequent to |
| 12:09 | 25 | January 2021? |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| 12:09 | 1 | A     Yes. |
| 12:09 | 2 | Q     And were those payments made to an account in the name |
| 12:09 | 3 | of an entity that you control? |
| 12:09 | 4 | A     ICapital Advisory probably. |
| 12:09 | 5 | Q     And would you agree with me that the entity iCapital |
| 12:09 | 6 | Advisory is a third party? |
| 12:09 | 7 | A     Sure, although some of my attorneys didn't think so. |
| 12:09 | 8 | But, okay. |
| 12:10 | 9 | Q     And they didn't think so because it's your entity and |
| 12:10 | 10 | you control it completely? |
| 12:10 | 11 | A     Yes. |
| 12:10 | 12 | Q     And you have the signatory authority over that account, |
| 12:10 | 13 | right? |
| 12:10 | 14 | A     Yes. |
| 12:10 | 15 | Q     And that account is at Bank of America, right? |
| 12:10 | 16 | A     I believe so. |
| 12:10 | 17 | Q     So subsequent to January of 2021, you received income |
| 12:10 | 18 | that went to your iCapital account, and do you feel that |
| 12:10 | 19 | those monies that came to you is consistent with your |
| 12:10 | 20 | representation here in number 9:  I do not have nor have I |
| 12:10 | 21 | had any financial arrangements whereby income is received by |
| 12:10 | 22 | any third party, be they individual or entities, for my |
| 12:10 | 23 | benefit? |
| 12:10 | 24 |          MR. TRAD:  Objection, Your Honor.  It's calling |
| 12:10 | 25 | for a legal conclusion and it's convoluted. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| | | |
|--|--|--|
| 12:10 | 1 | THE COURT: Overruled. If you have an answer, |
| 12:10 | 2 | sir -- |
| 12:10 | 3 | THE WITNESS: Maybe the way it's worded here, but |
| 12:10 | 4 | on my financial statement I listed whatever was in Security |
| 12:10 | 5 | America as my asset. So, I mean, in that regard maybe I |
| 12:10 | 6 | just didn't make the distinction as to how you're wording it |
| 12:11 | 7 | here or how we worded it. And I apologize for that, but I |
| 12:11 | 8 | wasn't trying to hide anything that Security America -- I |
| 12:11 | 9 | mean, that iCapital Advisory had received. |
| 12:11 | 10 | BY MR. VASILESCU: |
| 12:11 | 11 | Q   Is it your position that by November 12, 2021, you had |
| 12:11 | 12 | identified to the SEC the account that you controlled at |
| 12:11 | 13 | Bank of America -- well, the account for iCapital where you |
| 12:11 | 14 | were getting income after January 2021? Is that your |
| 12:11 | 15 | position? |
| 12:11 | 16 | MR. TRAD: Excuse me, Your Honor. Are we talking |
| 12:11 | 17 | iCapital or iCapital Advisory? |
| 12:11 | 18 | MR. VASILESCU: ICapital Advisory. |
| 12:11 | 19 | THE WITNESS: That I was getting income from |
| 12:11 | 20 | iCapital Advisory? |
| 12:11 | 21 | BY MR. VASILESCU: |
| 12:11 | 22 | Q   No -- that you were getting paid income into the |
| 12:11 | 23 | account of iCapital Advisory. |
| 12:11 | 24 | A   Yes. We have always put that out there to everyone |
| 12:11 | 25 | throughout every correspondence I have had with you guys. |

| | | |
|---|---|---|
| 12:12 | 1 | Q    Well, we just saw prior document responses.  In which |
| 12:12 | 2 | one of those did you disclose the iCapital Advisory account? |
| 12:12 | 3 | A    You've had iCapital's bank statements for eight years. |
| 12:12 | 4 | You have every bank statement. |
| 12:12 | 5 | Q    My question is where did you represent to us prior to |
| 12:12 | 6 | November of 2021 that you were getting income in iCapital |
| 12:12 | 7 | Advisory? |
| 12:12 | 8 | A    I'm not looking at my financial statement right now or |
| 12:12 | 9 | the one that we just filed, but I'm sure that whatever |
| 12:12 | 10 | monies are in there is included in the financial statements. |
| 12:13 | 11 | Q    Mr. Letcavage, which is the last exhibit number I had |
| 12:13 | 12 | before you? |
| 12:13 | 13 | A    I'm looking at Exhibit 6.  I also have an Exhibit 5 |
| 12:13 | 14 | here that we didn't look at or that I wasn't directed to. |
| 12:13 | 15 | Q    Do you have Exhibit 14 there? |
| 12:13 | 16 | A    I do not. |
| 12:13 | 17 |          MR. TRAD:  I have it. |
| 12:14 | 18 | BY MR. VASILESCU: |
| 12:14 | 19 | Q    It looks like Exhibit 9 on the front, but it's |
| 12:14 | 20 | Exhibit 14. |
| 12:14 | 21 | A    I do have that.  I apologize. |
| 12:14 | 22 | Q    Okay.  Do you recognize this spreadsheet -- well, not a |
| 12:14 | 23 | spreadsheet but a list of transactions by vendor for Premier |
| 12:14 | 24 | Holding? |
| 12:14 | 25 | A    Absolutely not.  Who could read this?  Can anybody in |

12:14  1   the court read this?  I don't know.  I can't.

12:14  2   Q    Did you produce this to the SEC as part of trying to

12:14  3   produce an accounting for Premier and yourself?

12:14  4   A    I don't recall, but if you have got something that

12:14  5   looked like that, I apologize because I can't read it.  I

12:14  6   don't know how anyone else can.

12:14  7   Q    Now, you understood at some point that Magistrate Judge

12:15  8   Scott ordered you to produce an accounting; is that right?

12:15  9   A    I don't know what accounting entails or doesn't.  I did

12:15  10  the best I could to produce whatever I could produce.

12:15  11  Q    Well, you were the CEO of a public company for many

12:15  12  years; isn't that right?

12:15  13  A    Yeah, and then I wasn't, and I had not the income or

12:15  14  the wherewithal or the help or anybody to help me deal with

12:15  15  all the things that we're dealing with right now.

12:15  16  Q    And you oversaw financial statements for that public

12:15  17  company; isn't that right?

12:15  18  A    I did.

12:15  19  Q    Do you know if this document, Exhibit 14, was part of

12:15  20  your effort to comply with Magistrate Scott's order for you

12:16  21  to provide an accounting?

12:16  22  A    I can't say that because I don't know what's on here.

12:16  23  I'm sorry.  I can't read it.

12:16  24  Q    Now if we go back to Exhibit 37, which is Magistrate

12:16  25  Scott's order, at the end, Section IV-B which I have on my

| | | |
|---|---|---|
| 12:16 | 1 | elmo here, see if this reminds you if you remembered what |
| 12:16 | 2 | your obligations were as to the accounting of assets. |
| 12:16 | 3 | Does this refresh your recollection as to what you |
| 12:16 | 4 | understood your obligation was for providing an accounting? |
| 12:16 | 5 | A    You took it off the screen. |
| 12:16 | 6 | Q    I'm sorry. |
| 12:17 | 7 | A    So what am I looking at? |
| 12:17 | 8 | Q    Right here. |
| 12:17 | 9 | A    I have it. |
| 12:17 | 10 | Q    Then it goes on to A.  When you're done with this, I |
| 12:17 | 11 | can flip it over.  It makes it easier. |
| 12:17 | 12 | A    Yeah.  I mean, I didn't have access to these records |
| 12:17 | 13 | going back to 2012. |
| 12:17 | 14 | Q    Then it goes on. |
| 12:17 | 15 | A    Especially with Premier, because I have no idea where |
| 12:17 | 16 | half of that is.  It was boxed up when Premier was shut down |
| 12:17 | 17 | a long time ago. |
| 12:18 | 18 | MR. VASILESCU:  Your Honor, if I may approach the |
| 12:18 | 19 | witness. |
| 12:18 | 20 | THE COURT:  You may. |
| 12:18 | 21 | MR. VASILESCU:  This is Exhibit 15.  This is |
| 12:18 | 22 | Exhibit 11.  This is Exhibit 11A.  There is Exhibit 11B. |
| 12:19 | 23 | This is Exhibit 12.  This is Exhibit 12A. |
| 12:20 | 24 | THE WITNESS:  You also gave me Exhibit 15.  Did |
| 12:20 | 25 | you mean to do that? |

| | | |
|---|---|---|
| 12:20 | 1 | MR. VASILESCU:  Yes. |
| 12:20 | 2 | (Counsel conferring) |
| 12:21 | 3 | MR. VASILESCU:  Here is 11A.  Here is 11B.  And |
| 12:21 | 4 | then 12 and 12A. |
| 12:21 | 5 | BY MR. VASILESCU: |
| 12:22 | 6 | Q   Okay.  If you look at Exhibit 15, it's -- well, we will |
| 12:22 | 7 | represent to you it was part of the production in the fall |
| 12:22 | 8 | of 2021 together with that other long document that looked |
| 12:22 | 9 | like a transaction sheet of some sort.  Do you recall being |
| 12:22 | 10 | involved in producing this document? |
| 12:22 | 11 | A   Yes.  And by long documents, you mean Exhibit 11A and |
| 12:23 | 12 | Exhibit 11B? |
| 12:23 | 13 | Q   No, no.  The previous document we looked at. |
| 12:23 | 14 | A   Or 14.  I'm sorry. |
| 12:23 | 15 | Q   Yes. |
| 12:23 | 16 | A   I don't know again if this was part of it, but I do |
| 12:23 | 17 | know that I was involved in putting this together, yes. |
| 12:23 | 18 | Q   Well, is it fair to say you provided the information |
| 12:23 | 19 | that went into this document? |
| 12:23 | 20 | A   Into document Exhibit 15? |
| 12:23 | 21 | Q   Yes. |
| 12:23 | 22 | A   Yes. |
| 12:23 | 23 | Q   There is a date of it of October 21.  Do you see that? |
| 12:23 | 24 | A   Yes. |
| 12:23 | 25 | Q   By the way, what account at Bank of America were you |

| 12:24 | 1 | referencing here? |
| 12:24 | 2 | A    I think that's my personal account. |
| 12:24 | 3 | Q    What are the ending numbers of that personal account? |
| 12:24 | 4 | A    I don't know. |
| 12:24 | 5 | Q    Is this an account number 2439871436? |
| 12:24 | 6 | A    I have no idea. |
| 12:24 | 7 | Q    But you believe what you identify in here was your |
| 12:24 | 8 | personal bank account? |
| 12:24 | 9 | A    Yes, sir. |
| 12:24 | 10 | Q    Now, subsequent to that time -- if you could take a |
| 12:25 | 11 | look at Exhibit 11.  Subsequent to November of 2021 is it |
| 12:25 | 12 | fair to say in this May of 2022 you produced additional |
| 12:25 | 13 | financial statements to the SEC? |
| 12:25 | 14 | A    I believe so. |
| 12:25 | 15 | MR. TRAD:  Hold on.  Excuse me one second.  You |
| 12:25 | 16 | said 11? |
| 12:25 | 17 | MR. VASILESCU:  Yes. |
| 12:25 | 18 | MR. TRAD:  I have got 11A and 11B. |
| 12:25 | 19 | (Counsel conferring) |
| 12:25 | 20 | THE COURT:  I don't have Exhibit 11 either. |
| 12:25 | 21 | MR. VASILESCU:  Do you have more than one |
| 12:25 | 22 | Exhibit 11 there? |
| 12:25 | 23 | THE WITNESS:  I do not.  I have 11, 11A, and 11B. |
| 12:26 | 24 | MR. VASILESCU:  I have it. |
| 12:26 | 25 | Mr. Trad, do you have 11? |

| | | |
|---|---|---|
| 12:26 | 1 | MR. TRAD:  I have it. |
| 12:26 | 2 | MR. VASILESCU:  Do you have 11, Mr. Letcavage? |
| 12:26 | 3 | THE WITNESS:  I do, yes. |
| 12:26 | 4 | THE COURT:  Thank you. |
| 12:26 | 5 | BY MR. VASILESCU: |
| 12:26 | 6 | Q   Mr. Letcavage, in May 2022, this year, did you produce |
| 12:26 | 7 | additional financial statements to the SEC? |
| 12:26 | 8 | A   I believe so.  I'm looking at a letter from Mr. Trad. |
| 12:27 | 9 | Q   Now, if you would take a look at Exhibit 11A. |
| 12:27 | 10 | MR. TRAD:  Your Honor, I'm going to object to 11A |
| 12:27 | 11 | and 11B.  These were unexecuted drafts that were |
| 12:27 | 12 | inadvertently sent to the SEC, and the SEC knows this.  It's |
| 12:27 | 13 | part of their Exhibit 12 and 12A, which is the actual |
| 12:27 | 14 | executed and correct financial summary and statement.  I |
| 12:27 | 15 | don't want the Court to get confused with what's going on |
| 12:27 | 16 | here. |
| 12:27 | 17 | THE COURT:  I understand. |
| 12:27 | 18 | Go ahead.  Ask your question.  In fact, I want to |
| 12:28 | 19 | take a break at 12:30, so would this be a good time? |
| 12:28 | 20 | MR. VASILESCU:  This would be a good time, Your |
| 12:28 | 21 | Honor, to take a break. |
| 12:28 | 22 | THE COURT:  Okay.  And I would appreciate it if |
| 12:28 | 23 | counsel would confer over the exhibits that you want to show |
| 12:28 | 24 | in the afternoon, and we'll pick back up at 1:30. |
| 01:37 | 25 | MR. VASILESCU:  Thank you, Your Honor. |

01:37   1           MR. TRAD:  Thank you, Your Honor.

01:37   2                (Recess taken at 12:28 p.m.;

01:37   3             proceedings resumed at 1:42 p.m.)

01:42   4           THE COURT:  I apologize for being late.

01:42   5           Please proceed.

01:42   6           MR. VASILESCU:  Your Honor, before I proceed with

01:42   7   Mr. Letcavage, I thought I would move into evidence the

01:42   8   exhibits that have already been put before the two

01:42   9   witnesses.

01:42   10          THE COURT:  All right.

01:42   11          MR. VASILESCU:  For Mr. Locke, it's Exhibit 25.  I

01:42   12   move that into evidence.

01:42   13          THE COURT:  It will be received into evidence.

01:42   14          (Exhibit 25 received in evidence)

01:42   15          MR. VASILESCU:  Then for what Mr. Letcavage has

01:42   16   responded to in terms of questions, they are Exhibits 1, 2,

01:42   17   4, 5, 6, 7, 8, 9, 11A, 11B, 14, 32, 37, 39, 40, and 41.

01:42   18          THE COURT:  Those exhibits will be received into

01:43   19   evidence?

01:43   20              (Exhibits 1, 2, 4-9, 11A, 11B, 14, 32,

01:43   21               37, 39, 40, and 41 received in evidence)

01:43   22          MR. TRAD:  I'll pose my objection based upon the

01:43   23   short notice and the document dump I had to deal with.

01:43   24          THE COURT:  I understand that.  Like I told you

01:43   25   before, if you need more time and you can explain to me why

| | | |
|---|---|---|
| 01:43 | 1 | you need more time, that will be fine.  A lot of the |
| 01:43 | 2 | information that I received so far, I'm not sure it's moving |
| 01:43 | 3 | the ball one way or the other. |
| 01:43 | 4 | MR. TRAD:  Since he is moving to admit these now, |
| 01:43 | 5 | I'm making my objection. |
| 01:43 | 6 | THE COURT:  You have an objection for late |
| 01:43 | 7 | disclosure.  Got it. |
| 01:43 | 8 | All right.  Please proceed. |
| 01:43 | 9 | BY MR. VASILESCU: |
| 01:43 | 10 | Q    Okay.  Mr. Letcavage, before we took the break, we were |
| 01:43 | 11 | looking at Exhibit 11.  This is the e-mail from your |
| 01:43 | 12 | attorney to the SEC on May 5th, 2022.  It has attachments to |
| 01:43 | 13 | it, SEC [sic] financials 4/12/22 pdf -- SFS financials, I'm |
| 01:44 | 14 | sorry -- and footnotes to financial disclosure. |
| 01:44 | 15 | Now, did you have an understanding back then that |
| 01:44 | 16 | you were producing additional financial statements to the |
| 01:44 | 17 | SEC? |
| 01:44 | 18 | A    Yes. |
| 01:44 | 19 | Q    Okay.  And if you could take a look at 11A, I'll |
| 01:44 | 20 | represent to you it is one of the attachments to that e-mail |
| 01:44 | 21 | that was sent to the SEC.  Do you see this, 11A? |
| 01:44 | 22 | A    I'm sorry.  I don't. |
| 01:44 | 23 | Q    Do you have 11A before you? |
| 01:44 | 24 | A    I have 11B, 12, 12A, a sheet of paper that is -- oh, |
| 01:45 | 25 | there it is, 11A.  I'm sorry.  I turned it over. |

72

| | | |
|---|---|---|
| 01:45 | 1 | Q    Okay.  Do you see 11A? |
| 01:45 | 2 | A    Yes. |
| 01:45 | 3 | Q    Okay.  And were you involved in preparing this |
| 01:45 | 4 | document? |
| 01:45 | 5 | A    I believe so. |
| 01:45 | 6 | Q    Okay.  And is it fair to say that there is no signature |
| 01:45 | 7 | on this from you?  Is that right? |
| 01:45 | 8 | A    Yes. |
| 01:45 | 9 | Q    Okay.  And then if you take a look at 11B, this was |
| 01:45 | 10 | also produced as part of that e-mail; isn't that correct? |
| 01:45 | 11 | MR. TRAD:  Again, Your Honor, I'm going to pose an |
| 01:45 | 12 | objection to these documents.  These were draft documents |
| 01:45 | 13 | that were sent over, and counsel has in his possession the |
| 01:45 | 14 | actual dated correct ones that are notarized. |
| 01:46 | 15 | MR. VASILESCU:  Your Honor, my line of questioning |
| 01:46 | 16 | will show that this was sent and not withdrawn and that the |
| 01:46 | 17 | reason -- well, we'll go into it through the questioning. |
| 01:46 | 18 | THE COURT:  Please proceed. |
| 01:46 | 19 | BY MR. VASILESCU: |
| 01:46 | 20 | Q    So if you look at this financial document, do you see |
| 01:46 | 21 | at the bottom that -- you were involved in preparing this |
| 01:46 | 22 | document; isn't that correct? |
| 01:46 | 23 | A    I don't recall.  I recall giving some of the |
| 01:46 | 24 | information, yeah. |
| 01:46 | 25 | Q    And it's assets and liabilities as of March 24th, '22, |

01:46   1   right?

01:46   2   A    Yes.  That's what it says.

01:46   3   Q    Okay.  And you didn't sign or notarize this, right?

01:46   4   A    No.  I believe this was a draft.

01:46   5   Q    Well, take a look at 11.  Where in 11 does it say it's

01:46   6   a draft and it should not be considered?

01:46   7            MR. TRAD:  Objection, Your Honor.  It's an

01:47   8   inappropriate question.  This is attorney communication with

01:47   9   another attorney and would cause the client to speculate

01:47  10   upon what the circumstances were.

01:47  11            THE COURT:  Well, I'll sustain on argumentative.

01:47  12   We don't have to have a discussion about the evidentiary

01:47  13   objection.  Just state the objection -- no foundation,

01:47  14   argumentative, hearsay.

01:47  15            MR. TRAD:  I apologize, Your Honor.

01:47  16   BY MR. VASILESCU:

01:47  17   Q    Take a look at 11.  Does the word draft appear in that

01:47  18   document?

01:47  19   A    No, but one is May 5th and the other is 3/24/22,

01:47  20   correct?

01:47  21   Q    What are you referring to?

01:47  22   A    I'm looking at Exhibit 11 and 11B, or am I supposed to

01:47  23   be looking at something else?

01:47  24   Q    Well, first I'm asking you to look at just 11, which is

01:48  25   the May 5th e-mail from your attorney to the SEC.  Do you

| | | |
|---|---|---|
| 01:48 | 1 | see that? |
| 01:48 | 2 | A    Yes.  I see the letter, yes. |
| 01:48 | 3 | Q    Do you see anywhere in that document that it's just a |
| 01:48 | 4 | draft financial statement and that it's going to be further |
| 01:48 | 5 | edited? |
| 01:48 | 6 | MR. TRAD:  Objection.  The document speaks for |
| 01:48 | 7 | itself. |
| 01:48 | 8 | THE COURT:  Sustained. |
| 01:48 | 9 | BY MR. VASILESCU: |
| 01:48 | 10 | Q    Okay.  Now can you take a look at Exhibit 12 which is |
| 01:48 | 11 | before you. |
| 01:48 | 12 | A    Yes. |
| 01:48 | 13 | Q    And do you see that your counsel is writing to my |
| 01:48 | 14 | colleague on May 11th, and he writes:  Ben, first, here is |
| 01:48 | 15 | the notarized document.  I thought I had selected the |
| 01:48 | 16 | correct one.  Yes, the footnotes are comprised of two pages. |
| 01:48 | 17 | Do you see that? |
| 01:48 | 18 | A    Yes. |
| 01:48 | 19 | Q    And do you see that one of the issues with the prior |
| 01:49 | 20 | document was that it wasn't notarized and that the SEC |
| 01:49 | 21 | wanted a notarized document? |
| 01:49 | 22 | A    I don't know.  And again, I have no idea even what that |
| 01:49 | 23 | other document was, to be honest with you.  Like I said, I |
| 01:49 | 24 | thought it was a draft, so how am I going to respond to |
| 01:49 | 25 | that? |

01:49  1   Q   Take a look at Exhibit 12A.

01:49  2   A   Okay.

01:49  3   Q   Now, this is a representation as of April 28, '22,

01:49  4   regarding your assets and liabilities; is that right?

01:49  5   A   Yes.

01:49  6   Q   And you signed this document; is that correct?

01:49  7   A   Yes.

01:49  8   Q   Okay.  Now, is there any change from this document that

01:49  9   is 12A from 11B that was sent to us?

01:50  10          MR. TRAD:  Objection.  It's argumentative, Your

01:50  11   Honor.  Again, assumes facts not in evidence and calls for

01:50  12   speculation.

01:50  13          THE COURT:  Those objections are overruled.

01:50  14          But, Mr. Letcavage, I don't want to put you in an

01:50  15   unfair position.  That question, is there any differences

01:50  16   between this Exhibit 12A and the draft one that was attached

01:50  17   to the letter, that could take an exercise of an hour for

01:50  18   you to do that.

01:50  19          So I would like you to understand the question as

01:50  20   you sit there today.  Do you recall there being any

01:50  21   important differences from the earlier draft to Exhibit 12A?

01:50  22          THE WITNESS:  Important differences?  I don't see

01:50  23   them right offhand.

01:51  24          THE COURT:  Or any -- do you remember any

01:51  25   differences?

01:51   1           THE WITNESS:  I can see a couple things that are

01:51   2   different.

01:51   3           THE COURT:  Okay.  Could you tell us.

01:51   4           THE WITNESS:  One has furniture at 15,000 instead

01:51   5   of 10,000.  The cash position is different.  One is 27,191.

01:51   6   One is 10,937.  The cash surrender value of the insurance is

01:51   7   different.  One is 12,924; one is 15,531.

01:51   8   BY MR. VASILESCU:

01:51   9   Q     Okay.  Now let's go back to 11A.  These were the

01:52   10   footnotes to the previous financial statement.

01:52   11   A     Okay.

01:52   12   Q     Do you see the footnotes?

01:52   13   A     Yes.

01:52   14   Q     Okay.  And you understood these footnotes were to

01:52   15   address the stuff in the 11B financial statement, right?

01:52   16   A     It looks that way, yes.

01:52   17   Q     Okay.  Now, if you look at the very bottom, other

01:52   18   information, part B, it says:  Since our marriage my wife

01:52   19   and I have helped our family in Indonesia by sending cash.

01:52   20   These amounts were all paid prior to the judgment in this

01:52   21   matter and are as follows.  Do you see that?

01:52   22   A     I don't see that.  Where am I looking at?  I apologize?

01:53   23   Q     11A, at the very bottom of 11A.

01:53   24   A     Yes, I see that.

01:53   25   Q     Okay.  Now, you are still technically married to your

01:53   1   wife; is that right?

01:53   2   A    Yeah.  We're going through a separation right now.

01:53   3   Q    But a divorce has not been finalized?

01:53   4   A    It has not.  I tried to file for separation to avoid

01:53   5   trying to get a divorce, to be honest, because she wants to

01:53   6   divorce me.  I was hoping that this would calm her down.

01:53   7   Q    When did you get married to your wife?

01:53   8   A    God, I don't know.  Eight years ago.  I'm just

01:53   9   guessing.  I don't have the date.

01:53   10  Q    Was it after you became the CEO of Premier?

01:54   11  A    I can't testify to that.  I'm sorry.

01:54   12  Q    Would you agree with me you became the CEO of Premier

01:54   13  in late 2012?

01:54   14  A    Okay, yeah.  2012, correct.

01:54   15  Q    And you have no recollection if your marriage, if you

01:54   16  got married prior to then or after then?

01:54   17  A    I have been with her for 16 years, and I just don't

01:54   18  remember the date.  I'm sorry.

01:54   19  Q    I see.  So you had a relationship with her before you

01:54   20  were married for many years; is that right?

01:54   21  A    Yes.

01:54   22  Q    Okay.  And what is her name?

01:54   23  A    Puti Nila Chandra Dewi Sign.

01:54   24  Q    And your wife has relatives in Indonesia; is that

01:54   25  right?

01:54  1    A    Yes.

01:54  2    Q    And is it fair to say you and your wife have been

01:55  3    sending funds to your in-laws, family in Indonesia over the

01:55  4    years?

01:55  5    A    We have sent funds, yes.

01:55  6    Q    And since the January 2021 judgment, have you or your

01:55  7    wife sent funds to the relatives in Indonesia?

01:55  8    A    I can't recall.  These were all pretty nominal amounts

01:55  9    during the whole time period.

01:55  10   Q    When you say nominal amounts, what type of amounts --

01:55  11   A    5,000 here, 6,000 there.

01:55  12   Q    -- are you talking about?  Let me finish the question.

01:55  13   When you speak over me, it makes it difficult for the court

01:55  14   reporter.

01:55  15        If you could explain what are these amounts

01:55  16   generally.

01:55  17   A    Under five or six thousand dollars.

01:55  18   Q    In what time periods?

01:56  19   A    Ten years.

01:56  20   Q    Well, when you say 5,000 or 6,000 --

01:56  21   A    The total?  Are you looking for the total?

01:56  22   Q    Let me rephrase the question.  Did you and your wife

01:56  23   send money to the relatives, like, on some schedule?

01:56  24   A    No.

01:56  25   Q    And how many times -- let's take from 2021.  Do you

01:56  1  have any memory of sending funds to your relatives in

01:56  2  Indonesia?

01:56  3  A     No.

01:56  4  Q     Now, in Exhibit 12A is there any disclosure in there

01:56  5  regarding sending monies to relatives overseas?

01:56  6  A     Disclosure?  Was I supposed to disclose something?

01:56  7  Q     Well, did you understand that you were supposed to

01:56  8  disclose all transactions from 2012 to the present, as of

01:57  9  that date?

01:57  10            MR. TRAD:  Objection, Your Honor --

01:57  11            THE WITNESS:  No.  This is an asset and liability

01:57  12  sheet for 4/28/2022.  Sorry, Phi.

01:57  13            MR. TRAD:  We are confusing the facts, Your Honor.

01:57  14  It's argumentative.  His question was from January 2021 on,

01:57  15  and now he's taking it back and try to make it relevant to a

01:57  16  2012 time period.  It's two different events.

01:57  17            THE COURT:  Let's see if we can get another

01:57  18  question to clarify.

01:57  19  BY MR. VASILESCU:

01:57  20  Q     Do you have any understanding why in the Exhibit 11A-B

01:57  21  e-mail, footnotes including that statement were included but

01:57  22  not in the Exhibit 12 and 12A communication with the SEC?

01:57  23  Do you know?

01:57  24  A     I could guess.

01:57  25  Q     I don't want you to guess.

01:58   1   A    Then I don't know.

01:58   2   Q    Now, I think previously I put before you Exhibit 32.

01:58   3   Do you have Exhibit 32?

01:58   4   A    I guess I will get to it.

01:58   5   Q    Number 32 is in the bottom right corner.

01:58   6   A    Okay.  Yes, I have it.

01:59   7   Q    Okay.  Now, as you can see, Exhibit 32 is a submission

01:59   8   to the Court.  It's got a docket number 307, filed on

01:59   9   November 9th, 2022.  Do you have an understanding that the

01:59   10  information that was submitted here on your behalf on

01:59   11  November 9th, 2022, was in connection with this hearing

01:59   12  regarding the contempt motion.

01:59   13  A    If you're telling me that's what it is, yes.

01:59   14  Q    Well, not based on what I am saying but based on your

01:59   15  memory.

02:00   16  A    I'm trying to see if I have seen this document.  The

02:00   17  attachment is something I worked on.  I have no recollection

02:00   18  of the actual document.

02:00   19  Q    Now, by attachment to 32, do you mean the attachment

02:00   20  Exhibit B to 32, which is page 13 of 14 under the top docket

02:00   21  number?

02:00   22       MR. TRAD:  Excuse me, Your Honor.  I'm confused.

02:00   23  What are you referring to?  Are you referring to his

02:00   24  financial statement?

02:00   25       MR. VASILESCU:  No.  This is 32.

| | | |
|---|---|---|
| 02:00 | 1 | MR. TRAD:  I got 32.  B is a letter to you guys. |
| 02:00 | 2 | (Counsel conferring) |
| 02:01 | 3 | THE COURT:  I'm not sure I have Exhibit 32. |
| 02:01 | 4 | MR. VASILESCU:  You don't have it, Your Honor? |
| 02:01 | 5 | THE COURT:  I don't believe I have it. |
| 02:01 | 6 | MR. VASILESCU:  I can give you this copy. |
| 02:01 | 7 | BY MR. VASILESCU: |
| 02:01 | 8 | Q    Okay.  Now, if you look at this submission, if you go |
| 02:01 | 9 | first to page 7 of 34 where on the top there is a docket |
| 02:01 | 10 | file number, do you see that, 307, and then it says page 7 |
| 02:01 | 11 | of 34? |
| 02:01 | 12 | A    I'm sorry.  I have no idea where we are at. |
| 02:01 | 13 | Q    Are you on Exhibit 32? |
| 02:01 | 14 | A    I am. |
| 02:01 | 15 | Q    Okay.  If you flip forward, there is a white page with |
| 02:02 | 16 | the word Exhibit A on it.  Do you see that?  It might be |
| 02:02 | 17 | double-sided. |
| 02:02 | 18 | A    Exhibit A, yes. |
| 02:02 | 19 | Q    Okay.  Now, do you see that what follows Exhibit A is |
| 02:02 | 20 | an e-mail from my colleague, Bennett Ellenbogen, to Mr. Trad |
| 02:02 | 21 | dated November 1st, 2022?  Do you see that? |
| 02:02 | 22 | A    Yes. |
| 02:02 | 23 | Q    Okay.  Take a look at the e-mail.  Were you aware of |
| 02:02 | 24 | this request by the SEC? |
| 02:02 | 25 | A    Not specific to that letter, but I did sit down with |

02:02  1    Mr. Trad when he asked me about a number of these other

02:02  2    accounts, yes.

02:02  3    Q    Okay.  Now, on the first page of Exhibit A to

02:02  4    Exhibit 32, there is a paragraph that starts off, "What's

02:02  5    more."  Do you see that?

02:03  6    A    The first page of Exhibit 32?

02:03  7    Q    Yeah, the e-mail from my colleague, Mr. Ellenbogen.

02:03  8    A    On the e-mail, okay.

02:03  9    Q    Yes.  That's in Exhibit A to Exhibit 32.

02:03  10   A    Yes.

02:03  11           MR. TRAD:  Counsel, are you referring to the

02:03  12   fourth paragraph?

02:03  13           MR. VASILESCU:  Yes.  It begins, "What's more."

02:03  14   BY MR. VASILESCU:

02:03  15   Q    Do you see that?  Do you see that paragraph?

02:03  16   A    Yes.

02:03  17   Q    Okay.  Now, if you go in to the third sentence, it

02:03  18   says:  The SEC has also identified 42 undisclosed bank

02:03  19   accounts in which Mr. Letcavage may have an interest.  See

02:03  20   Exhibit B attached hereto.  Mr. Letcavage should address his

02:03  21   interest in the trust and each of the accounts and any

02:03  22   others, and he should make a complete accounting and

02:03  23   document production for accounts in which he has an

02:03  24   interest.  Do you see that?

02:04  25   A    Yes.

02:04   1   Q    Okay.  Now, if you go forward in the document,

02:04   2   Mr. Ellenbogen attached to Mr. Trad two lists.  One is

02:04   3   entitled Exhibit A and one is entitled Exhibit B, which is

02:04   4   the list of 43 accounts.  Do you see that?

02:04   5   A    Yes.

02:04   6   Q    And the SEC included in this list what the institution

02:04   7   was and what were the last four numbers of the account;

02:04   8   isn't that correct?

02:04   9   A    Yes.

02:04   10  Q    Okay.  And then if you keep going in this Exhibit 32,

02:04   11  Exhibit B is Mr. Trad's response to the SEC on your behalf.

02:04   12  Do you see that?

02:04   13  A    Yes.

02:05   14  Q    Okay.  And in his response, if you go down, Mr. Trad

02:05   15  responds to our 43 count, Exhibit B.  Do you see that?

02:05   16  A    I'm sorry.  Go down from where?

02:05   17  Q    If you go forward in Exhibit 32, you come to Mr. Trad's

02:05   18  e-mail dated November 9, 2022, to Mr. Ellenbogen, right?

02:05   19  A    Yes.  I thought we were on that already.  My mistake.

02:05   20  Go ahead.

02:05   21  Q    We were in the prior one, but it basically deals with

02:05   22  the same 43-account list.

02:05   23  A    Okay.  Yeah.

02:05   24  Q    And then if you go forward to -- and to make it

02:05   25  identifiable, it's page 17 of 34 on the top line of each

84

| | | |
|---|---|---|
| 02:05 | 1 | page. |
| 02:05 | 2 | A    Yes. |
| 02:05 | 3 | Q    Okay.  And you can see Mr. Trad is providing responses |
| 02:06 | 4 | to the SEC regarding this list of accounts that have not |
| 02:06 | 5 | been accounted for.  Do you see that? |
| 02:06 | 6 | A    Yes. |
| 02:06 | 7 | Q    And if we look down at number six, Bank of America |
| 02:06 | 8 | account ending 4425. |
| 02:06 | 9 | A    Yes. |
| 02:06 | 10 | Q    Now, did you help Mr. Trad make these responses, these |
| 02:06 | 11 | factual responses? |
| 02:06 | 12 | A    I'm not sure when he responded prior to or after |
| 02:06 | 13 | talking to me, but I would assume after.  And, yes. |
| 02:06 | 14 | Q    You would agree with me that Mr. Trad could not figure |
| 02:06 | 15 | out these responses without your input, right? |
| 02:06 | 16 | A    Yes. |
| 02:06 | 17 | Q    Okay.  Look at number six.  The Bank of America account |
| 02:06 | 18 | ending in 4425, it says:  Closed for some time.  No other |
| 02:06 | 19 | information.  Do you see that? |
| 02:06 | 20 | A    Yes. |
| 02:06 | 21 | Q    Okay.  And how long had that account been closed? |
| 02:07 | 22 | A    I have no idea. |
| 02:07 | 23 | Q    And what's your understanding in terms of your |
| 02:07 | 24 | understanding of what closed for one of your accounts for a |
| 02:07 | 25 | long time means? |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| 02:07 | 1 | A | I guess it means the account was closed. |
| 02:07 | 2 | Q | But what does a long time mean? |
| 02:07 | 3 | A | I don't know because I don't know what that account is. |

02:07    1    A    I guess it means the account was closed.

02:07    2    Q    But what does a long time mean?

02:07    3    A    I don't know because I don't know what that account is.

02:07    4    Q    Or for some time?

02:07    5    A    I can't recognize it by the last four digits.

02:07    6    Q    Do you know the relevancy of that account?

02:07    7    A    No.

02:07    8         MR. VASILESCU:  Your Honor, may I approach the

02:08    9    witness?

02:08   10         THE COURT:  You may.

02:08   11         MR. TRAD:  Your Honor, if counsel is approaching

02:08   12    with schedules that I have already noted my objection to,

02:08   13    especially the ones that are hearsay or whatever, I would

02:08   14    like to know before he elicits testimony so that we can have

02:08   15    a decision made.

02:08   16         THE COURT:  All right.

02:08   17         What's being provided?

02:08   18         MR. VASILESCU:  Exhibit 192 is a financial

02:08   19    statement that you e-mailed to us I believe either yesterday

02:08   20    or the day before in anticipation of this hearing.  It's

02:08   21    something that we received from you, Mr. Trad.

02:08   22         MR. TRAD:  That's fine, but I need to see it.

02:08   23         MR. VASILESCU:  I'm going to give you a copy.

02:08   24         (Counsel conferring)

02:08   25         THE COURT:  I think he wanted to see the document

86

02:09  1   before you show it to the witness.

02:09  2           MR. VASILESCU:  I will just note, Your Honor, we

02:09  3   received this --

02:09  4           MR. TRAD:  Okay.  Thank you.  I know what it is.

02:09  5           MR. VASILESCU:  We received this notice 24 hours

02:09  6   ago.

02:09  7           MR. TRAD:  All right.  That's fine.  I have it.

02:09  8   BY MR. VASILESCU:

02:09  9   Q    This is a financial statement that was dated --

02:09  10  A    It's November 9th.

02:09  11  Q    It's dated as of November 9th, 2022; is that correct?

02:10  12  A    Yes.

02:10  13  Q    Is this something that you prepared in the last month?

02:10  14  A    Yes, I believe so, or at least I had a hand in it.  I

02:10  15  didn't prepare it, but, yes.

02:10  16  Q    Do you have any understanding that this was produced to

02:10  17  the SEC not on November 9th or the day after but

02:10  18  yesterday -- or on Wednesday this week?

02:10  19  A    I don't know that.

02:10  20  Q    And if you look under -- after page 6 there is a

02:11  21  section 3, other information.  That's the seventh page in, I

02:11  22  believe.

02:11  23  A    My page 6 is expense, disbursements, total expenditures

02:11  24  and disbursements.

02:11  25  Q    Right.  If you could look to the next page, other

02:11   1   information.  And it says:  List any disbursements having a

02:11   2   value or a thousand or more made on your behalf or on behalf

02:11   3   of your spouse or children by any other person or entity

02:11   4   since, and then it says --

02:12   5   A   When, and it says fill in the date.

02:12   6   Q   Okay.  So did you have an understanding of what time

02:12   7   period you should fill in here?

02:12   8   A   No.

02:12   9   Q   And then there is the answer:  None.  Should additional

02:12   10  information be discovered, it will be provided without

02:12   11  further request or demand.

02:12   12  A   Yes.  I see that.

02:12   13          MR. VASILESCU:  Your Honor, may I approach the

02:12   14  witness?

02:12   15          THE COURT:  You may.

02:12   16          MR. VASILESCU:  This is Exhibit 151, Exhibit 49,

02:13   17  and this is Exhibit 199.

02:13   18          (Counsel conferring)

02:13   19          MR. TRAD:  Your Honor, I have an objection.  As

02:14   20  part of my original filed objections with the Court, I

02:14   21  objected to Exhibit 49 because of the late document dump and

02:15   22  the detailed information provided going back to 2010, which

02:15   23  there is no conceivable way of being able to verify this

02:15   24  information.

02:15   25          Secondly, it's hearsay.  And thirdly, it's my

02:15  1   understanding that any information derived from this was not

02:15  2   prepared by other counsel here, and we don't have a person

02:15  3   to testify to it.  And lack of foundation and authenticity.

02:15  4              THE COURT:  All right.  It hasn't been received

02:15  5   into evidence, so we'll see where this goes.

02:15  6              MR. VASILESCU:  Your Honor, I'll represent this

02:15  7   chart which was 199 is part of a declaration that Jackie

02:15  8   Fine, an examiner, submitted on ECF last night.

02:15  9              THE COURT:  You said I have 49?

02:15  10             MR. VASILESCU:  No, 199.

02:15  11             THE COURT:  Oh, this summary chart.

02:15  12             MR. TRAD:  That's a second objection, Your Honor,

02:15  13  because they're quoting a declaration that I can't

02:15  14  cross-examine because they did not produce the witness.  So

02:16  15  the document is therefore hearsay.  I appreciate the fact

02:16  16  that it shows zero value in the account, but I don't want

02:16  17  there to be a waiver of any rights that could be construed

02:16  18  across.

02:16  19             THE COURT:  I'm not sure.  Let's see where this

02:16  20  goes.  I can't even make an informed decision.  I have no

02:16  21  idea what this is.

02:16  22             MR. TRAD:  I understand.

02:16  23             THE COURT:  So why don't you ask your questions.

02:16  24             MR. VASILESCU:  Yes.

       25

02:16  1   BY MR. VASILESCU:

02:16  2   Q   Mr. Letcavage, take a look at Exhibit 151.

02:16  3   A   Yes.

02:16  4   Q   What is 151?

02:16  5   A   It looks like a copy of a signature card.

02:16  6   Q   And is that your signature on the bottom?

02:16  7   A   It looks like it.

02:16  8   Q   And the date is April 5th, 2017; is that right?  Do you

02:16  9   see the date next to the signature?

02:16  10   A   Yes.  Uh-huh.  I can't verify that date.  I apologize,

02:17  11   but does that say 17?  I guess so, 4/5/17.

02:17  12   Q   What does it appear to you as, sir?

02:17  13   A   It looked like 13 for a minute, but I guess I'm looking

02:17  14   at the second signature, Bradshaw's.  And now that I see

02:17  15   that, this probably is a 7.

02:17  16   Q   Okay.  And who is Ms. Bradshaw?

02:17  17   A   Office manager for one of the companies.

02:17  18   Q   And she was an office manager at Premier; isn't that

02:17  19   right?

02:17  20   A   I'm not sure what her title was at Premier, but she

02:17  21   worked at Premier.

02:17  22   Q   Well, she was involved in the books and records of

02:17  23   Premier while you were the CEO?

02:17  24   A   She was the bookkeeper.

02:17  25   Q   While you were the CEO, right?

| | | |
|---|---|---|
| 02:17 | 1 | A     Yes. |
| 02:17 | 2 | Q     And she also was the bookkeeper for other companies |
| 02:17 | 3 | that you were involved in, right? |
| 02:17 | 4 | A     Yes. |
| 02:17 | 5 | Q     And this Bank of America account number 2439871436, |
| 02:18 | 6 | isn't this your -- |
| 02:18 | 7 | A     By the way, hang on just a second.  I apologize.  In |
| 02:18 | 8 | 2017 I think she was investor relations, but I can't |
| 02:18 | 9 | guarantee that.  I think that was her role until we ended |
| 02:18 | 10 | Premier, but I don't know about the other companies. |
| 02:18 | 11 | Q     Do you still work with Ms. Bradshaw in other companies? |
| 02:18 | 12 | A     I don't. |
| 02:18 | 13 | Q     When is the last time you spoke with Ms. Bradshaw? |
| 02:18 | 14 | A     I speak with her a lot because I still ask her to do |
| 02:18 | 15 | things for me, but she has pretty much gotten tired of that. |
| 02:18 | 16 | Q     What is her main line of work now; do you know? |
| 02:18 | 17 | A     She works with ONIT in investor relations and works |
| 02:18 | 18 | with GATC in investor relations. |
| 02:18 | 19 | Q     And these are both companies that you were involved in, |
| 02:18 | 20 | right? |
| 02:18 | 21 | A     Yes. |
| 02:18 | 22 | Q     And this account, if you look at the number up above, |
| 02:18 | 23 | 2439871436, isn't this in fact your personal account at Bank |
| 02:18 | 24 | of America? |
| 02:19 | 25 | A     I have no idea. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:19    1    Q    Do you know what the account number is for your
02:19    2    personal account?
02:19    3    A    No.
02:19    4    Q    Now, Exhibit 49 I will represent to you is a production
02:19    5    from Bank of America as to all the transactions in this
02:19    6    account.  Exhibit 199 is a summary that an examiner from the
02:19    7    SEC created going through this document, particularly
02:19    8    focusing on the period from January '21 to the extent going
02:19    9    forward in the future.  The only transactions it shows since
02:19   10    January 2021 in this account is that interest, very little
02:19   11    interest was obtained, one cent a month.  Do you see that?
02:19   12    A    Yes.
02:19   13    Q    So, in fact, there is hardly any activity in terms of
02:19   14    money coming in or money going out from this account in the
02:19   15    period from January 2021 through the spring of 2022?
02:20   16             MR. TRAD:  Your Honor, I'm going to object only
02:20   17    because unless I'm looking at a different document, this is
02:20   18    dated from August 10, 2010, at least the copy I have, to
02:20   19    2015.  We're referencing dates of 2021.  So maybe I'm
02:20   20    looking in the wrong place.
02:20   21             THE COURT:  Well, I actually have a bigger
02:20   22    problem, but I want to give counsel leeway because it's not
02:20   23    a jury trial.  But Mr. Letcavage has indicated he doesn't
02:20   24    know what this is.  So I'm not sure he is the appropriate
02:20   25    witness for what you're trying to get in.  But if you want

| | | |
|---|---|---|
| 02:20 | 1 | to ask him some questions, because this is meaningless to me |
| 02:20 | 2 | as it stands right now with respect to this witness. |
| 02:20 | 3 | BY MR. VASILESCU: |
| 02:20 | 4 | Q    Okay, let's move on.  You have no memory of what this |
| 02:20 | 5 | account was for or how you used it? |
| 02:21 | 6 | A    No, sir, and I can't read this.  Again, I apologize. |
| 02:21 | 7 | MR. VASILESCU:  Your Honor, may I approach the |
| 02:21 | 8 | witness? |
| 02:21 | 9 | THE COURT:  You may. |
| 02:21 | 10 | MR. VASILESCU:  This is Exhibit 150.  I'm going to |
| 02:21 | 11 | give you one of these. |
| 02:23 | 12 | MR. TRAD:  Your Honor, may I have an understanding |
| 02:23 | 13 | as to what all these documents are that are being handed to |
| 02:23 | 14 | the witness.  It's usually customary that the Court and |
| 02:23 | 15 | counsel are served with the documents first and then they're |
| 02:23 | 16 | handed to a witness. |
| 02:23 | 17 | MR. VASILESCU:  These are the account statements |
| 02:23 | 18 | from the account at Bank of America that we discussed ending |
| 02:23 | 19 | in 4425. |
| 02:23 | 20 | MR. TRAD:  From which to which? |
| 02:23 | 21 | MR. VASILESCU:  From January 2021 through whatever |
| 02:23 | 22 | the latest date is. |
| 02:23 | 23 | MR. TRAD:  All right. |
| 02:25 | 24 | Your Honor, if it will assist the Court while this |
| 02:25 | 25 | is going on, I gave the Court a summary which should include |

| | | |
|---|---|---|
| 02:25 | 1 | all of these account dates in chronological fashion.  It |
| 02:25 | 2 | might be easier to look at than all the different |
| 02:25 | 3 | statements.  As long as that's what's being handed out, I'll |
| 02:25 | 4 | have no objection.  But if they change or add anything, then |
| 02:25 | 5 | I would have to see what it is.  If it might easier for the |
| 02:25 | 6 | Court, in our trial exhibits I think it's Exhibit B to -- |
| 02:25 | 7 | THE COURT:  What exhibit? |
| 02:25 | 8 | MR. TRAD:  Exhibit B.  It's a summary of all of |
| 02:25 | 9 | these accounts, bank accounts that potentially could be |
| 02:25 | 10 | looked at.  But you will find this account that he's |
| 02:25 | 11 | referencing, 4425, Bank of America for MACH 6. |
| 02:25 | 12 | THE COURT:  Where is Exhibit B? |
| 02:25 | 13 | MR. TRAD:  It's in the defendant's trial exhibits. |
| 02:26 | 14 | I have an extra copy if the Court doesn't have it before it. |
| 02:26 | 15 | THE COURT:  I don't think I have any of your |
| 02:26 | 16 | exhibits before me. |
| 02:26 | 17 | MR. TRAD:  If I may, Your Honor. |
| 02:26 | 18 | MR. VASILESCU:  Mr. Trad, what document are you |
| 02:26 | 19 | referring to?  Is it our document or your document? |
| 02:26 | 20 | MR. TRAD:  It's my summary of the documents you're |
| 02:26 | 21 | handing out.  It's Exhibit B. |
| 02:26 | 22 | MR. ELLENBOGEN:  Are you referring to the |
| 02:26 | 23 | documents you recently e-mailed to us? |
| 02:26 | 24 | MR. TRAD:  Yes. |
| 02:26 | 25 | MR. VASILESCU:  Your Honor, this is 150 and |

| | | |
|---|---|---|
| 02:26 | 1 | monthly statements from January '21 forward in monthly |
| 02:26 | 2 | order. |
| 02:26 | 3 | THE COURT:  All right. |
| 02:27 | 4 | (Counsel conferring) |
| 02:27 | 5 | BY MR. VASILESCU: |
| 02:27 | 6 | Q    If you could take a look at Exhibit 150, Mr. Letcavage. |
| 02:27 | 7 | A    Yes. |
| 02:27 | 8 | Q    Is that your signature there on the bottom? |
| 02:27 | 9 | A    Yes, it looks like it. |
| 02:27 | 10 | Q    Along with Ms. Bradshaw's? |
| 02:27 | 11 | A    Yes. |
| 02:27 | 12 | Q    And the date is March 8, 2017? |
| 02:27 | 13 | A    Yes. |
| 02:27 | 14 | Q    Okay.  Now, this account is 00243904425; isn't that |
| 02:27 | 15 | right? |
| 02:27 | 16 | A    Yes. |
| 02:27 | 17 | Q    And do you recall that's the one in Exhibit 32, |
| 02:27 | 18 | Schedule B, that when we pointed out that there was this |
| 02:28 | 19 | account, you said that, you know, it was an old account? |
| 02:28 | 20 | A    Okay. |
| 02:28 | 21 | MR. TRAD:  Object.  Misstates his prior testimony. |
| 02:28 | 22 | This states it's a closed account. |
| 02:28 | 23 | BY MR. VASILESCU: |
| 02:28 | 24 | Q    When was this account closed? |
| 02:28 | 25 | A    I don't know. |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

| 02:28 | 1 | Q | Now, Exhibit 134 is the March -- is the January 2021 |
| 02:28 | 2 | | statement.  Okay.  If you look at the addressee here, this |
| 02:28 | 3 | | is a Bank of America statement.  It's to MACH 6, Inc., 2030 |
| 02:28 | 4 | | Main Street, Suite 60, Irvine, California.  Do you see that? |
| 02:28 | 5 | A | Yes. |
| 02:29 | 6 | Q | Isn't it fair to say in January of 2021 you controlled |
| 02:29 | 7 | | this entity? |
| 02:29 | 8 | A | MACH 6? |
| 02:29 | 9 | Q | Yes. |
| 02:29 | 10 | A | I was a signature on there. |
| 02:29 | 11 | Q | And who's the other signature? |
| 02:29 | 12 | A | Megan Bradshaw. |
| 02:29 | 13 | Q | Who between you and her made decisions for MACH 6? |
| 02:29 | 14 | A | Me, but I had a partner in MACH 6 as well. |
| 02:29 | 15 | Q | Who was your partner? |
| 02:29 | 16 | A | Richard Cohen. |
| 02:29 | 17 | Q | Who is Richard Cohen? |
| 02:29 | 18 | A | A guy that I have done business with for years. |
| 02:29 | 19 | Q | Are you doing business with him now? |
| 02:29 | 20 | A | I haven't done business with him for a while. |
| 02:29 | 21 | Q | When is the last time you did business with him? |
| 02:29 | 22 | A | I don't know.  Maybe 2020, early 2021. |
| 02:29 | 23 | Q | And -- |
| 02:29 | 24 | A | This was technically his account. |
| 02:29 | 25 | Q | But he did not have signatory power on this account; |

| | | |
|---|---|---|
| 02:30 | 1 | did he? |
| 02:30 | 2 | A    I don't know.  I know I did. |
| 02:30 | 3 | Q    What's your belief as to why he had -- how do you |
| 02:30 | 4 | believe that he had signatory authority? |
| 02:30 | 5 | A    He started the company.  I'm not sure when there was |
| 02:30 | 6 | bank accounts formed in that company.  I mean, I'm only |
| 02:30 | 7 | seeing two people with signature accounts, myself and Megan. |
| 02:30 | 8 | Q    Do you have the -- this address, who's at the address |
| 02:30 | 9 | 2030 Main -- |
| 02:30 | 10 | A    That is the address of ONIT. |
| 02:30 | 11 | Q    Okay.  But when this statement is sent in January 2021, |
| 02:30 | 12 | who opens the document when it arrives? |
| 02:30 | 13 | A    I don't know. |
| 02:30 | 14 | Q    Who reviews the document? |
| 02:30 | 15 | A    I don't know. |
| 02:30 | 16 | Q    Have you ever reviewed any of these statements? |
| 02:30 | 17 | A    No. |
| 02:30 | 18 | Q    Have you ever used money in this account to pay your |
| 02:30 | 19 | personal expenses? |
| 02:30 | 20 | A    Yes. |
| 02:30 | 21 | Q    In fact, since January 2021, didn't you use this |
| 02:30 | 22 | account primarily to make payments for your personal |
| 02:31 | 23 | expenses? |
| 02:31 | 24 | A    This account was my business along with iCapital |
| 02:31 | 25 | Advisory, and I paid personal expenses out of that business, |

| | | |
|---|---|---|
| 02:31 | 1 | but I also paid business expenses out of that account. |
| 02:31 | 2 | Q    Okay, but you would agree, then, among the things that |
| 02:31 | 3 | you used this account for was to pay personal expenses? |
| 02:31 | 4 | A    Yes. |
| 02:31 | 5 | Q    So Exhibit 134 is the January '21 statement. |
| 02:31 | 6 | Exhibit 132 is the February '21 statement.  Exhibit 138 is |
| 02:31 | 7 | the March '21 statement.  Exhibit 128 is the April '21 |
| 02:31 | 8 | statement.  The May '21 statement is Exhibit 140.  The June |
| 02:32 | 9 | '21 statement is Exhibit 137.  The July '21 statement is |
| 02:32 | 10 | Exhibit 136.  And the Exhibit 130 is the August 2021 |
| 02:32 | 11 | statement.  September 2021 is 143.  October 2021 is 142. |
| 02:32 | 12 | November 2021 is Exhibit 141.  December 2021 is Exhibit 131. |
| 02:32 | 13 | And January 2022 is Exhibit 135.  February 2022 statement is |
| 02:32 | 14 | Exhibit 133.  March 2022 statement is Exhibit 139.  And |
| 02:32 | 15 | April 2022 statement is Exhibit 129. |
| 02:33 | 16 | Now, I will represent to you we got these |
| 02:33 | 17 | documents from Bank of America, and we were only able to get |
| 02:33 | 18 | through that last month.  Do you know if there are |
| 02:33 | 19 | additional months of statements for that account since |
| 02:33 | 20 | April 2022? |
| 02:33 | 21 | A    I do not. |
| 02:33 | 22 | MR. VASILESCU:  Your Honor, I would like to |
| 02:33 | 23 | approach the witness with exhibits. |
| 02:33 | 24 | THE COURT:  All right. |
| 02:33 | 25 | MR. TRAD:  May I see that first, please, counsel, |

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

02:33    1    before you approach the witness.

02:33    2                (Counsel conferring)

02:33    3                MR. TRAD:  Your Honor, I'm accepting counsel's

02:34    4    representation that this is the summary of the time period

02:34    5    of exhibits listed.

02:34    6                THE COURT:  All right.

02:34    7    BY MR. VASILESCU:

02:34    8    Q    Now, in this time, if you look at -- now, this chart

02:34    9    was created by one of the SEC's examiners who filed the

02:34   10    declaration, Ms. Jackie Fine, and she basically to make it

02:34   11    more efficient, rather than going through these 15 or 16

02:34   12    months' worth of statements and going through each line,

02:34   13    basically she went through it and put them into categories

02:34   14    of spending, not all of them but in these categories.

02:34   15                MR. TRAD:  Your Honor, again I will stipulate that

02:35   16    these are summaries of the categories of the documents so

02:35   17    that we don't burden the Court with needless minutia.

02:35   18                THE COURT:  All right.

02:35   19    BY MR. VASILESCU:

02:35   20    Q    Now, during the period from January 2021 to March 2022,

02:35   21    did you use this account to buy wine?

02:35   22    A    Yes.

02:35   23    Q    And here she calculates approximately $8,125 worth of

02:35   24    wine.  Is that something that you sort of remember in terms

02:35   25    of about the amount of money you spent on wine during that

99

| | | |
|---|---|---|
| 02:35 | 1 | period? |
| 02:35 | 2 | A    As near as I can tell.  Like I said, this is a business |
| 02:35 | 3 | account.  I can tell you why that wine is on there. |
| 02:35 | 4 | Q    How about cigars? |
| 02:35 | 5 | A    Same reasons, yes. |
| 02:35 | 6 | Q    Now, and this was business expenses that you spent on |
| 02:36 | 7 | cigars and wine after these judgments were entered against |
| 02:36 | 8 | you, right? |
| 02:36 | 9 | MR. TRAD:  Objection.  Calls for a legal |
| 02:36 | 10 | conclusion and speculation, Your Honor. |
| 02:36 | 11 | THE COURT:  Overruled.  If you recall one way or |
| 02:36 | 12 | the other. |
| 02:36 | 13 | THE WITNESS:  I was still trying to run a business |
| 02:36 | 14 | and, by the way, trying to pay you guys.  So I was never |
| 02:36 | 15 | given a mechanism to do that, but go ahead. |
| 02:36 | 16 | BY MR. VASILESCU: |
| 02:36 | 17 | Q    You were never given the mechanism to make a payment to |
| 02:36 | 18 | the SEC? |
| 02:36 | 19 | A    No.  No. |
| 02:36 | 20 | Q    Do you know how to write a check? |
| 02:36 | 21 | A    My friend has a $10 million fine as well.  He went |
| 02:36 | 22 | through collections.  He owes them a certain amount every |
| 02:36 | 23 | month.  I mean, that's what I have been waiting for and |
| 02:36 | 24 | looking for this whole period of time.  So go ahead.  I'm |
| 02:36 | 25 | waiting. |

02:36   1    Q    Is it your position that you had funds back in the

02:36   2    spring of 2021 where on your own you could have made some

02:36   3    sort of payment?

02:36   4    A    Some, yes.

02:36   5    Q    And you chose not to?

02:36   6    A    No, I didn't choose not to.  I have been asking counsel

02:37   7    to arrange for how I make these payments, right?  And as far

02:37   8    as I know, we were going to discuss settlement and/or we

02:37   9    were going to go to collections and make payments once you

02:37   10   were certain that there wasn't $10 million laying around.

02:37   11   Q    Okay.  Now, if you look at these statements -- and

02:37   12   let's call it the MACH account at Bank of America -- you

02:37   13   would agree with me that many of the transactions of

02:37   14   spending out of that account were transactions that you

02:37   15   initiated during the period from January 2021 to March 2022?

02:37   16   A    Yes.

02:37   17   Q    And you would agree with me that there was activity in

02:37   18   that account at least through March of 2022?

02:37   19   A    Through March of 2022, yes.

02:37   20   Q    Okay.  But in your Exhibit 32, you didn't identify that

02:38   21   as an account where there was activity in terms of you

02:38   22   benefiting from the money in that account?

02:38   23   A    I'm not looking at those, but I didn't think there was

02:38   24   any money left in that account, and I don't know what was

02:38   25   left in that account.  You can tell me, I guess.

| 02:38 | 1 | Q    Let's take a look at Exhibit 139. |
|---|---|---|
| 02:38 | 2 |        MR. TRAD:  Pardon me, Your Honor, and I apologize |
| 02:38 | 3 | for the late objection, but I had to pull the exhibit up. |
| 02:38 | 4 | Counsel misstates the evidence as well as the document, |
| 02:38 | 5 | Exhibit 32.  Referencing account 4425 on page 17 of 34 as |
| 02:38 | 6 | identified, it just says it's closed for some time.  This |
| 02:38 | 7 | document was mailed November 9, 2022.  By counsel's own |
| 02:38 | 8 | records and exhibits, activity in this account was stopped |
| 02:38 | 9 | in February of 2022.  After that there is zero balances. |
| 02:39 | 10 |        THE WITNESS:  In fact, it has got a negative |
| 02:39 | 11 | balance, I think.  Sorry.  Go ahead. |
| 02:39 | 12 | BY MR. VASILESCU: |
| 02:39 | 13 | Q    How about the accounts and the financial statements |
| 02:39 | 14 | that you produced in the fall of 2021?  Did you identify |
| 02:39 | 15 | this MACH account in those accounts? |
| 02:39 | 16 | A    Possibly not.  I don't know.  I'm not looking at that |
| 02:39 | 17 | right now.  What was the date that you're asking me about? |
| 02:39 | 18 | Q    Your account statements that you filed in 2021. |
| 02:39 | 19 | A    In what month? |
| 02:39 | 20 | Q    In October and November of 2021. |
| 02:39 | 21 |        MR. TRAD:  Object to the form of the question.  He |
| 02:39 | 22 | has testified he has filed any account statements. |
| 02:39 | 23 |        THE COURT:  Sustained. |
| 02:39 | 24 |        THE WITNESS:  Do you want me to answer? |
| 02:39 | 25 |        THE COURT:  No. |

| | | |
|---|---|---|
| 02:39 | 1 | BY MR. VASILESCU: |
| 02:39 | 2 | Q    Do you know for a fact if there was activity after |
| 02:40 | 3 | April 2022 in that account? |
| 02:40 | 4 | A    I'm looking at it.  So, yes.  There was $221 in here. |
| 02:40 | 5 | Q    That's not my question. |
| 02:40 | 6 | A    Okay.  I'm sorry. |
| 02:40 | 7 | Q    I will represent to you that Bank of America only |
| 02:40 | 8 | produced these account statements to us through April 2022. |
| 02:40 | 9 | A    Okay. |
| 02:40 | 10 | Q    Do you know as you sit here today whether there is any |
| 02:40 | 11 | activity since April 2022 in the account at Bank of America |
| 02:40 | 12 | for 4425? |
| 02:40 | 13 | A    I seriously doubt it, but I can't testify to that. |
| 02:40 | 14 | Q    If you look at the total in 150 -- I'm sorry, in 201, |
| 02:41 | 15 | in these categories in that January 2021 period through |
| 02:41 | 16 | March of 2022 add up to $162,533.  Do you see that? |
| 02:41 | 17 | A    Yes. |
| 02:41 | 18 | Q    Now, do you see the category birthday and Christmas |
| 02:41 | 19 | gifts from Letcavage? |
| 02:41 | 20 | A    Yes, I see it.  I don't know who termed it that, but |
| 02:41 | 21 | okay.  Yes, I see it. |
| 02:41 | 22 | Q    Were Christmas gifts part of your business? |
| 02:41 | 23 | A    Yes, but I don't know who for. |
| 02:41 | 24 | Q    If you look at the second line, family support to Asu |
| 02:41 | 25 | Tuti, $30,000. |

| | | |
|---|---|---|
| 02:41 | 1 | A    No, that's not part of my business. |
| 02:41 | 2 | Q    Who is Asu Tuti? |
| 02:41 | 3 | A    I don't know. |
| 02:41 | 4 | Q    You don't know who that is? |
| 02:41 | 5 | A    No.  I know that sounds weird, but I just gave you my |
| 02:41 | 6 | wife's name, so you figure out of the five names which one |
| 02:41 | 7 | she used there.  I don't know what they call her, probably |
| 02:41 | 8 | something totally different.  So in Indonesia, if that's an |
| 02:42 | 9 | Indonesian family member, I don't know. |
| 02:42 | 10 | Q    Do you believe this relates to family in Indonesia? |
| 02:42 | 11 | A    I do.  I mean, that's my best guess. |
| 02:42 | 12 | Q    So do you have an understanding that at least $30,000 |
| 02:42 | 13 | after the judgments were entered were sent to family in |
| 02:42 | 14 | Indonesia? |
| 02:42 | 15 | A    Yeah.  I'm sorry.  You know, I'm trying to continue to |
| 02:42 | 16 | support my wife at that time. |
| 02:42 | 17 | Q    And the utilities, 14,000.  Whose utilities was that |
| 02:42 | 18 | spent on? |
| 02:42 | 19 | A    Probably my own, but I don't know that for sure. |
| 02:42 | 20 | Q    Why do you say probably your own? |
| 02:42 | 21 | A    I don't know whose utilities they were.  You know, it |
| 02:42 | 22 | could have been for the office.  I don't know.  I think I |
| 02:42 | 23 | still had an office on Valencia at the time.  I don't know |
| 02:42 | 24 | for sure.  I shouldn't have answered that. |
| 02:42 | 25 |         MR. VASILESCU:  Your Honor, may I approach the |

02:45  1  witness?

02:45  2          THE COURT:  You may.  Do you want to approach

02:45  3  Mr. Trad first?

02:46  4          (Counsel conferring)

02:46  5          MR. TRAD:  Your Honor, while he is handing these

02:46  6  out, again I will stipulate that Exhibit 202 will represent

02:46  7  a summary not prepared by counsel but by a third party in

02:46  8  their offices.  I'm going to waive my hearsay objection, but

02:46  9  it should be a summary of accounts in I believe iCapital

02:46  10  Advisory.  So I won't have to post an objection as to these

02:46  11  because I'm accepting counsel's representation that these

02:46  12  are accurate summaries of the items that are listed.

02:46  13          THE COURT:  I appreciate that.

02:46  14          The bottom line, Mr. Trad, is there any money left

02:47  15  in the account?

02:47  16          MR. TRAD:  I actually have that information, Your

02:47  17  Honor.  As of May 2022, $3,848.51.  And there may be some

02:47  18  nominal transactions out there, but I can't testify to that

02:47  19  to the Court to provide specifics.

02:47  20          May I inquire, Your Honor, while we're doing that,

02:47  21  how late does the Court go on Friday?

02:48  22          THE COURT:  I don't know.  I don't know where this

02:48  23  is going to go.  I'm not trying to be coy with you.  I just

02:48  24  don't know.

02:48  25          MR. TRAD:  My anticipation is I will never be able

02:48  1   to get through my part of this.  They have a right to go as

02:48  2   long as they need to go.  I'm not suggesting -- I'm just

02:48  3   trying to figure out the timing for my sake as well as the

02:48  4   Court's.

02:48  5              THE COURT:  I appreciate that.  Once he organizes

02:48  6   the exhibits, I will ask him how long.

02:48  7              MR. TRAD:  Okay.

02:48  8              THE COURT:  Counsel, how long do you anticipate

02:49  9   your examination going?

02:50  10             MR. VASILESCU:  Your Honor, I think I'm making

02:50  11  good progress getting through my outline.

02:50  12             THE COURT:  Okay.

02:50  13             MR. VASILESCU:  I mean, at least another hour on

02:50  14  my direct.  My colleague is saying it will probably be

02:50  15  longer, maybe an hour and a half to be more realistic.

02:50  16             THE COURT:  Okay.

02:50  17  BY MR. VASILESCU:

02:50  18  Q    Mr. Letcavage, if you could take a look at Exhibit 193.

02:50  19  A    Yes.

02:50  20  Q    The second page, is that your signature on the second

02:51  21  page next to the date April 5th, 2017?

02:51  22  A    It looks like my signature stamp, yes.

02:51  23  Q    Okay.  Did you have an understanding that iCapital

02:51  24  Advisory Group, LLC, had an account at Wells Fargo Bank?

02:51  25  A    Yeah.

| | | |
|---|---|---|
| 02:51 | 1 | Q    And the other signatory is Megan Samson? |
| 02:51 | 2 | A    Yes. |
| 02:51 | 3 | Q    Who is Megan Samson? |
| 02:51 | 4 | A    Again, bookkeeper, office manager. |
| 02:51 | 5 | Q    And is iCapital Advisory an entity that you do |
| 02:51 | 6 | consulting work through? |
| 02:51 | 7 | A    Yes. |
| 02:51 | 8 | Q    And this is an area where you, even prior to the |
| 02:51 | 9 | judgment, was a vehicle that you got compensated through? |
| 02:51 | 10 | A    Yes. |
| 02:51 | 11 | Q    Isn't Ms. Bradshaw also Ms. Samson? |
| 02:52 | 12 | A    Yes. |
| 02:52 | 13 | Q    So the same person who's the same co-signatory for the |
| 02:52 | 14 | MACH account as well as the iCapital account, right? |
| 02:52 | 15 | A    Yes. |
| 02:52 | 16 | Q    Now, after January 2021, after the judgments were |
| 02:52 | 17 | entered, did you get income through iCapital Advisory? |
| 02:52 | 18 | A    Yes and no, right?  I mean, ICapital Advisory performed |
| 02:52 | 19 | the services for the companies which generated the income, |
| 02:52 | 20 | and then I took money out as needed out of iCapital |
| 02:52 | 21 | Advisory.  I mean, I made payments for my personal use, yes. |
| 02:52 | 22 | Q    Okay.  And the exhibits that I gave you, I'm sorry they |
| 02:53 | 23 | are not in chronological order, but they are account |
| 02:53 | 24 | statements in the period from, I believe, January 2001 [sic] |
| 02:53 | 25 | through April of 2022, these account statements which I gave |

02:53  1    you, which are 102, 103, 104, through 118.  Do you see those

02:53  2    exhibits?

02:53  3    A    Yes.

02:53  4    Q    Okay.  So our colleague, the examiner, makes it easy

02:53  5    for us to go through these monthly statements from January

02:53  6    created 202, Exhibit 202.

02:53  7    A    Yes.

02:53  8    Q    And 202 identifies money into iCapital from other

02:53  9    entities.  Do you see that?

02:53  10   A    Yes.

02:53  11   Q    And you see that all together $198,159.38 came into

02:54  12   that account from other places like ONIT Science, Mach 6,

02:54  13   GATC Health Corp, GATC, and then RTP from ONIT Science.

02:54  14         So didn't you use this account as a main vehicle

02:54  15   for where you would get your income in the period after

02:54  16   January 2021 through the spring of 2022?

02:54  17   A    I think this was the main source that I used forever,

02:54  18   including all the way back through Premier and everything

02:54  19   else.  I was paid through this company.

02:54  20   Q    Okay.

02:55  21         MR. VASILESCU:  May I approach the witness, Your

02:56  22   Honor?

02:56  23         THE COURT:  You may.

02:56  24         (Counsel conferring)

02:56  25         MR. TRAD:  Your Honor, again while counsel passes

02:56 1    out the forms, he's going to give the Court Exhibit 200, and
02:56 2    I will stipulate that the summary as set forth in
02:56 3    Exhibit 200 reflects if you added up the schedules to this
02:57 4    account under our summaries.  So I'm not going to pose a
02:57 5    hearsay or a foundational objection.
02:57 6              THE COURT:  I appreciate you.  Same question as
02:57 7    before:  Is there any money left in the account?
02:57 8              MR. VASILESCU:  Here is 152.
02:57 9              MR. TRAD:  The last entries that we have on this
02:57 10   account, Your Honor, and as also I think the July 2021 at
02:57 11   that time, there was $9,500.
02:57 12             THE COURT:  July '21, last year?
02:57 13             MR. TRAD:  2021, yes.  And there was a matching
02:57 14   savings account which we have already covered, which
02:57 15   combined is more than $760.  All I can hope is that some
02:58 16   Court of Appeals is going to say why is that fool bringing
02:58 17   in all that stuff?  But I think it's more efficient.
02:58 18             THE COURT:  I think it's much more efficient.  The
02:58 19   fact of the matter is for contempt, there has to be the
02:58 20   ability to pay now.  So this information is important for
02:58 21   you if there is no money to pay, and there is not much I can
02:58 22   do.
02:58 23             But there might have been money a year, year and a
02:58 24   half ago.  It's relevant and it's important, but to my
02:58 25   knowledge I don't believe there was an asset freeze; was

02:58   1   there?

02:58   2          MR. TRAD:  No.  No pre-judgment -- no asset

02:58   3   freeze, no nothing, no collection activities.

02:59   4          MR. VASILESCU:  Well, we disagree with the

02:59   5   representation that --

02:59   6          MR. TRAD:  I apologize.  You can argue your own

02:59   7   case.

02:59   8          MR. VASILESCU:  You have been litigating

02:59   9   post-judgment for a year and a half.

02:59  10          MR. TRAD:  We offered you 350,000 in payments

02:59  11   every month, and you didn't want it when there was money in

02:59  12   the account.  I'm sorry to blurt that out, but that's a

02:59  13   fact.

02:59  14          Again, I apologize, Your Honor, while they're

02:59  15   doing this, but if they're going to go another hour, hour

02:59  16   and a half, I'm going to ask the Court for an additional

02:59  17   day.  That will give me a chance to go through the document

02:59  18   dump as well as get other stuff ready so I can be very --

02:59  19   I'm generally very efficient, but this will give me an

02:59  20   opportunity.  I don't that I can do that in the limited

02:59  21   amount of time to break up testimony.

02:59  22          THE COURT:  I appreciate that.  I represented to

03:00  23   you at least twice you're going to have the ability to have

03:00  24   your say, whether that's next week or -- I don't know.  We

03:00  25   can talk about that.

110

| | | |
|---|---|---|
| 03:00 | 1 | BY MR. VASILESCU: |
| 03:00 | 2 | Q    If you take a look, Mr. Letcavage, at Exhibit 152, if |
| 03:00 | 3 | you can confirm that's your signature at the bottom? |
| 03:00 | 4 | A    I apologize.  I'm totally confused here.  I think what |
| 03:00 | 5 | you just handed me was the 202 and the 124, the 126.  Did I |
| 03:00 | 6 | miss something or pick up the wrong file? |
| 03:00 | 7 | Q    No.  I gave you Exhibit 152. |
| 03:01 | 8 | A    Okay.  I have 152.  I'm sorry.  It was mixed up with |
| 03:01 | 9 | the other pile.  Yes, that's my signature. |
| 03:01 | 10 | Q    Okay.  And this is another Bank of America account that |
| 03:01 | 11 | you had control over at Bank of America? |
| 03:01 | 12 | A    I don't know what this account is.  There is no name on |
| 03:01 | 13 | the account except for mine.  I think this is my personal |
| 03:01 | 14 | account. |
| 03:01 | 15 | Q    Well, and the exhibits go up from 121 to, I think, 127; |
| 03:01 | 16 | is that right?  You think this is your personal account? |
| 03:02 | 17 | A    Yes. |
| 03:02 | 18 | Q    Now, if you look at this summary Ms. Fine prepared, |
| 03:02 | 19 | which is Exhibit 200, this is for the period January 2021 |
| 03:02 | 20 | through July 2021.  Do you see that? |
| 03:02 | 21 | A    Yes. |
| 03:02 | 22 | Q    And it says during that period there are these |
| 03:02 | 23 | categories that appear to have been spent? |
| 03:02 | 24 | A    Yes. |
| 03:02 | 25 | Q    And property is 31,500.  Do you see that? |

```
03:02   1    A    Yes.  I don't know what that means.
03:02   2    Q    Now, were you paying -- what's the last place that
03:02   3    you -- well, where do you live now, sir?
03:02   4    A    I just checked out of an Airbnb a week ago after moving
03:02   5    out of Copa De Oro in Anaheim Hills four weeks ago, and I'm
03:03   6    staying with my friend hopefully tonight.
03:03   7    Q    How long have you not been -- I'm sorry.  The property
03:03   8    that you moved out of, what --
03:03   9    A    November 15th, moved out of the Copa De Oro house in
03:03  10    Anaheim Hills.
03:03  11    Q    November 15th of this year?
03:03  12    A    This past November, yes.
03:03  13    Q    And you have been renting an Airbnb?
03:03  14    A    Yes.
03:03  15    Q    How are you paying for the Airbnb?
03:03  16    A    I had a little bit of cash.
03:03  17    Q    Well, how much did the Airbnb cost?
03:04  18    A    I don't know.  $2,000 maybe.
03:04  19    Q    2,000 a month? a week? a day?  How much?
03:04  20    A    For the month.
03:04  21    Q    And where is the location?
03:04  22    A    It's a one-bedroom garage apartment in Fullerton.
03:04  23    Q    And the prior place that you were living that you moved
03:04  24    out in November from?
03:04  25    A    It was a little different, yeah.
```

03:04   1    Q    How long had you lived there?

03:04   2    A    Five years, six years, five, I think.

03:04   3    Q    Did you rent that property?

03:04   4    A    Yes.

03:04   5    Q    And how much did you pay a month for that property?

03:04   6    A    I think with gardening and everything, about 13,000 a

03:04   7    month.

03:04   8    Q    So through November of this year you were paying

03:05   9    $13,000 a month for where you were living?

03:05   10   A    I paid my rent six months in advance per my agreement

03:05   11   with the landlord.

03:05   12   Q    Okay.  And was your wife living there, too?

03:05   13   A    She was.

03:05   14   Q    Did she move out of there?

03:05   15   A    Around September, maybe October.

03:05   16   Q    Does your wife own any property?

03:05   17   A    No.

03:05   18   Q    Prior to living there, where did you live?

03:05   19   A    Laguna Niguel.

03:05   20   Q    And did you rent that house?

03:05   21   A    Yes.

03:05   22   Q    How much did you pay a month for that house?

03:05   23   A    $8,500 maybe, somewhere around there.

03:06   24   Q    The monies that you paid recently for Airbnb, from what

03:06   25   account did you make those payments?

03:06  1    A    I think that was on my personal account.

03:06  2    Q    The Bank of America account?

03:06  3    A    I believe so, yeah.

03:06  4    Q    Now, you still own shares of companies, right?

03:07  5    A    Yes.  I offered them up in the settlement.

03:07  6    Q    What company shares do you still own?

03:07  7    A    Nexalin, Premier, and the dividend off of Premier

03:07  8    spinout, which is Power One.

03:07  9    Q    And what is the approximate value --

03:07  10   A    And by the way, I'm not sure that's all of them, but I

03:07  11   can't think of anything else at the moment.

03:07  12   Q    And what's the approximate value of those shares?

03:07  13   A    I don't know.  Premier is trading at pennies.  Power

03:07  14   One, they're kind of meeting their projections, but I don't

03:07  15   know what they're worth.  And Nexalin was supposed to go

03:07  16   public about six months ago, and I don't know where that

03:07  17   stands right now.

03:08  18        MR. VASILESCU:  Your Honor, do you think it would

03:08  19   make sense to take a short break at this point?

03:08  20        THE COURT:  Yeah.  Why don't we take a break.  I

03:08  21   want to talk to you about something.  Sir, you can step

03:08  22   down, take a break.

03:08  23        Just seeing how this is going, I'm not so sure

03:08  24   this is a contempt proceeding as opposed to a motion to

03:08  25   compel discovery.  The way I understand the law is unless

03:08  1   there is an asset freeze or I have an order where he is

03:08  2   committing to a plan, the fact that he was spending a lot of

03:08  3   money on housing in the past, I don't see how I can hold him

03:08  4   in contempt.

03:08  5           Contempt is to deal with the present situation in

03:08  6   the future.  So I would appreciate if the parties would

03:09  7   indulge me and we can take a little bit longer break, but

03:09  8   see if you can work out a payment schedule and then if you

03:09  9   could agree on the discovery.  You know, I'm not here to

03:09  10  criticize either side.  I'm talking about a lot of money

03:09  11  going out of the accounts, but I'm getting the sense there

03:09  12  is not much money left.

03:09  13          Unless the SEC has information that there is a lot

03:09  14  of money out there, we're engaging in a futile exercise.

03:09  15  The money would be better spent paying the outstanding

03:09  16  judgments than attorney's fees.  But I know the way the

03:09  17  process is, it's difficult.  You know, the SEC is entitled

03:09  18  to know what are the assets that he's got.  What's out

03:10  19  there?

03:10  20          You know, I look in the record.  I don't know

03:10  21  whether it's true or not.  I haven't made any decisions, but

03:10  22  it seems like there is assertion of a Fifth Amendment

03:10  23  privilege that was improper.  I sensed you were getting

03:10  24  stonewalled in the information, and I don't have a problem

03:10  25  if we want to use the court proceedings to get the

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

03:10   1    information that you're entitled to.  I have no problem with

03:10   2    that.

03:10   3          Just based on what has been presented so far, I

03:10   4    don't see how I can hold him in contempt -- and I haven't

03:10   5    even heard from Mr. Trad on the evidence he's going to

03:10   6    say -- unless you have information that there's a lot of

03:10   7    money floating around there.  But now I just learned he's

03:10   8    living in a garage.

03:10   9          MR. VASILESCU:  Your Honor, I would just make this

03:10  10    point, which is there's actually two grounds for contempt

03:10  11    here.  One is not making any payments on the judgments.  And

03:10  12    you're right, like, what can he pay now.

03:11  13          The second issue is it was an order, a discovery

03:11  14    order way back in 2021 that compelled him, overruled all of

03:11  15    his objections where he wasn't producing documents, tax

03:11  16    returns.  I mean, there's a whole bunch of stuff here that

03:11  17    he has never produced.  It was like trying to, like, get

03:11  18    from a stone information.

03:11  19          So he has systematically, like this MACH account

03:11  20    which is clearly, you know, an iCapital, like only gets

03:11  21    identified at the 11th hour after we go come to him, after

03:11  22    doing a lot of work trying to hunt down accounts.  He was

03:11  23    ordered by a magistrate judge back in the fall of 2021 to do

03:11  24    a full accounting.

03:11  25          The other ground is this discovery issue.  That's

03:11    1    the problem.  We agree with Your Honor.  One of our

03:11    2    difficulties here is Mr. Trad, you know, reaches out to us

03:11    3    and says can't we come up with a payment plan.  The problem

03:12    4    is our collection people, they will do a payment plan if

03:12    5    somebody opens up and shows everything that they have and

03:12    6    works with us and say these are all my accounts.

03:12    7            And also one of the issues why we are -- why we

03:12    8    have a problem is that we have been hunting for accounts and

03:12    9    then we find an account and then they were like, oh, yeah,

03:12   10    yeah.  There was money there.  We already finished spending

03:12   11    it.  Okay.

03:12   12            We still don't know what happened to the

03:12   13    $7 million from iShop that he raised, this sole shop that he

03:12   14    took from investors.  And we are concerned that unless he

03:12   15    cooperates and gives full exposure to what he truly knows,

03:12   16    there is money out there that he hasn't told us about,

03:12   17    because we can't track down the millions of dollars,

03:12   18    $7 million that he raised that disappeared.

03:13   19            THE WITNESS:  There is not $7 million out there.

03:13   20    What are you talking about?

03:13   21            MR. TRAD:  Randy, step outside.

03:13   22            MR. VASILESCU:  But you are right, Your Honor.

03:13   23            THE COURT:  We need to take a deep breath.  Let's

03:13   24    just assume for the moment what you're saying is true.  I

03:13   25    know you dispute it.  I'm going to give him a chance to

03:13   1   comply and give you this information.  But for that order to

03:13   2   be meaningful, it's got to be precise and specific.  Do you

03:13   3   know what I mean?

03:13   4             MR. VASILESCU:  Yes, Your Honor.

03:13   5             THE COURT:  And I don't know whether this could

03:13   6   have been done with the magistrate judge or not.  You are

03:13   7   here now.  You have my attention, and I'm here to assist

03:13   8   you, but this is really turning into almost a motion to

03:13   9   compel discovery as opposed to contempt.  Like I said,

03:14   10  contempt, when you get to me, the way I understand the law

03:14   11  is here is an order; you didn't comply.  Now I'm going to

03:14   12  require you to comply.  And if you don't, I'm going to fine

03:14   13  you $5,000.  You don't comply then, I will fine you $10,000.

03:14   14            If you don't comply then, you're going into

03:14   15  custody.  And I've done that and I will do that, but I have

03:14   16  to have, for example, the payment obligation.  I have to

03:14   17  have for me clear and convincing evidence that he has got

03:14   18  the money.

03:14   19            I can't punish him for not having the same

03:15   20  priorities that I wish he would have had.  With respect to

03:15   21  documents, I have got to have a sense by the time it gets to

03:15   22  me for contempt that there is specific information or

03:15   23  documents that he has.  And then I order him:  You must

03:15   24  produce this by this date.  If you don't, I'll fine you

03:15   25  $5,000.  You have a week more, $10,000.  Going into

03:15    1    custody -- until Mr. Trad finds the documents and gives me

03:15    2    that information.  But again, it's got to be precise.

03:15    3              So I am not here to debate you or test you, but

03:15    4    contempt --

03:15    5              MR. VASILESCU:  We understand, Your Honor.

03:16    6              THE COURT:  But I do understand.  I don't want you

03:16    7    to think I'm being critical of you.  I just sense you are

03:16    8    frustrated.  You are not getting the information and I'm not

03:16    9    casting judgment on whose fault that is.  Maybe it's both

03:16   10    sides.  Maybe it's just the nature of the process.  But

03:16   11    contempt, again it's got to be teed up.  Here is the order.

03:16   12    You're supposed to do this.  You can do this and you're not

03:16   13    doing it.

03:16   14              MR. VASILESCU:  Yes, Your Honor, and we agree.

03:16   15    That's why in the remedy section of our brief which we

03:16   16    filed, we suggest, like, a $5,000 payment plan a month

03:16   17    which, given his past spending, now, you know, if he needs

03:16   18    more time to make that first $5,000 payment, we can work

03:16   19    that in.  But that was one of our proposals for, like, a

03:17   20    remedy, that he start making payments as to the payment

03:17   21    plan.

03:17   22              There are specific categories of documents he

03:17   23    still has not produced.  For example, he can go to the IRS

03:17   24    and get the IRS to produce to him the tax records that we

03:17   25    need to see, like what other income there was.  He has given

03:17    1    us some tax records that are very limited.  The magistrate

03:17    2    found specifically, you know, there is a lot of stuff in the

03:17    3    magistrate's order of, like, documents he has failed to

03:17    4    produce.

03:17    5              THE COURT:  And I wish that would be produced, but

03:17    6    do we need him?  Can't I give you an order that you can use

03:17    7    with the IRS and say we want these tax returns?

03:17    8              MR. VASILESCU:  I'm not sure if that will work,

03:17    9    but I know if he did it, it would be quicker.  But you're a

03:17   10    federal judge.  If a federal judge tells the IRS to produce

03:17   11    some records, there's probably a good chance they will be

03:17   12    produced.

03:18   13              MR. TRAD:  For two years or the year and a half I

03:18   14    have been on this case, there's always been these sweeping

03:18   15    innuendos.  I know this is not the time for closing, and

03:18   16    that seems to be what counsel is trying to do.  I will

03:18   17    represent to this Court as an offer of proof that we're

03:18   18    going to go through all of those subject matters, and

03:18   19    Mr. Letcavage hasn't filed tax returns in the last five

03:18   20    years.  There is nothing to produce.

03:18   21              He has been making payments because of allegations

03:18   22    to the IRS, and that information has been provided.  We had

03:18   23    viable discussions about points all the way down the line.

03:18   24    And as the Court knows, out the gate I said.  He is happy to

03:18   25    start making $5,000-a-month payments.  Okay.

03:18    1         I don't know about handling this down payment that

03:18    2    they wanted, and we would have waived any attempt to

03:18    3    mitigate or reduce down the order.  You know, I'm trying to

03:18    4    help this man get his life back on track, and that's my sole

03:18    5    obligation.

03:18    6         THE COURT:  From your standpoint you were here

03:18    7    several weeks ago, and I thought you were going to confer

03:19    8    and the details.  I feel like we are kind of learning things

03:19    9    for the first time during this contempt hearing, and that's

03:19   10    not the way I have ever had a contempt hearing.

03:19   11         MR. TRAD:  If the Court recalls, in my initial

03:19   12    request to speak to the Court and my complaints and

03:19   13    objections about this process was that I initiated the

03:19   14    meet-and-confer process.  I was given representations about

03:19   15    what was going to be done, and all of those representations

03:19   16    have been abrogated not by my side of the fence.

03:19   17         Now, I know, Judge, your reputation.  I have no

03:19   18    concern that I will have my opportunity to present our case.

03:19   19    I believe you.  I don't doubt that.  But all of these

03:19   20    sweeping generalizations have been the way this case has

03:19   21    been handled since day one.

03:19   22         All I know is that after practicing law for 40

03:19   23    years in this county, that the SEC over almost ten years of

03:20   24    litigation hasn't been able to find a substantive asset?  I

03:20   25    mean, I'd like to think some of my clients are good but

03:20 1 they're not that good, not against the power of the SEC.

03:20 2 So all I am asking is that rather than turn this

03:20 3 into a pre-closing, I would welcome that to resume, like I

03:20 4 tried to do this morning, which was resolve this

03:20 5 financially, get the payment structure in place, and, as I

03:20 6 asked Your Honor, if it's possible, refer us out to a

03:20 7 referee that will help pound the two sides together and talk

03:20 8 some sense into both of us -- whatever it takes to get it

03:20 9 done.

03:20 10 THE COURT:  Well, I would love to see it resolved,

03:20 11 but if it's not resolved, I'm fine with going the contempt,

03:20 12 but it's not feeling like a contempt proceeding to me.

03:20 13 MR. TRAD:  I understand.

03:20 14 THE COURT:  And what I am asking you to do is take

03:21 15 a little time, see if you can resolve a payment plan.  And

03:21 16 then I guess maybe you can't because you're saying we need

03:21 17 more assurance there is no money there before we can agree

03:21 18 to a payment plan.  If that's the case, I get it.  But then

03:21 19 if you could identify what information specifically you

03:21 20 need.

03:21 21 Then I will be open to hearing argument on whether

03:21 22 that's proper and whether you can do it.  And if you can do

03:21 23 it, I'm going to order that he does it, and then we can

03:21 24 resolve this.  And then once you have the information you

03:21 25 need to make an informed decision, then you can agree on a

03:21    1    payment plan.

03:21    2            But I just think proceeding the way we are, this

03:21    3    is like more a motion to compel discovery and information

03:21    4    than it is contempt.

03:22    5            MR. VASILESCU:  Understood, Your Honor.

03:22    6            MR. TRAD:  Understood.

03:22    7            THE COURT:  Because the way we're going, this

03:22    8    contempt/compel hearing is going to go for four weeks.  I'm

03:22    9    going to be calling you back, and it's just not an efficient

03:22   10    way to proceed for anybody.

03:22   11            MR. VASILESCU:  Understood, Your Honor.

03:22   12            MR. TRAD:  How much time do you want us to take?

03:22   13            THE COURT:  You know, as much time as you need,

03:22   14    candidly, but I would think you could at least come to an

03:22   15    agreement, if not on a payment schedule because they need

03:22   16    more information, what specific information they want, how

03:22   17    you can get it to them if you can get it to them.

03:22   18            MR. TRAD:  I am happy to do so.

03:22   19            THE COURT:  So talk and then let me know.  You

03:22   20    know, hopefully you can do that in less than a half hour.

03:22   21            MR. VASILESCU:  Thank you, Your Honor.

03:23   22                    (Recess taken at 3:23 p.m.;

03:23   23                     proceedings resumed at 3:48 p.m.)

03:47   24            THE COURT:  Okay.  What's the result?

03:48   25            MR. TRAD:  Thanks, Your Honor, for the guidance.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

03:48   1   We have actually, believe it or not, almost hammered out an

03:48   2   approach.  They obviously have to go back to their people

03:48   3   and work some things out.  I have made certain commitments,

03:48   4   including beginning, starting up the payments until we can

03:48   5   get this stuff worked out.

03:48   6           The idea is that we have settled on everything we

03:48   7   can agree on, and if there's something that we can't agree

03:48   8   on, then we would like to -- we want to come back to Your

03:48   9   Honor in probably a couple of weeks, something like that.

03:48   10          MR. VASILESCU:  Well, I think the idea is we would

03:48   11  work expeditiously to provide a framework to submit a

03:48   12  proposed order to Your Honor.  Okay.  And if there were

03:48   13  parts of it that we couldn't agree on, then we'd both submit

03:48   14  our different positions.

03:48   15          It would have two parts, the proposed order.  One

03:48   16  part would order certain information to be produced

03:48   17  either -- well, including Mr. Letcavage and/or third

03:48   18  parties, will look into the issue of the IRS, for example.

03:48   19  So that one part will be the information that should be

03:49   20  ordered to sort of confirm what he does or does not have

03:49   21  fully.

03:49   22          And then the second part would be a proposed

03:49   23  payment plan if they can get on board with that.  That could

03:49   24  be ordered.  Then obviously that can always be adjusted in

03:49   25  the future by anybody coming to the Court if they can show

03:49  1    there is more money or less money in terms of the payment

03:49  2    plan.  But the idea is to come back to Your Honor with a

03:49  3    proposed order.

03:49  4                MR. TRAD:  And if there's an area that we just

03:49  5    can't seem to strike a barter on, we will submit it to Your

03:49  6    Honor, and whatever Your Honor orders we are going to

03:49  7    follow.

03:49  8                THE COURT:  That will be fine.  So I'm not going

03:49  9    to deny the motion yet.  I guess we are going to hold it in

03:49  10   abeyance, and you don't have to go back to the magistrate

03:49  11   judge.  If there is a discovery dispute, you tell me what

03:49  12   information you believe you need and are entitled to.  You

03:50  13   tell me it's not relevant or it isn't there, and then I can

03:50  14   make a decision.

03:50  15               MR. VASILESCU:  And just to be clear, Your Honor,

03:50  16   our concept is under this proposed order, the areas of

03:50  17   discovery that we still think have not been completed that

03:50  18   were previously ordered by the magistrate at our request we

03:50  19   will ask to put into that order from Your Honor so that it

03:50  20   is ordered to be completed if we haven't resolved it.

03:50  21               MR. TRAD:  I have already agreed to I'll take care

03:50  22   of getting to the IRS, so whatever we can work together on

03:50  23   whatever concerns they have.  I guess what I am trying to

03:50  24   say is that -- thank you for your guidance, and I think it

03:50  25   has a positive effect on all of us.  We all need to get this

03:50  1   done and get it out of the way.

03:50  2          MR. VASILESCU:  So the plan is to come back to

03:51  3   Your Honor with a proposed order.

03:51  4          THE COURT:  How long will you need to do that?

03:51  5          MR. VASILESCU:  Well, we would like to move

03:51  6   quickly.

03:51  7          MR. TRAD:  Well, if I subpoena the IRS, I don't

03:51  8   know -- I mean, it will -- I don't necessarily have to have

03:51  9   the discovery, I guess, in your hands.

03:51  10          MR. VASILESCU:  But, Mr. Trad, that's -- the order

03:51  11   can be entered in soon.  It's the compliance with the order

03:51  12   that takes more time, and then we can build in compliance

03:51  13   time into the order.  I believe we can move expeditiously

03:51  14   and maybe in one week get back to Your Honor.

03:51  15          THE COURT:  All right.  So the motion is pending,

03:51  16   and I will anticipate a proposed order within a week.  And

03:51  17   if there is disputes over it, we can have a hearing and get

03:51  18   back together and discuss it, resolve it.

03:51  19          MR. VASILESCU:  Yes, Your Honor.  And just a

03:51  20   little housekeeping.  We should move into evidence the

03:52  21   exhibits since the last time we moved into evidence, and

03:52  22   those exhibits are --

03:52  23          MR. TRAD:  I would like to hold that out until we

03:52  24   resume because that will have given me an opportunity to go

03:52  25   through all the rest of the stuff that I haven't seen and

03:52  1    that I have to so that I can intelligently object or not

03:52  2    object to the introduction of any particular evidence, if

03:52  3    that's acceptable to the Court.

03:52  4         THE COURT:  Well, this isn't a jury trial, and

03:52  5    just from organization I would like all the exhibits part of

03:52  6    the record, which is the evidence.  And if you have an

03:52  7    objection -- hearsay, no foundation -- then I obviously

03:52  8    will -- if I rely on that evidence, I'm going to have to

03:52  9    address your objections.

03:52  10        MR. TRAD:  That's fair, Your Honor.

03:52  11        MR. VASILESCU:  So, Your Honor, I will just read

03:52  12   into the record the exhibits that we're moving into

03:52  13   evidence.

03:53  14        THE COURT:  Before you do that, though, I think we

03:53  15   got distracted.  You did that with the prior exhibits, and

03:53  16   then there was an objection and I got into a discussion of

03:53  17   that and I overruled it, but I don't think I then moved

03:53  18   those prior exhibits in.

03:53  19        MR. VASILESCU:  Yes, Your Honor.

03:53  20        THE COURT:  So if your memory is consistent with

03:53  21   mine, so I don't think the other exhibits were formally

03:53  22   accepted into evidence, but now they are.

03:53  23        Do you have those numbers, or do you need counsel

03:53  24   to go over them again?

03:53  25        THE CLERK:  I have those numbers, Your Honor.

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER

03:53  1          THE COURT:  Okay.  So those are received into

03:53  2   evidence, and now these ones.

03:53  3          MR. VASILESCU:  And these additional exhibits that

03:53  4   were used with Mr. Letcavage are Exhibits 12, 12A, 49, 199,

03:53  5   151, 49, 150, 134, 132, 138, 128, 140, 137, 136, 130, 143,

03:54  6   142, 141, 131, 135, 133, 139, 129, 201, and also 202, and

03:54  7   then 102 to 118.

03:54  8          THE COURT:  Those exhibits are part of the record.

03:54  9          (Exhibits 12, 12A, 49, 199, 151, 49, 150, 134,

03:54  10  132, 138, 128, 140, 137, 136, 130, 143, 142, 141, 131, 135,

03:54  11   133, 139, 129, 201, 202, and 102-118 received in evidence)

03:54  12         THE COURT:  All right.  So I will look forward to

03:54  13  hearing from you in about a week.

03:54  14         MR. VASILESCU:  Thank you, Your Honor.

03:54  15         MR. TRAD:  Thank you, Your Honor.

03:54  16         THE COURT:  Thank you.

03:54  17             (Proceeding adjourned at 3:54 p.m.)

03:54  18                     *    *    *

03:54  19

03:54  20

03:54  21

03:54  22

03:54  23

03:54  24

03:54  25

```
03:54    1
03:54    2
03:54    3
03:54    4                        CERTIFICATE
03:54    5
03:54    6        I hereby certify that pursuant to Section 753,
03:54    7   Title 28, United States Code, the foregoing is a true and
03:54    8   correct transcript of the stenographically reported
03:54    9   proceedings held in the above-entitled matter and that the
03:54   10   transcript page format is in conformance with the
03:54   11   regulations of the Judicial Conference of the United States.
03:54   12
03:54   13   Date:  December 2, 2022
03:54   14
03:54   15
03:54   16                     /s/   Sharon A. Seffens  12/2/22
03:54   16                     _____
03:54   17                     SHARON A. SEFFENS, U.S. COURT REPORTER
        18
        19
        20
        21
        22
        23
        24
        25
```

SHARON A. SEFFENS, U.S. DISTRICT COURT REPORTER